UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM ON BEHALF OF THE UNIVERSITY OF HOUSTON SYSTEM AND ITS MEMBER INSTITUTIONS; THE UNIVERSITY OF HOUSTON SYSTEM; and THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM, | § § § § § § § § § | |
| | § | CIVIL ACTION NO. 4:16-CV-01839 |
| Plaintiffs/Counter-Defendants, | § § | |
| v. | § § | |
| HOUSTON COLLEGE OF LAW, INC., formerly known as SOUTH TEXAS COLLEGE OF LAW, | § § § § § | |
| Defendant/Counter-Plaintiff. | § | JUDGE KEITH ELLISON |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**OF COUNSEL:**

Lynne Liberato
State Bar No. 00000075
S.D. Tex. 3072
lynne.liberato@haynesboone.com
Kent Rutter
State Bar No. 00797364
S.D. Tex. 20519
kent.rutter@haynesboone.com
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600

Respectfully submitted,

/s/ David J. Beck
　David J. Beck
　State Bar No. 00000070
　S.D. Tex. 16605
　dbeck@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

**ATTORNEY-IN-CHARGE FOR
HOUSTON COLLEGE OF LAW**

Jeffrey M. Becker
State Bar No. 02015730
jeff.becker@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

Eric J.R. Nichols
State Bar No. 14994500
S.D. Tex. 13066
enichols@beckredden.com
Karson K. Thompson
State Bar No. 24083966
S.D. Tex. 2878342
kthompson@beckredden.com
BECK REDDEN LLP
515 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone: (512) 708-1000
Facsimile: (512) 708-1002

Parth S. Gejji
State Bar No. 24087575
S.D. Tex. 2917332
pgejji@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas  77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................. iv

TABLE OF EXHIBITS ....................................................................................................... viii

I.      INTRODUCTION ........................................................................................................1

II.     NATURE AND STAGE OF PROCEEDINGS ............................................................1

III.    STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ..............................2

IV.     SUMMARY OF ARGUMENT ....................................................................................2

V.      ARGUMENT ................................................................................................................4

        A.     In a recent opinion, the Eleventh Circuit provides a blueprint for the
               analysis of this case ......................................................................................... 4

        B.     U of H cannot show a substantial likelihood of success on the merits. ................. 6

               1.     U of H cannot show any relevant marks that are legally
                      protectable. ........................................................................................... 6

                      a.     U of H's claimed common law marks are weak and
                             have not acquired a secondary meaning. ....................................... 7

                      b.     U of H abandoned its claimed common law mark
                             UNIVERSITY OF HOUSTON COLLEGE OF LAW. ................ 10

                      c.     U of H's claimed federally registered marks are narrow
                             and therefore inapplicable. ........................................................ 13

                      d.     Third-party use further weakens U of H's claims of
                             protection over its asserted marks. ............................................. 14

               2.     U of H cannot establish a likelihood of confusion. .................................. 16

                      a.     Strength of the plaintiff's mark: U of H's marks are
                             weak. ...................................................................................... 17

                      b.     Similarity between the marks: the marks are dissimilar. .............. 17

c.      Similarity of products: U of H provides services not provided by the College. ............................................................ 18

d.      Identity of retail outlets and purchasers: potential law students are "relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names." ........................................... 19

e.      Identity of advertising media: the media relied upon by the U of H distinguish between it and the College. ...................... 20

f.      Defendant's intent: the College did not intend to infringe upon U of H's marks. ...................................................... 20

g.      Actual confusion: U of H's evidence is insufficient to establish confusion. ..................................................... 22

h.      Degree of care exercised by potential consumers: law students make their choice carefully. ............................................ 29

C.      U of H has not shown it will likely suffer irreparable injury. .............................. 30

1.      There is no presumption of irreparable injury in the Fifth Circuit. ......................................................................... 30

2.      Absent a presumption, U of H has not proven it is likely to suffer any irreparable injury ...................................................... 33

D.      The balance of the hardships favors the College. ................................................. 35

E.      Preliminary injunctive relief would adversely affect the public interest. ............. 36

F.      Objections to the form of the proposed injunction. .............................................. 37

VI.     CONCLUSION ....................................................................................................................37

CERTIFICATE OF SERVICE ...................................................................................................39

# TABLE OF AUTHORITIES

**CASE**                                                                    **PAGE(S)**

*Abraham v. Alpha Chi Omega*,
   708 F.3d 614 (5th Cir. 2013) .........................................................32

*Affiliated Prof'l Home Health Care Agency v. Shalala*,
   164 F.3d 282 (5th Cir.1999) ...........................................................2

*Am. Rice, Inc. v. Producers Rice Mill, Inc.*,
   518 F.3d 321 (5th Cir. 2008) ...........................................................6

*Amazing Spaces, Inc. v. Metro Mini Storage*,
   665 F. Supp. 2d 727 (S.D. Tex. 2009),
   *aff'd in relevant part*,
   608 F.3d 225 (5th Cir. 2010) .....................................................9, 10

*Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC*,
   No. H-11-3218, 2011 WL 6091807
   (S.D. Tex. Dec. 7, 2011) ...............................................................33

*Bank of Tex. v. Commerce Southwest, Inc.*,
   741 F.2d 785 (5th Cir. 1984) .......................................................8, 23

*Bell v. Starbucks U.S. Brands Corp.*,
   389 F. Supp. 2d 766 (S.D. Tex. 2005),
   *aff'd*, 205 F. App'x 289 (5th Cir. 2006).........................................29

*Blue Bell Creameries, L.P. v. Denali Co.*,
   Civil Action No. H-08-0981, 2008 WL 2965655
   (S.D. Tex. July 31, 2008) ..............................................................25

*Board of Supervisors for La. State v. Smack Apparel Co.*,
   550 F.3d 465 (5th Cir. 2008) .........................................................15

*Brennan's, Inc. v. Brennan*,
   512 F. Supp. 2d 559 (S.D. Miss. 2007),
   *aff'd*, 289 Fed. App'x. 706 (5th Cir. 2008).........................................34

*Children's Med. Ctr. v. Columbia Hosp. at Med. City Dall. Subsidiary, L.P.*,
   No. 3-04-CV-2436-BD, 2006 WL 616000
   (N.D. Tex. Mar. 10, 2006) ............................................................16

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ...........................................................2

*Eastman Chem. Co. v. PlastiPure, Inc.*,
  969 F. Supp. 2d 756 (W.D. Tex. 2013),
  *aff'd*, 775 F.3d 230 (5th Cir. 2014) .......................................................32

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)............................................................30, 31, 32

*Elvis Presley Enters., Inc. v. Capece*,
  141 F.3d 188 (5th Cir. 1998) ..............................................................7

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985) .............................................................33

*Exxon Corp. v. Humble Exploration Co.*,
  695 F.2d 96 (5th Cir. 1983) ...............................................................12

*Exxon Corp. v. Texas Motor Exchange of Houston*,
  628 F.2d 500 (5th Cir. 1980) .............................................................28

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
  765 F.3d 205 (3d Cir. 2014)...............................................................31

*First Savs. Bank, F.S.B. v. First Bank Sys., Inc.*,
  101 F.3d 645 (10th Cir. 1996) ...........................................................15

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
  No. 15-11509, __ F.3d __, 2016 WL 4010164
  (11th Cir. July 26, 2016) ........................................................... *passim*

*Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*,
  754 F.2d 591 (5th Cir. 1985) .............................................................16

*Granite State Trade School, LLC v. The N.H. School of Mech. Trades, Inc.*,
  120 F. Supp. 3d 56 (D.N.H. 2015)......................................................19

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ...........................................................31

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*,
  17 F.3d 691 (4th Cir. 1994) ...............................................................33

*InterState Net Bank v. NetB@nk, Inc.*,
  348 F. Supp. 2d 340 (D.N.J. 2004) .....................................................28

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) .............................................................33

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   335 F.3d 357 (5th Cir. 2003) ...................................................................................2

*Keane v. Fox Television Stations, Inc.*,
   297 F. Supp. 2d 921 (S.D. Tex. 2004),
   *aff'd*, 129 F. App'x 874 (5th Cir. 2005)................................................................13

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   543 U.S. 111 (2004)..................................................................................................8

*Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
   735 F.3d 735 (7th Cir. 2013) (Posner, J.) ..............................................................33

*Mail Boxes Etc., Inc. v. Christo*,
   No. H-06-0451, 2006 WL 6598916
   (S.D. Tex. Feb. 20, 2006) (Ellison, J.)...................................................................33

*Munaf v. Geren*,
   553 U.S. 674 (2008)................................................................................................37

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*,
   522 F.3d 1211 (11th Cir. 2008) ..............................................................................31

*Oreck Corp. v. U.S. Floor Sys., Inc.*,
   803 F.2d 166 (5th Cir. 1986) ........................................................................ *passim*

*Paulsson Geophysical Services, Inc. v. Sigmar*,
   529 F.3d 303 (5th. Cir., 2008) ................................................................................30

*Qualitex Co. v. Jacobson Prods. Co.*,
   514 U.S. 159 (1995)................................................................................................10

*RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*,
   655 F. Supp. 2d 679 (S.D. Tex. 2009) ....................................................................29

*S. Monorail Co. v. Robbins & Myers, Inc.*,
   666 F.2d 185 (5th Cir. 1982) ..................................................................................30

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)......................................................................................31

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*,
   765 F. Supp. 2d 884 (S.D. Tex. 2011) ....................................................................29

*Sun Banks of Fla., Inc. v. Sun Fed. Savs. & Loan Ass'n*,
   651 F.2d 311 (5th Cir. 1981) ..............................................................................7, 14

*Sun-Fun Prods. v. Suntan Research & Dev.*,
  656 F.2d 186 (5th Cir. 1981) ....................................................................16

*T-Mobile US, Inc. v. AIO Wireless LLC*,
  991 F. Supp. 2d 888 (S.D. Tex. 2014) ......................................................29

*Uber Promotions, Inc. v. Uber Techs., Inc.*,
  No. 1:15CV206-MW/GRJ, 2016 WL 617450
  (N.D. Fla. Feb. 16, 2016) .........................................................................31

*Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*,
  909 F.2d 839 (5th Cir. 1990) ......................................................................7

*USA Football, Inc. v. Robinson*,
  No. H-03-4858, 2004 WL 3363843
  (S.D. Tex. Sept. 20, 2004) .......................................................................7, 9

*Winter v. Natural Res. Defense Council, Inc.*,
  555 U.S. 7 (2008)........................................................................................31

*Zapata Corp. v. Zapata Trading Int'l, Inc.*,
  841 S.W.2d 45 (Tex. App.—Houston
  [14th Dist.] 1992, no writ) ........................................................................16

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*,
  698 F.2d 786 (5th Cir. 1983) ...................................................................8, 9

*Zazu Designs v. L'Oreal, S.A.*,
  979 F.2d 499 (7th Cir. 1992) ....................................................................13

## STATUTES

15 U.S.C. § 1127.............................................................................................11, 13

## OTHER AUTHORITIES

FED. R. CIV. P. 65(c)............................................................................................37

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ................................... *passim*

# TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Declaration of Parth Gejji |
| B | *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.* |
| C | *USA Football, Inc. v. Robinson* |
| D | 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:76 (4th ed.) |
| E | Autobiography of a Law School |
| F | Leonard Baynes Deposition of August 9, 2016 |
| G | University of Houston Law Center marketing materials |
| H | Carrie Criado Deposition of August 10, 2016 |
| I | Press Release |
| J | Admissions Brochure |
| K | Advertisement |
| L | Advertisement |
| M | Lisa Holdeman Deposition of August 10, 2016 |
| N | Declaration of Helen Palmore |
| O | Texas Southern University website page |
| P | Strayer University website page |
| Q | North American University website page |
| R | Rice University website page |
| S | University of St. Thomas website page |
| T | Houston Baptist University website page |
| U | Houston Community College website page |
| V | Houston Graduate School of Theology website page |
| W | Texas Woman's University Health Science—Houston Center website page |
| X | American InterContinental University Houston website page |
| Y | Texas Baptist College website page |
| Z | Texas College website page |
| AA | Western Texas College website page |
| BB | Austin College website page |
| CC | Central Texas College website page |

| DD | Houston Community College website page |
|----|----|
| EE | Harris County Clerk's Assumed Name Search |
| FF | Table of Co-Existing U.S. Federal Trademark Registrations |
| GG | *Children's Med. Ctr. v. Columbia Hosp. at Med. City Dall. Subsidiary, L.P.* |
| HH | Houston College of Law website page |
| II | Texas Tribune Article: "UH System Speaks Out Against UT System Plans for Houston" |
| JJ | Simpson Scarborough Report, dated July 22, 2013 (filed under seal) |
| KK | Board of Trustee minutes for South Texas College of law, dated May 22, 1973 |
| LL | Declaration of Diane Summers |
| MM | Declaration of Randy Sorrels |
| NN | *Blue Bell Creameries, L.P. v. Denali Co.* |
| OO | 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:184 (4th ed.) |
| PP | Rebuttal Report of Gabriel M. Gelb |
| QQ | Deposition Exhibit HCL 66 |
| RR | Deposition Exhibit HCL 67 |
| SS | Hal Poret Deposition of August 17, 2016 (Rough Draft) |
| TT | 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 (4th ed.) |
| UU | Expert Report of Gabriel M. Gelb |
| VV | 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:185 (4th ed.) |
| WW | *Uber Promotions, Inc. v. Uber Technologies, Inc.* |
| XX | *Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC* |
| YY | *Mail Boxes Etc., Inc. v. Christo* |
| ZZ | July 15, 2016 Hearing Transcript |

## I.     INTRODUCTION

The word "Houston" is not the property of the University of Houston System Plaintiffs ("U of H").  Houston College of Law (the "College") has the right to claim Houston not only as its heritage, its cultural touchstone, and its home, but also as part of its name.

Founded in 1923 as South Texas College of Law, Houston College of Law is the oldest law school in Houston.  Over the last 93 years, as the city has grown in size and stature, the term "South Texas" has come to refer specifically to the Rio Grande Valley.  Just as Houston has matured into a diverse, sophisticated, and dynamic city, so has the College matured as an institution to provide a 21st-century legal education that possesses the same characteristics as its home.  In replacing "South Texas" in its name with "Houston," the College has adopted a name that reflects its location and its mission.  The College has no desire to associate itself with U of H, or the law school associated with U of H.  Both schools are venerable institutions, each with much to be proud of in its own right.

There is no reason that the College and the University of Houston Law Center cannot co-exist.  Other major American cities are home to multiple law schools that proudly bear their cities' names—including New York (home of New York Law School and New York University Law School) and Boston (home of Boston College Law School and Boston University School of Law).  Houston is no different.

Even though its ability to assert claims of trademark over the name "Houston" is limited, U of H's requested preliminary injunctive relief is substantial.  The College will show that U of H cannot support its claim for relief, either in the facts or by law.

## II.    NATURE AND STAGE OF PROCEEDINGS

U of H has filed its complaint (Dkt. 1), and the College has answered and counterclaimed (Dkt. 21).  No trial date or Rule 16 Scheduling Conference has been set, and no Rule 26(f)

conference has occurred.  On August 8, 2016, this Court set a hearing on U of H's motion (Dkt. 27, hereinafter "PI Mot.") for August 26, 2016.

## III.   STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

The issue on U of H's motion is whether U of H can meet the preliminary injunction factors to establish that the College should be prohibited from using HOUSTON COLLEGE OF LAW and its logo as a name, mark, or source identifier for its legal education services.  As the Court is well aware, a district court is afforded discretion to determine whether a proponent of preliminary injunctive relief has met its burden of proof under these factors.  *E.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

## IV.   SUMMARY OF ARGUMENT

U of H cannot satisfy its burden to prove the requirements for issuance of a preliminary injunction as it has requested.  First, it cannot demonstrate a likelihood of success on the merits—the threshold requirement to obtain preliminary injunctive relief.  Nor can U of H show either that its law school marks are distinctive, or that the College's purported infringement is likely to cause confusion among the relevant consumers.  U of H's already-heavy burden is even heavier any grant of the preliminary injunctive relief it seeks would give it substantially the same relief it seeks at trial.

U of H begins by exaggerating the distinctiveness and strength of asserted marks—regardless of whether the asserted marks are actually used to advertise or promote the law school associated with U of H, which for years has been promoted and marketed as the University of Houston Law Center.  The University of Houston Law Center stopped using "UNIVERSITY OF HOUSTON COLLEGE OF LAW," one of the alleged "common law" marks, over thirty years ago.  The other alleged common law marks asserted by U of H are combinations of generic and

geographical descriptive terms or basic colors. These weak marks merit no protection, because U of H cannot show that the marks have acquired secondary meaning.

Even if U of H could show that any of its asserted marks are protectable, its motion would still fail because it cannot demonstrate a likelihood of confusion. U of H contends that the current name of the Houston College of Law causes confusion over the affiliation of the College with U of H. But the confusion U of H alleges is not the type of confusion required by law. For purposes of trademark law, the only confusion with relevance is confusion on the part of consumers—here, potential law students making life decisions about which law school to attend, as opposed to others in the community at large. Moreover, only confusion concerning the source of the schools' services is legally relevant, as opposed to other types of confusion, such as the common mistakes that happen after any name change that are quickly and easily corrected or dispelled. Finally, confusion for purposes of trademark law could exist only if the College's marks were visually similar to a substantial extent to U of H's marks (if any) that are actually protected. The College's name and logo are not confusingly similar to any of U of H's asserted marks, especially since they appear (and will appear, at a minimum, during the period leading up to trial on the merits) next to prominent reminders of the College's former name.

U of H also asserts confusion caused by a purported change in the College's colors. The evidence shows that the College did not change its colors when it changed its name. The College adopted crimson as its primary color in the 1970s, and has maintained its use of this historic color since then.

Apart from its failure to show a probability of success on the merits, U of H cannot show that it will suffer irreparable harm between now and the time of trial. In contrast, the College would face significant hardship if it were required to change its name back to "South Texas

College of Law" pending trial, only to once again change its name to "Houston College of Law" should it prevail at trial.

In sum, U of H cannot meet its heavy burden to establish entitlement to a preliminary injunction, especially since the relief it seeks is substantially the same as the relief it will seek at trial. The Court should deny U of H's motion for preliminary injunction.

## V. ARGUMENT

### A. In a recent opinion, the Eleventh Circuit provides a blueprint for the analysis of this case.

Six days before U of H filed its application for preliminary injunction, the Eleventh Circuit affirmed a take-nothing judgment in another trademark infringement case between two schools—Florida National University (FNU) and Florida International University (FIU). *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, No. 15-11509, __ F.3d __, 2016 WL 4010164 (11th Cir. July 26, 2016) (Ex. B). If any one opinion provides a blueprint for this case, it is *Florida International*. U of H barely mentions *Florida International* in its motion, but the case merits close consideration.

The defendant in *Florida International*, FNU, was established under the name Florida International Institute and was initially accredited to grant associate's degrees as its highest-level offering. *Id.* at *1. Over time, the school expanded its offerings to include additional programs. *Id.* The name of the school evolved along with its credentials, ultimately becoming "Florida National University." *Id.* When this happened, FIU sued FNU for allegedly infringing its trademarks. *Id.* Among other relief, FIU sought an injunction barring FNU from using the name "Florida National University." *Id.*

Both the district court and the Eleventh Circuit evaluated the strength of FIU's registered marks and considered whether FNU's name change caused confusion. Both concluded that it did

not, and many of their considerations are instructive here. For example, both courts identified potential students as the only relevant consumers, and both determined that students looking for a college to attend are likely to be "relatively sophisticated and knowledgeable because of the nature, importance, and size of the investment in college education." *Id.* at *7. Here, too, any claims of potential confusion are relevant only from the perspective of the correct consumers— prospective law students. These future lawyers are embarking on a three-year journey with (in many cases) a six-figure price tag. Thus, they are even more likely than prospective undergraduates to carefully analyze marketing materials and make well-informed, reasoned decisions about where they will choose to attend law school.

The courts in *Florida International* also found that third-party use had diminished the strength of FIU's trademark for the words FLORIDA INTERNATIONAL UNIVERSITY, finding the mark to be "relatively weak" even though it was both federally registered and "incontestable." *Id.* at *8. The courts found it significant that about a dozen other educational institutions in the state used both "Florida" and "University" in their names. Similarly, multiple educational institutions in Houston use both "Houston" and "College" in their names.

Turning to the issue of confusion, the courts in *Florida International* determined that the marks FLORIDA NATIONAL UNIVERSITY and FLORIDA INTERNATIONAL UNIVERSITY are not similar from a trademark standpoint. 2016 WL 4010164, at *11. Compared to the Florida marks, there are even more dissimilarities in the present case between the visual elements of U of H's mark and the College's name and logo.

This case and *Florida International* involve not only the same issues, but also strikingly similar evidence. In both cases, there is evidence that some people made fleeting mistakes regarding the identities of the two schools, but no evidence that prospective students were

confused. In *Florida International*, there was some confusion on the part of FedEx, an inquiry from a high school student, employees of FIU who were confused, and a radio announcer who announced the wrong school name. But because there was no evidence that prospective students were confused, the district court "concluded that FIU had provided insufficient evidence of actual confusion to weigh in favor of a finding of likelihood of confusion" and the Eleventh Circuit agreed, finding "no clear error in the district court's assessment of this factor." *Id.* at *14.

The significance of the *Florida International* decision, as it pertains to specific individual issues in U of H's motion, is further addressed below.

**B.      U of H cannot show a substantial likelihood of success on the merits.**

U of H seeks a preliminary injunction on only its trademark infringement claims. (PI Mot. at 2 (seeking to prove "trademark infringement exists" in order to receive a preliminary injunction).)    To obtain a preliminary injunction, U of H must demonstrate a substantial likelihood of success.    This means that U of H must (1) show that its marks are legally protectable, and also (2) establish infringement by showing a likelihood of confusion. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).    Because U of H cannot demonstrate either element, it cannot show a significant likelihood of success.

**1.      U of H cannot show any relevant marks that are legally protectable.**

U of H asserts both common law and federally registered marks in its motion.    As shown below, U of H's common law marks are not entitled to legal protection, and the law school associated with U of H long ago abandoned the only asserted common law mark that uses the terminology "College of Law."    As to U of H's registered marks, they are either too different or too weak to be relevant to this dispute.    Finally, evidence of third-party use further weakens U of H's claims that its asserted marks are protected.

### a. U of H's claimed common law marks are weak and have not acquired a secondary meaning.

U of H asserts the following common law (i.e., federally unregistered) marks: "HOUSTON," "HOUSTON LAW," "UNIVERSITY OF HOUSTON LAW," and the colors red and white. (PI Mot. at 5, 7–9.)  Common law marks enjoy no presumption of protectability.  *USA Football, Inc. v. Robinson*, No. H-03-4858, 2004 WL 3363843, at *5 (S.D. Tex. Sept. 20, 2004) (Ex. C) (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998)).  None of U of H's claimed marks are protected.

Trademarks are classified on a spectrum from "strong" to "weak."  *See Sun Banks of Fla., Inc. v. Sun Fed. Savs. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981).  The stronger the mark, the greater the scope of protection it receives; the weaker the mark, the less protection it receives.  *Fla. Int'l*, 2016 WL 4010164, at *8 (citation omitted); *see also Elvis Presley*, 141 F.3d at 202. It is difficult to prove infringement of a weak mark because even weak marks that are similar will not create a likelihood of customer confusion. 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:76 (4th ed.) (Ex. D at 1–2 [hereinafter "MCCARTHY"].  On the spectrum from weakest to strongest, marks are classified as (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *See Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 845 (5th Cir. 1990).

U of H's marks are merely descriptive.  A descriptive mark provides a characteristic or quality of a good or service.  *Id.*  Geographic terms are descriptive when describing where the services are offered.  *Id.*  Each of the claimed word marks—"HOUSTON," "HOUSTON LAW," and "UNIVERSITY OF HOUSTON LAW"—provides a characteristic or quality of a good or service or is a geographic term describing where U of H offers legal education services.  *See Bank of Tex. v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984) ("A name such as

Bank of Texas is not inherently distinctive, in that it combines the generic term 'bank' with the geographical term 'Texas.' Rather, the name is descriptive of the type of services offered and the place from which such services originate.").

Because U of H's word marks are descriptive at most, U of H, as the party seeking to show that the marks are protectable, bears the burden to show that the marks have acquired secondary meaning to the consuming public. *E.g., Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790–91, 793–94 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004). This burden is "substantial," in that a "high degree of proof is necessary to establish secondary meaning for a descriptive term." *Id.* at 791, 794 (citation omitted). Where, as here, the marks are geographically descriptive, secondary meaning can be established only where the mark no longer causes the public to associate the services with a particular place but to associate it with a particular source. *Id.* at 787 ("In order to establish secondary meaning for a term, a plaintiff must show that the primary significance of the term in the mind of the consuming public is not the product but the producer."). Applying that standard, the Fifth Circuit has determined that the geographically descriptive mark "Bank of Texas" lacks secondary meaning. *Id.* The same is true here.

U of H falls far short of satisfying its "substantial" burden to show secondary meaning. Its evidence is limited to the following: (1) a declaration regarding its total advertising expenditures, which are not specific to the marks at issue (PI Mot., Ex. Q ¶ 3); (2) a declaration from the U of H Law Center dean attesting to the duration of the marks' use (PI Mot. at 7 & Ex. C ¶¶ 11, 13); and (3) an isolated instance of a third party referring to the University of Houston Law Center as "HOUSTON" (PI Mot. at 8 & Ex. I). U of H also makes the conclusory assertion,

without evidentiary support, that "[t]hese common law [U of H] trademarks used in conjunction with [U of H's] official colors of red and white operate as brands, are famous and are widely-known by the relevant public as a designation of source of [U of H's] high quality education and other services." (PI Mot. at 8.)

None of this can support a determination of secondary meaning, because U of H focuses on the wrong evidence. U of H describes the length of time it has used the marks and the money it has spent to promote them, but those are not the relevant considerations. Instead, a finding of secondary meaning must be based on "empirical information about consumer association of the product design to its manufacturing source." *Amazing Spaces, Inc. v. Metro Mini Storage*, 665 F. Supp. 2d 727, 740 (S.D. Tex. 2009) (citation omitted), *aff'd in relevant part*, 608 F.3d 225 (5th Cir. 2010). "[T]he question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of [the term] to the consuming public." *Zatarains*, 698 F.2d at 795 (internal quotations and citation omitted) (emphasis in original). This is why the Fifth Circuit prefers survey evidence to establish such secondary meaning, *see, e.g., id.*, but despite employing a survey expert, U of H fails to supply this evidence in its motion. (The survey by U of H's expert, Hal Poret, concerns confusion, not secondary meaning, which is an entirely different subject matter.) This is also why "evidence of long use is insufficient to prove secondary meaning . . . without empirical proof that the [mark] has come through use to be uniquely associated with a specific source." *Amazing Spaces*, 665 F. Supp. 2d at 741 (internal quotations and citation omitted). U of H offers no such empirical proof.

Evidence of U of H's rights to the colors red and white fails for similar reasons. Because they are unregistered, the colors red and white enjoy no presumption of protectability. *USA Football*, 2004 WL 3363843, at *5. And, as is true for descriptive marks, protection of colors

requires a showing of secondary meaning. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995); *see also Amazing Spaces*, 608 F.3d at 240 (interpreting *Qualitex*). U of H's only support for its claim of secondary meaning is found in a declaration from U of H's dean stating that (1) the colors were adopted some time ago and are currently used among U of H's various schools, including for advertisements; (2) the colors are "well known"; and (3) U of H's students, faculty, and alumni wear the colors on Fridays. (PI Mot. at 9–10 & Ex. C ¶¶ 10, 12.) This evidence shows that U of H uses red and white to rally school spirit and stir up support for its sports teams. But while sports teams are universally signified by color schemes in the eyes of their fans, law schools are known by their names, their programs, their faculties, and their alumni. U of H's evidence is insufficient to demonstrate secondary meaning, and therefore protectability, with regard to its law school.

> **b.    U of H abandoned its claimed common law mark**
> **UNIVERSITY OF HOUSTON COLLEGE OF LAW.**

The alleged UNIVERSITY OF HOUSTON COLLEGE OF LAW common law mark suffers the same defect as its other common law marks: it is a descriptive term for which U of H has not proven a secondary meaning. This mark has another important problem—U of H legally abandoned any rights to the mark it might have once had, because it stopped using the mark decades ago.

When U of H's law school was founded in 1947, it was known as the "University of Houston College of Law." (*See* Ex. E at 370.) But shortly after U of H became part of the State of Texas's higher education system in 1963, the law school was renamed "Bates College of Law." (*Id.* at 194; *see also* Ex. F (Dean Baynes Depo. 23:6–23 (testifying the name change took place in 1967)).) In 1982, the law school was renamed once again, and it has been known ever since as the "University of Houston Law Center." (Ex. E at 194; Ex. F (Dean Baynes Depo.

26:2–7).)  That is the name reflected in all of its current marketing materials.  (*E.g.*, Ex. G; *see also* PI Mot., Ex. C ¶ 3, Ex. Q ¶ 5 ("The college of law within the University of Houston System is primarily known and marketed as the UNIVERSITY OF HOUSTON LAW CENTER").) U of H Law Center's Executive Director of Communications and Marketing testified as a Fed. R. Civ. P. 30(b)(6) witness that she was unaware of any use of the phrase "Houston Law" without association with "Houston Law Center."   (Ex. H (Criado Depo. 48:23–49:12).)   And the University of Houston Law Center's communications and marketing representative is unaware of any advertisements that do not use University of Houston Law Center, and further, is unaware of any using "University of Houston Law," "University of Houston College of Law," or "Houston" to promote the University of Houston Law Center.   (*Id.* (Criado Depo. 52:10–53:18).)   The website for U of H's Law Center carries the name University of Houston Law Center, as do its admissions brochures, press releases, and advertisements.[1]  U of H's Facebook, LinkedIn, Flickr and Instagram accounts all use "University of Houston Law Center."[2]  The "University of Houston Law Center" is the name associated with U of H's YouTube page as well.  (Ex. H (Criado Depo. 33:2–9).)

This history establishes that U of H has abandoned the alleged UNIVERSITY OF HOUSTON COLLEGE OF LAW mark. A mark is abandoned when its use is discontinued with an intent not to resume use. 15 U.S.C. § 1127. Nonuse for three consecutive years is *prima facie* evidence of abandonment. *Id.* When a challenger makes a *prima facie* case of abandonment, the

---

[1]Exs. I [HCL 44] (press release); J [HCL 45] (admissions brochure); K and L [HCL 46 and HCL 47] (advertisements); Ex. H (Criado Depo. 28:24–39:19 (website); 40:2–18 (press release); 43:16–44:7 (admissions brochures); 46:4–7 (advertisements)).

[2]Ex. H  (Criado Depo. 28:24–29:3 (Facebook); 30:9–20 and 31:19–25 (Twitter); 34:13–21 (LinkedIn); 35:24–36:12 (Flickr); and 37:6-19 (Instagram)).  Ms. Criado is the Law Center's Executive Director of Communications and Marketing.  (*Id.* (Criado Depo. 8:7–19).

mark's owner has the burden to demonstrate that the circumstances do not justify an inference of intent not to resume use. *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir. 1983).

U of H has not met this burden. Faced with the College's abandonment contention in its Answer (Dkt. 21 ¶ 113), U of H responded with a declaration from Lisa Holdeman, its Associate Vice President of Marketing, Communications and Media Relations. The declaration asserts— without elaboration—that to the "knowledge and belief" of Ms. Holdeman, "there has never been a three consecutive year period after adoption of a mark during which any of these marks have not been used *in commerce to market* the legal educational services of the law college." (PI Mot. Ex. Q ¶ 8 (emphasis added).) But Ms. Holdeman admitted in deposition that a key statement about the use of "Houston Law" was erroneous because it was based solely on U of H Board of Regents Minutes from 1982. (Ex. M (Holdeman Depo. 37:18–39:5 ("I was confused"); 41:22– 42:4). Faced with the mistake in her declaration, Ms. Holdeman then tenuously claimed that Houston Law was used as "verbal marketing" among "internal constituents." (*Id.* (Holdeman Depo. 39:15–41:2).) But use among "internal constituents" is not public use *in commerce*, and her assertion is fatally undermined by social media, advertising and marketing showing dedicated use of "University of Houston Center of Law."

Moreover, Ms. Holdeman's declaration provides no specific examples of continued use of the UNIVERSITY OF HOUSTON COLLEGE OF LAW mark *in commerce*. In fact, the only specific examples of any use that U of H offers are: (1) one plaque on an unspecified wall, the age of which appears to pre-date the name change to the University of Houston Law Center; and (2) a diploma dated 1982—more than 30 years ago. (PI Mot. at 7 & Ex. C ¶ 14.) Neither of these antiquated examples does anything to rebut the *prima facie* case of abandonment, since

neither constitutes the type of use in commerce that establishes legal rights in a term. For rights to accrue, the Lanham Act requires that the mark be "used or displayed *in the sale or advertising of services*" in a manner that is a "bona fide use of such mark made in the ordinary *course of trade*, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127 (emphasis added). Moreover, the "use must have been *sufficiently public* to have 'allow[ed] consumers to associate a mark with particular [services].'" *Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 936 (S.D. Tex. 2004) (emphasis added), *aff'd,* 129 F. App'x 874 (5th Cir. 2005) (quoting *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992)). Neither the plaque nor the diploma are used by U of H in the "sale or advertising" of its services, nor are they "sufficiently public" for prospective law students to associate the phrase UNIVERSITY OF HOUSTON COLLEGE OF LAW with U of H. At his deposition, even the University of Houston Law Center Dean did not know the location of the plaque. (Ex. F (Dean Baynes Depo. 30:9–37:8; 37:8 ("I'm not sure where it is.").) The marketing director then testified erroneously about its location. (Ex. H (Criado Depo. 71:6–72:6 (testifying the plaque was on the "donor wall")).) Further investigation found the plaque hidden away on the second floor of the Law Center, not on its donor wall. (Ex. N (Palmore Decl. ¶¶ 2–6).) Such use is not public and not used in trade or advertising. Thus, U of H has not rebutted the presumption of abandonment.

> ### c. U of H's claimed federally registered marks are narrow and therefore inapplicable.

In addition to its claimed common law marks, U of H refers to some federally registered marks that are limited to specific uses. These marks are narrower than U of H alleges and pertain to goods and services that are not relevant to this case.

Federal registrations, even incontestable ones, "do[] not make a weak mark strong." *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986); *see also Fla. Int'l*, 2016

WL 4010164, at *8 (Ex. B). U of H's mark UNIVERSITY OF HOUSTON (Reg. No. 0,747,078) is federally registered and incontestable, but that does not alter the fact that it is a descriptive mark, and thus a weak mark. Moreover, this registration, by its express language, covers only "sporting events" and "educational services rendered through the medium of television and radio" (PI Mot., Ex. C at 2–3.) U of H Law Center does not offer either; nor does the College. Similarly, U of H's stylized **HOUSTON** mark[3] (Reg. No. 4,650,772) is directed to printed or other materials, not educational services themselves. (PI Mot., Ex. G.) It also appears nearly identical to logos used by other businesses located in Houston, including the educational institutions described below. And contrary to its insinuations (*see* PI Mot. at 6–7), U of H possesses no trademark rights—federally registered or otherwise—to the word "HOUSTON."[4]

> **d.** **Third-party use further weakens U of H's claims of protection over its asserted marks.**

U of H's arguments are further weakened by evidence that its marks have long been used by third parties. Extensive third-party use of a particular word can be "impressive evidence that there would be no likelihood of confusion." *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981). In *Sun Banks*, for example, the court determined that the common usage of "Sun" in the state of Florida meant it was unlikely that consumers would be confused between two financial institutions named "Sun Banks" and "Sun Federal." *Id.* Similarly, in *Florida International*, the Eleventh Circuit determined that third-party use diminished the strength of Florida International University's federally registered and incontestable word mark because several other educational institutions in Florida use "both

---

[3]This mark is not incontestable and the College has counterclaimed for its cancellation. (Dkt. 21 ¶¶ 126–29.)

[4]Although U of H appears to be asserting claims to the unadorned word "HOUSTON" in its motion for preliminary injunction, it asserted no such rights in its Complaint. (Dkt. 1.)

'Florida' and 'University' in their names (and the letters 'F' and 'U' in their initials)." 2016 WL 4010164, at *8–9 (Ex. B); *see also First Savs. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 654 (10th Cir. 1996) ("[W]e recognize[] the well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection.").

There is significant third-party use of the terms for which U of H seeks protection. U of H is just one of the many institutions in Houston that use the term "University": other examples include Texas Southern University, Strayer University, North American University, Rice University, the University of St. Thomas, and Houston Baptist University—which, like U of H, uses both "University" and "Houston" in its name. (Exs. O–T (respective websites).) Moreover, U of H and Houston Baptist University are not the only institutions of higher education that use "Houston" in their names: other examples include Houston Community College, Houston Graduate School of Theology, Texas Woman's University Health Science—Houston Center, and American InterContinental University Houston. (Exs. U–X (respective websites).) And to the extent U of H claims any rights to, or confusion stemming from, the use of the word "College," that common term has likewise been used by many institutions of higher learning in the state, including Texas Baptist College, Texas College, Western Texas College, Austin College, Central Texas College, and Houston Community College. (Exs. Y–DD (respective websites).) The prevalence of "University," "Houston," and "College" in the geographic region and business area[5] in which U of H and the College both operate establishes that academic institutions "operate[] in a crowded field of similar names." *Fla. Int'l*, 2016 WL 4010164, at *9 (Ex. B).

---

[5]The Court's inquiry is not limited to post-secondary academic institutions. *Smack Apparel Co.*, 550 F.3d at 479 ("All third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak."). "Houston" is surely among the most commonly used words for businesses in the city. A search of the Harris County Clerk's Office's assumed

Moreover, there is a vast number of third-party federal trademark registrations on both HOUSTON alone and HOUSTON combined with a generic term. (Ex. FF [Table of Co-Existing U.S. Federal Trademark Registrations].) "[S]everal courts, including the Fifth Circuit, have held that evidence of third-party registrations is relevant to the scope of protection to be afforded a particular mark." *Children's Med. Ctr. v. Columbia Hosp. at Med. City Dall. Subsidiary, L.P.*, No. 3-04-CV-2436-BD, 2006 WL 616000, at *5 (N.D. Tex. Mar. 10, 2006) (Ex. GG) (citing several circuit courts). The quality and quantity of these registrations further undermine U of H's claimed rights.

Because U of H cannot show that any marks bearing any similarity to the College's name are legally protectable, the inquiry should end there. The motion for preliminary injunction should be denied.

### 2. U of H cannot establish a likelihood of confusion.

U of H's motion fails not only because it cannot prove that the relevant marks are protectable, but also because it cannot show a likelihood of confusion.[6] To determine whether an alleged infringement is likely to cause confusion, the Fifth Circuit considers eight factors: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the products; (4) the identity of retail outlets and purchasers; (5) the similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) the degree of care exercised by potential purchasers. *Oreck*, 803 F.2d at 170 (citing *Fuji Photo Film Co. v. Shinohara Shoji*

---

name database reports more than 25,000 registered business names incorporating the word "Houston" during the last 40 years. (*See* Ex. EE.)

[6]The same requirement applies to trademark infringement claims brought under Texas law. *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ) ("A common law trademark infringement action under Texas law presents no difference in issues than those under federal trademark infringement actions.").

*Kabushiki Kaisha*, 754 F.2d 591, 595 (5th Cir. 1985)); *Sun-Fun Prods. v. Suntan Research & Dev.*, 656 F.2d 186, 189 (5th Cir. 1981).  In applying these factors, the burden to establish likelihood of confusion is "higher than usual" when, as here, "potential students are relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names." *Fla. Int'l*, 2016 WL 4010164, at *15 (Ex. B).

An examination of the likelihood-of-confusion factors, especially in light of U of H's heightened burden, compel a determination that U of H cannot show confusion.

### a. Strength of the plaintiff's mark: U of H's marks are weak.

The first factor the Fifth Circuit considers is the strength of a plaintiff's mark. *Oreck*, 803 F.2d at 170.  As described above, U of H's marks, to the extent they merit any legal protection at all, are weak marks.  "The weaker a mark, the fewer are the junior uses that will trigger a likelihood of customer confusion." 2 MCCARTHY § 11:76 (4th ed.) (Ex. D at 1).  Thus, in *Florida International*, the Eleventh Circuit affirmed the district court's findings that "Florida International University" is a weak mark and that "Florida National University" and "Florida International University" can legally co-exist. 2016 WL 4010164, at *15 (Ex. B).

### b. Similarity between the marks: the marks are dissimilar.

The second factor the Fifth Circuit considers is whether the marks are similar. *Oreck*, 803 F.2d at 170. With regard to U of H's federally registered marks, those marks and the College's name share two words:  "Houston" and "of."  One word is a geographic description, while the other is a preposition.  None of U of H's federally registered marks contains the words "Law" or "College."  Indeed, U of H uses the relatively uncommon phrase "Law Center," which sets it apart from other law schools.

A similar analysis applies to U of H's alleged common law marks.  Only one of those marks contains the word "College," and the law school associated with U of H abandoned that

mark decades ago.  Moreover, U of H cannot succeed in its attempt to claim common law rights in the word "Houston," standing alone.  There is no plausible argument that the word "Houston" by itself—without the particular, stylized font—has a secondary meaning that suggests U of H.

The marks are also dissimilar because the College's logo has additional distinguishing features.  First, the College's logo prominently features the scales of justice, which are *not* part of any of U of H's asserted marks.  Second, the College's logo includes the phrase "Est. 1923," further distinguishing the College from U of H's Law Center, which was founded more than two decades later.  Third, the College's logo uses the phrase "College of Law," as contrasted with U of H's "Law Center."  Fourth, and especially important here, the College uses its logo in conjunction with a clarifying statement:  "Formerly South Texas College of Law." (Ex. HH.) Finally, the College's logo does not use its crimson color scheme standing alone, but in conjunction with these other distinguishing features. Reasonably prudent consumers would not mistake the two marks, especially given that they use different shades of red—crimson for the College, compared to a bright, fire-engine red for U of H.

These differences are more than sufficient to prevent confusion, particularly because U of H and the College both "operate[] in a crowded field of similar marks on similar goods or services." *Fla. Int'l*, 2016 WL 4010164, at *11 (internal quotations omitted).  In such a situation, even "slight differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Id.* (internal quotations omitted).

**c.**      **Similarity of products: U of H provides services not provided by the College.**

The third factor relates to the similarity of products or services the two entities provide. *Oreck*, 803 F.2d at 170.  Even when two schools provide similar services, that does not mean

they will be confused. *See Fla. Int'l*, 2016 WL 4010164, at *12 (upholding a determination of no trademark infringement even though the similarity-of-products factor weighed in favor of the plaintiff).

Here, there are both similarities and differences in the services provided. Although the University of Houston Law Center and the College are both law schools, U of H provides an array of academic and athletic products and services not provided by the College. For example, many of U of H's marks are specifically registered in classes related to "collegiate sports" and protect items such as "footballs," "cheerleading pom poms," and "foam cougar paws." (PI Mot., Ex. G.) Moreover, U of H is a public institution, whereas the College is private. When U of H's current Board Chairman, Tilman Fertitta, was asked whether local competition between a public and a private university (such as UCLA and USC) is the same as local competition between two public universities (such as U of H and The University of Texas), he responded that such a comparison is "asinine." (Ex. II at 2.)

> ### d. Identity of retail outlets and purchasers: potential law students are "relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names."

The fourth factor relates to the identity of purchasers. *Oreck*, 803 F.2d at 170. Because both the College and the University of Houston Law Center are law schools, the relevant consumers are potential law students, who are unlikely to be confused. As the Eleventh Circuit noted, "in a field like post-secondary education, the primary consumers—potential students . . . generally spend a substantial amount of time and energy learning about their options before choosing a school and are, therefore, unlikely to be confused by similar names." *Fla. Int'l*, 2016 WL 4010164, at *8; *see also Granite State Trade School, LLC v. The N.H. School of Mech. Trades, Inc.*, 120 F. Supp. 3d 56 (D.N.H. 2015) (analyzing actual confusion in a case between

two schools and observing that "the vast majority of prospective students cautiously explore their options"). Given that "potential [law] students are relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names," the burden to establish likelihood of confusion is "higher than usual." *Fla. Int'l*, 2016 WL 4010164, at *15. U of H offers no competent evidence that potential law students will be confused.

> ### e. Identity of advertising media: the media relied upon by the U of H distinguish between it and the College.

Identity of advertising media is the fifth factor used to determine whether a plaintiff has met its burden to show confusion. *Oreck*, 803 F.2d at 170. The University of Houston Law Center and the College likely will use at least some similar channels of advertising or communication, such as law school fairs, websites regarding law schools, and college counseling departments. However, the identity of many of these channels of communication weighs against a finding of confusion. Having multiple media sources that exist solely to compare and contrast law schools works to prevent confusion. For example, U of H cites the *U.S. News* Rankings in its Complaint. (Dkt. 1 ¶¶ 33, 38–40.) The entire purpose of this ranking is to distinguish between law schools by comparing and contrasting them. It is easy to use such a source to find out, for example, that New York University Law School is different from New York Law School, or that Boston College Law School is different from Boston University School of Law. The media relied on by U of H, rather than causing confusion, will actually help distinguish between U of H and the College.

> ### f. Defendant's intent: the College did not intend to infringe upon U of H's marks.

In its sixth factor, the Fifth Circuit considers a defendant's intent. *Oreck*, 803 F.2d at 170. U of H contends that the College changed its name and colors in bad faith to capitalize on U of H's goodwill. That accusation is baseless.

The evidence shows that in 2013, the College commissioned an extensive market survey regarding the College's former name from an independent agency in Alexandria, Virginia. The market survey examined the problems caused by the name "South Texas College of Law" and identified potential solutions. The survey demonstrated that the College's location was often misperceived as being near the Texas–Mexico border, despite the fact that the College has been located in downtown Houston for the past 93 years. (Ex. JJ [7/22/13 Scarborough] at 43–44, 89–90.) As one alumnus noted, "South Texas conjures different images (border patrol issues) than Houston (thriving metropolis)." (*Id.* at 43.)

The survey also revealed that the most popular option for a new name (favored by 32% of respondents, compared to 9% for the second-place option) was to introduce the word "Houston" into the name—for example, by changing the name to "Houston College of Law," "Houston School of Law," or "Houston Law School." (*Id.* at 52, 106).

The survey shows that the name change had nothing to do with any supposed intention to encroach on U of H's brand. Rather, it was driven by a desire to align the College's name with its location—Houston—in the minds of consumers. Once again, the Florida International decision is instructive. There, the court found no wrongful intent where "the parties had peacefully coexisted for over twenty years . . . and [the defendant] provided a plausible explanation for why it added the word 'University' to its name." 2016 WL 4010164, at *13 (Ex. B).

As for its colors, crimson has been the College's dominant color since 1973, when the Board of Trustees approved a motion to change the school's colors to red and gold. (Ex. KK [5/22/73 Board Minutes] at 4.) The use of crimson has persisted ever since. (Ex. LL (Summers

Decl. (observing that the College's red is a crimson of Pantone Matching System (PMS) value 200 and that the College's official colors have been in place since their adoption)).)

U of H's arguments regarding the College's allegedly nefarious intent are insupportable. First, U of H suggests that, because the College's new name is closer to U of H's alleged marks than it was before, the College must have acted in bad faith. (PI Mot. at 19.) U of H provides no legal authority in support of its position.

Second, U of H argues that the College could not have had any justification to change its name from "South Texas College of Law" to "Houston College of Law" because (1) other Houston businesses have "South Texas" in their names and (2) Houston, after all these years, remains in the southern part of Texas. (PI Mot. at 19–20.) But the name-changing calculus of other businesses is irrelevant to the College's intent—as are the maps and Wikipedia entries that U of H provides to the Court. (PI Mot., Exs. BB, DD.)

The reason the College changed its name is a simple one. The College desires to obtain greater recognition of the fact that it is located in Houston and closely tied to the city of Houston. Relatedly, the College desires to end the confusion about whether it is located in the Rio Grande Valley near the Texas-Mexico border. U of H's accusations to the contrary have no basis in fact and no support in the evidence.

g.    **Actual confusion: U of H's evidence is insufficient to establish confusion.**

The seventh of the eight factors is whether a plaintiff has shown actual confusion of the type required by the trademark laws. *Oreck*, 803 F.2d at 170. Not all actual confusion is relevant. As the Eleventh Circuit explained:

> In assessing the weight of evidence of actual confusion, we must consider *who* was confused and *how* they were confused: "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, . . . while confusion of actual customers of a business is worthy of substantial weight.

*Fla. Int'l*, 2016 WL 4010164, at *14 (citations omitted) (emphasis in original). The plaintiff in

*Florida International*, Florida International University, offered evidence of actual confusion

including an email from a FedEx employee to one of the plaintiff's administrators asking

whether the defendant, Florida National University, was "accredited with [the plaintiff]." *Id.*

The Eleventh Circuit found that evidence unpersuasive, stating that "the district court, as the

finder of facts, could reasonably afford little weight to the letter from the FedEx employee

because there was nothing in the record that suggested she was a potential applicant for either

school." *Id.* The plaintiff in *Florida International* also pointed to evidence that a radio

announcer reading one of Florida National University's advertisements referred to the school as

"Florida Int—Florida National University." *Id.* However, the Eleventh Circuit found it

reasonable to discount the radio broadcaster's "flub" as the type of "short-lived confusion by an

individual casually acquainted with [the defendant that was] worthy of little weight." *Id.* (internal

quotations omitted).

Like the Eleventh Circuit, the Fifth Circuit focuses on whether there is confusion among

consumers, rather than the general population. *See Bank of Texas v. Commerce Southwest, Inc.*,

741 F.2d 785 (5th Cir. 1984). The plaintiff in that case, Bank of Texas, filed a trademark

infringement action against banks that changed their name to "BancTEXAS." *Id.* at 786. The

Fifth Circuit evaluated the evidence of actual confusion and found it wanting:

> [Plaintiff] points to instances of actual confusion in which, for example, wire
> transfers intended for BancTEXAS were sent to Bank of Texas . . . . We note that
> most of the instances of confusion were on the part of the personnel of other
> banks who were responsible for sending wire transfers. They occurred during the
> time period immediately after [Defendant] adopted the group name
> "BancTEXAS" and before people had had time to assimilate the change of
> name. . . . There was little evidence of actual ***consumer*** confusion.

*Id.* at 788 (emphasis in original).

Under these applicable authorities, U of H's evidence of actual confusion is unavailing. For example, U of H relies on an anecdote regarding an employee of the Sunbelt Consortium who made a mistake concerning the name change. (PI Mot. at 21–22 & Ex. FF.) This employee was not a potential law student, and her admitted mistake is akin to the broadcaster's "flub" in *Florida International*. Similarly, U of H's anecdote concerning the U.S. Postal Service returning a piece of correspondence to the wrong address (PI Mot. at 22 & Ex. GG) is the type of "short-lived confusion by an individual casually acquainted with [the defendant that is] worthy of little weight." *Fla. Int'l*, 2016 WL 4010164, at *14 (internal quotations omitted).

U of H also alleges that the College itself was somehow confused about the name change. (PI Mot. at 22.) In support of this allegation, U of H supplies a declaration from the U of H Law Center's dean in which he says that he "received emails from several [University] graduates forwarding to [him] communications from [the College] improperly identifying them as graduates of 'Houston College of Law.'" (PI Mot., Ex. C ¶ 25.) This purported correspondence is not attached to either the preliminary injunction motion or the dean's declaration. When pushed, U of H finally produced an example of one of the emails, which showed no misidentification; it was merely a form letter addressed not to graduates of the College but sent broadly to a mailing list of licensed Texas attorneys regardless of the law school they attended. (Ex. LL (Summers Decl..) In any event, this statement is hearsay—a declarant's statement, as to what others told him, as to what other communications said. *See Fla. Int'l*, 2016 WL 4010164, at *14 (noting that the district court was "well within its right to disregard [plaintiff's] hearsay evidence of confusion"). Nor is the declaration relevant to actual confusion among consumers, because the supposed emails are not from prospective law students.

Further, U of H argues that one of the College's alumni, Randy Sorrels, was confused because his website resume briefly indicated the wrong name of his alma mater. This is also not evidence of confusion by a prospective law student, and it is the type of mistake that occurs after any name change. Clear instructions to change the name were provided to the third-party vendor managing Mr. Sorrels's law firm's website, and he has never been confused by the name change. (Ex. MM ¶¶ 3–6.) In any event, this mistake is not relevant to the issue at hand, which is whether prospective law students are confused. It is telling that U of H has not attached evidence of any relevant consumers—potential law students—being confused about the source of the College's services.[7]

Finally, U of H contends that the survey report of its purported expert, Hal Poret, is evidence of actual confusion. That is not the case—the "view that a survey is evidence of actual confusion is not correct." 6 MCCARTHY § 32:184 n.1 (Ex. OO at 2) (author's view). At most, a survey is probative of likelihood of confusion or a proxy for actual confusion.

In any event, U of H's study has several flaws. Most of them are persuasively described and analyzed by Gabriel M. Gelb, a survey expert with forty years of survey and research experience, in his Rebuttal Report of Gabriel M. Gelb (the "Gelb Rebuttal"). (Ex. PP, p. 1 [Gelb Rebuttal]; *id*. Appendix A (Curriculum Vitae of Mr. Gelb).) At least two of those flaws render Mr. Poret's survey dead on arrival.

First, Mr. Poret did not show survey recipients the College's trademark use as it actually occurs in the marketplace. In his survey, Mr. Poret purposely omitted two prominent rotating

---

[7]U of H provides Facebook® and Twitter® feeds allegedly showing confusion. (PI Motion at 15 n.12, Ex. H, Ex. T.) These, too, are irrelevant. *Blue Bell Creameries, L.P. v. Denali Co.*, Civil Action No. H-08-0981, 2008 WL 2965655, at *5 (S.D. Tex. July 31, 2008) (Ex. NN) (disregarding blog entries as evidence of actual confusion because they lacked sufficient indicia of reliability).

banners from the mocked-up website pages presented to his subjects. Omission of these banners "is significant and drastically decreases the reliability of the survey results." (Ex. PP, Gelb Rebuttal, p. 6.) The first omitted banner prominently states: "South Texas College of Law Changes to Houston College of Law." (Ex. QQ [HCL 66].) The second states: "Houston College of Law Stands Behind Name Change; Is Prepared to Defend Decision in Court." (Ex. RR [HCL 67].) Mr. Poret's reasoning for omitting both of the banners is that he believes they will go away at some point in the future. (Ex. SS (Poret Depo. 57:5–12.) But he has no idea when. (*Id.* (Poret Depo. 66:13–67:2).) U of H is seeking a preliminary injunction in this case, claiming imminent harm, yet its expert did not even test the alleged infringing use as it's actually seen in the real world today.[8] The failure of Mr. Poret to properly present the real-world webpages in his survey is an independent basis for this Court to give no weight to his results, particularly in a preliminary injunction context.

Second, Mr. Poret was over-inclusive in determining his survey population, because he included respondents other than potential law students. (Ex. PP, Gelb Rebuttal, p. 5, 8; PI Mot., Ex. B at 42.)[9] Mr. Poret knows both law schools in this case sell educational services. (Ex. SS (Poret Depo. 44:13–45:1).) He knows a likelihood of confusion survey should include only those most likely to partake of the two institutions' services. (*Id.* 21:1–:6.) And Mr. Poret's first

---

[8]Remarkably, and throwing common sense out the window, Mr. Poret doggedly refused to admit that the presence of either of the banners would operate to lessen consumer confusion. (Ex. xx (Poret Depo. 67:21 to 68:4; 68:7 to 69:4).)

[9]In its reply, U of H may try to rely on the alleged "confusion rate" of only law students. But only 27 of the 638 final survey respondents identified themselves as college students who were likely to consider attending law school. (PI Mot., Ex. B at App'x C.) Thus, only 4% of Mr. Poret's survey population consists of potentially relevant consumers. Mr. Poret did not bother to conduct any analysis as to this sub-group in his opening report. In addition, this group was identified merely by asking if they might go to law school, not when, and without verifying any concrete steps to actually apply and then go (like taking the LSAT, which is what Mr. Gelb required in his study, *infra*.).

group of survey recipients (potential law students) actually includes consumers of those educational services. (*Id.* (Poret Depo. 36:4–:7).) But his other four survey groups result in over-inclusion. Mr. Poret included in his survey kids bound for college who thought they might go to law school in the distant future (and their parents); companies and individuals that might retain a lawyer for legal services; and an ill-defined group of people that had some role in hiring decisions related to any type of employee (lawyer or not). (Ex. PP, Gelb Rebuttal, p. 3.)[10] As Mr. Gelb points out, this is not a proper survey population. (Ex. PP, Gelb Rebuttal, pp. 5, 8.) And it is not consistent with the law. *See* 6 MCCARTHY § 32:159 (Ex. TT at 1) (noting that in a forward confusion case the "proper universe to survey is the *potential buyers of the junior user's goods or services*" (emphasis added)). Mr. Poret ignored both logic and the law, and Mr. Gelb properly concludes that the "failure to properly select the survey universe makes the findings of [Mr. Poret's] survey unreliable." (Ex. PP, Gelb Rebuttal, p. 5.)

There are additional serious flaws in Mr. Poret's approach, opinions and methods. Mr. Poret over-exposed recipients to eight web pages, an improper method. (Ex. PP, Gelb Rebuttal pp. 6, 9.) His inclusion of individuals and businesses who might hire lawyers in the future was off-base because research shows that no one hires lawyers based on where they went to law school. (*Id.* pp. 5, 9–10.) His inclusion of supposed hiring personnel resulted in the inclusion of people that clearly do not hire in-house lawyers.[11] He asked survey takers to speculate. (Ex. PP, Gelb Rebuttal, p. 6.) And he was over-inclusive in tabulating results when he assumed that

---

[10]Mr. Poret revealed the fallacious reasoning underpinning his selection of a wildly overbroad survey population when he testified that he believed the survey should include any subjects "who are in a position to *come across* the allegedly infringing use." (Ex. SS (Poret Depo. 34:3–:20 (quote at 34:7–:10) (emphasis added)).)

[11]These included a school district supervisor, software engineer, RN nursing supervisor, pastor, director of events, front desk supervisor, assistant principal, accounting manager, clinical psychologist, public information officer, and training manager. (*Id.* p. 5; Ex. SS (Poret Depo. 135:7–138:10)).)

anyone who mentioned "Houston" meant U of H should be included and included respondents that gave non-responsive answers. (*Id.* pp. 6, 10.) To the extent no single error is fatal, Mr. Poret's survey and opinions collapse under the weight of these numerous flaws.

Fortunately, Mr. Gelb corrected Mr. Poret's mistakes and conducted a survey of his own. (Ex. UU, Expert Report of Gabriel M. Gelb (the "Gelb Survey Report").) That survey resulted in an extremely low net confusion rate of 6%. (Ex. UU, Gelb Survey Report, p. 8.) As Mr. Poret could have done, Mr. Gelb obtained the contact information for LSAT takers in Texas. (*Id.* p. 4.) He then sent them surveys. (*Id.*) The test group was shown a webpage of the College as it actually appears in the real world today; the control group was shown a website using the name "South Texas College of Law/Houston." The survey's net confusion rate of 6% indicates no likelihood of confusion. (*Id.* p. 9.) This Court should give weight to this result.

Last but not least, even though the flaws in Mr. Poret's survey skewed the results in favor of a finding of confusion, the survey also found a low net confusion percentage—just 18.4%. (*Id.* at 41.) That is too low to be meaningful, especially given that the other likelihood-of-confusion factors in this case do not militate in favor of a finding of likelihood of confusion. *See InterState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 354 (D.N.J. 2004) (finding that a survey's confusion rate of 16% was too low to be actionable in light of "the high degree of care exercised by consumers in selecting banking services[] and the inherent weakness of the mark," among other factors); *cf.* 6 McCarthy § 32:185 (Ex. VV at 1–3) (observing that figures in the 25% to 50% range have often been relied on as support for finding a likelihood of confusion, but that it takes confusion levels over 50% to be "almost always" viewed by courts as persuasive evidence). In Texas, courts have typically required confusion rates of 25% or more before finding survey evidence relevant, stemming from an oft cited 1980 Fifth Circuit case in which

the survey had shown a combined 38% confusion rate. *Exxon Corp. v. Texas Motor Exchange of Houston*, 628 F.2d 500, 507 (5th Cir. 1980) (noting, in a case with a strong mark, that "15 percent of the individuals surveyed associated the Texon sign with EXXON [and] [a]nother 23 percent associated the sign with gasoline, a gas station, or an oil company.").[12]

In sum, the evidence of relevant actual confusion in this case is nonexistent. Mr. Poret's survey suffers from too many flaws to count, and generated a low rate of confusion even with those flaws. And Mr. Gelb's properly conducted survey generated a percentage that clearly refutes any likelihood of confusion.

> **h.**      **Degree of care exercised by potential consumers: law students make their choice carefully.**

The eighth and final factor weighs heavily against a finding of confusion. *Oreck*, 803 F.2d at 170. The potential consumers in this case, the only ones that legally matter, are prospective law students. Law schools are expensive, time-consuming investments. Prospective law students therefore make their choice carefully—presumably, even more carefully than prospective undergraduates do. Thus, the Eleventh Circuit's observation regarding undergraduate institutions applies with even greater force here:

> [S]tudents looking for a college to attend are likely to be relatively sophisticated and knowledgeable because of the nature, importance, and size of the investment in a college education. As one court has observed: "[I]t is hard to imagine a more important or expensive purchase than a college education. The degree of care and thought involved in choosing a college is undoubtedly higher than that required for most purchases."

---

[12] *See also T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888 (S.D. Tex. 2014) (26.3% confusion rate); *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884 (S.D. Tex. 2011) (34.3% confusion rate); *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679 (S.D. Tex. 2009) (25% confusion rate); and *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766 (S.D. Tex. 2005), *aff'd*, 205 F. App'x 289 (5th Cir. 2006) (25% confusion rate).

*Fla. Int'l*, 2016 WL 4010164, at *7. This factor weighs heavily against a finding of likelihood of confusion, because these relatively sophisticated consumers "are unlikely to be easily or meaningfully confused by similar-sounding university names." *Id.* at *15.

In sum, the eight factors considered by the Fifth Circuit, especially when considered in light of U of H's heightened burden under *Florida International*, compel the conclusion that U of H cannot show confusion.

### C.      U of H has not shown it will likely suffer irreparable injury.

In addition to showing a substantial likelihood of success on the merits, U of H must show that it will suffer irreparable injury before trial in the absence of a preliminary injunction. U of H cannot make that showing.

### 1.      There is no presumption of irreparable injury in the Fifth Circuit.

U of H hardly attempts to show irreparable injury. Instead, U of H's motion relies almost exclusively on the notion that if U of H can establish a likelihood of success on the merits, then irreparable injury may be presumed. That is not the law.

The Fifth Circuit has never expressly adopted a presumption of irreparable injury. For nearly thirty years, the Fifth Circuit's stated position was that it had "no views upon whether a presumption of irreparable injury as a matter of law is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim." *S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 188 (5th Cir. 1982); *see also Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 313 (5th. Cir., 2008) ("This Court has avoided expressly adopting this presumption of irreparable injury."). In 2008, when the Fifth Circuit was again confronted with this issue, it again declined to decide what it called a "difficult question" in light of the United States Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). *See Paulsson*, 529 F.3d at 313. In *eBay*, the court declined to adopt a "categorical

rule" either against or in favor of permanent injunctions in patent cases. 547 U.S. at 393–94. In both the copyright and patent contexts, the court explained, the appropriateness of injunctive relief is to be judged according to "well-established principles of equity" rather than categorical presumptions. *See id.* at 392–94.

The Fifth Circuit's reluctance to embrace a presumption of irreparable harm is well-warranted. Since the *eBay* decision, federal courts of appeals across the country have either expressly rejected the presumption or suggested it should not apply. *E.g., Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014) ("Because a presumption of irreparable harm deviates from the traditional principles of equity . . . we hold that there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases."); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) ("We now join other circuits in holding that the *eBay* principle—that a plaintiff must establish irreparable harm—applies to a preliminary injunction in a trademark infringement case."); *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010) ("*eBay*'s central lesson is that . . . a court deciding whether to issue an injunction must not . . . presume that a party has met an element of the injunction standard") (citation omitted); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) (recognizing that *eBay* "is applicable" to Lanham Act cases but declining to decide the presumption question); *see also Uber Promotions, Inc. v. Uber Techs., Inc.*, No. 1:15CV206-MW/GRJ, 2016 WL 617450, at *2–3 (N.D. Fla. Feb. 16, 2016) (Ex. WW) (describing this trend and concluding that under *eBay*, "a presumption of irreparable harm is no longer appropriate in a trademark-infringement case once a substantial likelihood of success on the merits is shown"). Subsequent decisions from the United States Supreme Court further support this conclusion. *See, e.g., Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22

(2008) (holding that a party seeking a preliminary injunction must establish that it is "likely" to suffer irreparable harm, and rejecting a lower standard based on a "possibility" of irreparable harm).

U of H argues that the Fifth Circuit adopted the presumption in 2013, citing *Abraham v. Alpha Chi Omega*, 708 F.3d 614 (5th Cir. 2013). But *Abraham*, rather than expressly adopting the presumption, simply noted that "a leading treatise" has endorsed the presumption (though, as demonstrated above, many circuits disagree with the treatise on this point). *Id.* at 627. It is simply not plausible that the Fifth Circuit resolved this notoriously difficult issue with a single sentence without any reasoning or explanation. *Abraham* cited *eBay* only once, to set out the uncontroversial four-prong test for a preliminary injunction. *Id.* If the Fifth Circuit had intended to depart from more than thirty years of precedent and approve of the presumption approach, it would have said so clearly and unequivocally. It did not.

In the years since *Abraham* was decided, the Fifth Circuit has never cited that case for the proposition that a presumption of irreparable injury exists in trademark infringement cases. To the contrary, the Fifth Circuit has since affirmed at least one Lanham Act decision which expressly rejected the presumption. *See Eastman Chem. Co. v. PlastiPure, Inc.*, 969 F. Supp. 2d 756, 767-68 (W.D. Tex. 2013) (rejecting the presumption in considering a permanent injunction in a false advertising case), *aff'd*, 775 F.3d 230 (5th Cir. 2014).

In sum, there is no reliable precedent requiring this Court to presume that U of H will be irreparably harmed if it establishes a likelihood of success on the merits. The weight of the authority, from the United States Supreme Court to circuit courts around the nation, is to the contrary. U of H's right to injunctive relief should be determined by an application of "traditional principles of equity," rather than any categorical presumption. *See eBay*, 547 U.S. at 394.

2. Absent a presumption, U of H has not proven it is likely to suffer any irreparable injury.

U of H devotes only one paragraph of its motion to the question of whether it will likely suffer irreparable injury in the absence of a preliminary injunction. U of H does not cite a single piece of evidence or a single case. The extraordinary remedy of a preliminary injunction demands a more robust showing than that.

The key concept in the irreparable harm analysis is the word "irreparable." *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011); *see also Amegy Bank Nat'l Ass'n v. Monarch Flight II, LLC*, No. H-11-3218, 2011 WL 6091807, at *6 (S.D. Tex. Dec. 7, 2011) (Ex. XX) ("Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable.") (quoting *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)); *Mail Boxes Etc., Inc. v. Christo*, No. H-06-0451, 2006 WL 6598916, at *1 (S.D. Tex. Feb. 20, 2006) (Ellison, J.) (Ex. YY) (denying preliminary injunction on Lanham Act claim because "any harm . . . is compensable by money damages").

This Court may also consider the availability of permanent injunctive relief in the event that U of H succeeds at trial. *See Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) (Posner, J.) ("[F]or the grant of a preliminary injunction to be proper, the harm to the plaintiff also must be judged irreparable—meaning not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor.").

The record before the Court contains no evidence of harm. It is difficult to imagine how U of H could possibly be harmed before trial, especially considering that through the time of trial (at a minimum) the College's name and logo will appear alongside a prominent reminder of the College's former name. Unsurprisingly, U of H has not identified a single actual or prospective purchaser of its legal education services that has ever been confused by the College's new name. Nor has U of H shown it has suffered any actual damage to its reputation or goodwill since the College changed its name. *See Brennan's, Inc. v. Brennan*, 512 F. Supp. 2d 559, 573 (S.D. Miss. 2007), *aff'd*, 289 Fed. App'x. 706 (5th Cir. 2008) (finding no showing of irreparable harm where the trademark-infringement plaintiff offered no evidence of "an imminent threat to [its] reputation even if some confusion about [the parties'] relationship did occur"). For example, U of H made no attempt to show a decline in applications or enrollment numbers at the University of Houston Law Center, or a drop in the law school's rankings based on some perceived decrease in "prestige." Its entire case for harm is purely speculative.

When analyzing the harm question, it is again critical to consider the nature of the parties' services. A law school education is not some product a consumer might casually pluck off the shelf at the grocery store. T he nature of the purchasing decision distinguishes this case from the trademark cases involving small-scale purchasing decisions that typically involve little preparation, research, or dedication. *See Florida International*, 2016 WL 4010164, at *15 ("potential college students are relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names").

Even if U of H could identify a non-speculative harm, there is no evidence in the record that any such harm would be irreparable. Among the anecdotal examples of "confusion" by non-purchasers cited by U of H, the alleged confusion was easily repaired by, for example, a single

phone call placed the same day the mistake was made. And the longer prospective purchasers are exposed to both names, the less likely they are to be confused. *See Fla. Int'l*, 2016 WL 4010164, at *11 (noting that consumers of post-secondary educational services learn to distinguish between many similar-sounding institutions).

As this Court recognized at the first hearing in this case, the Lanham Act provides an adequate legal remedy for U of H in the form of money damages for trademark infringement. (Ex. ZZ at 19 [July 15, 2016 Hrg. Tr.].) The Lanham Act also provides for permanent injunctive relief where appropriate. Those remedies are certainly adequate. There is certainly no evidence to suggest the College might be unable to satisfy any adverse judgment, including compliance with any permanent injunction, that may be rendered in this case.

> **D.** **The balance of the hardships favors the College.**

A preliminary injunction is also unwarranted because it would cause an injury to the College that far outweighs any possible injury to U of H. U of H has not produced any evidence of an injury it would face if injunctive relief is denied, asserting only generalizations regarding erosion of its marks and damage to its goodwill. (PI Mot. at 25.) In contrast, a preliminary injunction would impose significant costs on the College. Changing the College's name back to "South Texas College of Law" would be expensive, and changing the name back to "Houston College of Law" once again, should the College prevail at trial, would be expensive as well.

U of H wrongly assumes that the cost of changing the College's name was minimal, pointing to Dean Donald J. Guter's statement that the College has spent $40,000 to complete the name change. (PI Mot. at 24.) However, the $40,000 figure does not begin to capture the total cost to the College of changing its name. (Ex. KK.) As explained in the declaration of Diane Summers, the College's Director of Marketing and Communications, a significant amount of time, labor, and money was invested in the name change. (Ex. KK.) The College was able to

keep its monetary expenditures to a minimum because its staff spent many hours working on the name change. *Id*. The College's staff spent many hours creating, revising, and implementing a comprehensive communications plan that called for the completion of 36 key activities and outreach to nearly 62,000 constituents. *Id*. For example, the College sent customized letters to different segments of the legal community, including 42,000 Texas attorneys. Moreover, the College has initiated the name change on its website, stationery, and signage, and in the process, much of the older stationery and signage has been recycled or destroyed. *Id*. Reverting back to the former "South Texas College of Law" name would require a similar expenditure of time, labor, and money. *Id*. If the injunction is granted but the College ultimately prevails at trial, the College will be forced to undergo the entire process again. Finally, reverting back to the former "South Texas College of Law" name would result in other harms, including hampering the College from concentrating on tasks related to its educational mission, along with unquantifiable reputational harm. *Id*.

U of H's injunction would effectively operate as an ultimate determination on the merits, potentially ending this litigation without requiring U of H to prove trademark infringement at trial. Such a harsh outcome counsels against the grant of the preliminary injunction.

### E. Preliminary injunctive relief would adversely affect the public interest.

The public interest would be adversely affected by the grant of preliminary injunction. Because the College has demonstrated that there is no likelihood of success on the confusion inquiry, granting a preliminary injunction would adversely affect the public interest.

Moreover, even if U of H could show that the College's new name has the potential to cause confusion of some sort, the same could be said for the College's old name—after all, "South Texas College of Law" contains the same geographic terms as "Texas Southern University," which also operates a law school in Houston. Thus, the relief U of H seeks—an

order compelling the College to switch back to its former name—could not possibly eliminate any confusion in the marketplace, but rather, at best, merely alter the nature of that confusion. For this additional reason, a preliminary injunction would disserve the public interest.

### F. Objections to the form of the proposed injunction.

Federal Rule of Civil Procedure 65(c) requires that any preliminary injunction be secured by a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). U of H's proposed injunction includes no bond requirement whatsoever.

The College has presented evidence of the significant costs it would incur if it were required to cease using its new name and revert to its former name until this matter is tried. The College has presented evidence of the substantial costs it would then incur changing its name yet again if it prevails at trial. In addition to those costs, the College will suffer damages in the interim period from its inability to use its new name in the marketplace. If the Court determines that the extraordinary remedy of a preliminary injunction is warranted, the College requests that U of H be required to post a bond in the amount of $500,000, which can be used to compensate the College for its costs and damages in the event the College prevails at trial.

## VI. CONCLUSION

U of H cannot establish its right to a preliminary injunction, relief that the Supreme Court characterizes as "extraordinary and drastic." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). U of H's motion for preliminary relief should be denied.

Respectfully submitted,

_/s/ David J. Beck_
David J. Beck
State Bar No. 00000070
S.D. Tex. 16605
dbeck@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas  77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

**ATTORNEY-IN-CHARGE FOR
HOUSTON COLLEGE OF LAW**

**OF COUNSEL:**

Lynne Liberato
State Bar No. 00000075
S.D. Tex. 3072
lynne.liberato@haynesboone.com
Kent Rutter
State Bar No. 00797364
S.D. Tex. 20519
kent.rutter@haynesboone.com
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600

Jeffrey M. Becker
State Bar No. 02015730
jeff.becker@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

Eric J.R. Nichols
State Bar No. 14994500
S.D. Tex. 13066
enichols@beckredden.com
Karson K. Thompson
State Bar No. 24083966
S.D. Tex. 2878342
kthompson@beckredden.com
Beck Redden LLP
515 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone: (512) 708-1000
Facsimile: (512) 708-1002

Parth S. Gejji
State Bar No. 24087575
S.D. Tex. 2917332
pgejji@beckredden.com
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, Texas  77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2016, a true and correct copy of the foregoing instrument was served via the Court's ECF filing system and via Dropbox.

*/s/ Parth S. Gejji*
Parth S. Gejji