UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM ON BEHALF OF THE UNIVERSITY OF HOUSTON SYSTEM AND ITS MEMBER INSTITUTIONS; THE UNIVERSITY OF HOUSTON SYSTEM; and THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM,<br><br>Plaintiffs/Counter-Defendants,<br><br>V.<br><br>HOUSTON COLLEGE OF LAW, INC., formerly known as SOUTH TEXAS COLLEGE OF LAW | §§§§§§§§§§§§§§§§§§§ | CIVIL ACTION NO. 4:16-CV-01839<br><br><br><br><br><br>JUDGE KEITH P. ELLISON |

**PLAINTIFFS' MOTION TO EXCLUDE OR STRIKE DEFENDANT'S
EXPERT WITNESS GABRIEL GELB, ALONG WITH
<u>ANY REFERENCE TO HIS SURVEY AND REPORT</u>**

Plaintiffs respectfully submit this Motion to Exclude the Survey and testimony of Defendant's Expert, Gabriel Gelb. The Survey conducted by Mr. Gelb in this matter is unreliable; under applicable case law, this Court should prohibit Defendant from offering testimony about the Survey or attempting to rely upon it. In support, Plaintiffs respectfully show this Honorable Court the following:

**FACTUAL
BACKGROUND**

The facts of this case have been extensively briefed. The Court will hold an evidentiary hearing on August 26, 2016. This Honorable Court is well aware of the issues in this case. However, for the instant Motion, Plaintiffs note that Defendant South Texas College of Law engaged Gabriel Gelb as its "survey" expert. Mr. Gelb surveyed barely 100 LSAT takers, ultimately concluding that only 6% of them were confused regarding its new mark and name

change.[1] As shown below, this Court should exclude Gelb, his Survey, and prevent any testimony about the Survey because it is unreliable and fails to meet the requirements of the Federal Rules of Evidence and applicable case law.

## ARGUMENT AND AUTHORITIES

District courts act as "gatekeepers" in excluding expert testimony. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371-72 (5th Cir. 2000). "This so-called 'gate-keeping' function applies to all types of expert testimony, not just 'scientific' testimony." *Id.* at 372.

### A. An expert's opinion must be reliable to admissible.

A court should exclude the testimony of an expert if it is not reliable. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow. Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). An expert witness may be qualified and highly credible, but his conclusions may be based on unreliable methodology. Scientific evidence that is not grounded in the "methods and procedures of science" is no more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

For an expert's testimony to be considered reliable, the "party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably applied the principles and methods to the facts of the case." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007)); FED. R. EVID. 702. "*Daubert* identifies a nonexhaustive list of factors a district court should consult in assessing the reliability of expert testimony: (1) whether the theory can or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or

---

[1] The Plaintiffs were for the first time provided Gelb's Survey and informed that the Defendant had a survey expert when Defendant filed its Response to Plaintiffs' Motion for Preliminary Injunction. Plaintiffs do not seek to delay the hearing, and understand that the Court may carry this Motion until it hears testimony from Gelb, and receives a formal response from the Defendant.

potential rate of error; (4) the existence and maintenance of standards and controls; and (5) whether the theory has been generally accepted in the relevant scientific, technical, or professional community." *Cannon v. BP Products N. Am., Inc.,* 2013WL 5514284, at *6 (S.D. Tex. Sept. 30, 2013) (citing *Daubert*, 509 U.S. at 593–94). While further "guideposts", *id.*, have been developed following *Daubert,* a court has the "discretion to consider… [the] factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (citing *Kuhmo*, 526 U.S. at 151).

The purpose of the reliability requirement is to ensure the expert uses the same level of intellectual rigor as other experts in the same field. *Kuhmo*, 526 U.S. at 152. Here, because Defendant's expert Gelb opinions run wide of these guideposts, and fail to demonstrate the rigor of similar experts in their field, the Court may exclude these unreliable opinions.

### B. The Gelb Survey is Unreliable and Flawed

In support of its contention that its name change is not likely to cause confusion in the marketplace, Defendant has submitted a survey conducted by Gabriel Gelb. There are a myriad of glaring problems with Gelb's "survey," not the least of which is that Gelb focuses survey respondents only on a large and prominent advertisement of the name change. Further, Gelb uses a methodology that produces an unacceptably low response rate and high margin of error, such that his results simply cannot be statistically reliable. Moreover, Gelb's survey fails to indicate whether there would be confusion when his flawed results were projected beyond the small and skewed sample he uses. Finally, and importantly, Gelb's Survey likely surveyed those who have already enrolled or applied to either Plaintiff or Defendant's law school, and likely surveyed respondents who had previously been provided an email announcing the name change. In short, Gelb's Survey has multiple shortcomings, rendering it so flawed as to be completely unreliable.

### 1. The Gelb Survey's Test and Control are biased.

#### a. *Gelb provides the respondents the answer before ever asking the question.*

The stated purpose of the Gelb Survey was to measure the likelihood of confusion regarding its new name and mark to determine if survey respondents associate or confuse the new mark with the Plaintiff's marks at issue in this case. Yet, in practice, when the survey respondents are actually shown Defendant's new mark and name, such is done in a fashion that highlights the recentness of the name change and reminds them of the previous name, rather than simply showing the new mark. Specifically, in the "Test" screenshot shown to survey respondents, the bottom of the screenshot clearly states "South Texas College of Law Changes to Houston College of Law."[2]   There is no other "Test" image.  Exhibit A, pg. 6. This methodology results in a forced exposure.  In other words, the Gelb Survey fixes a respondent's attention on the name change section, tells them what the previous name was, and then asks if the respondent associates the name with any other entity. By doing the Survey this way, what Gelb has done is essentially give the respondents the answer before ever asking the question. The fact that there is a recent name change remains on the page the entire time, and *never disappears.*  This methodology is not actually illustrative of how Defendant uses its new name and mark. Indeed, the screenshot shown the respondents is not even representative of Defendant's actual website, because Defendant's current website actually rotates through *three* different banner ads.  The advertisement of the name change is only one of them.  Thus, for the duration of time a visitor is on Defendant's actual site, the advertisement of the fact of the name change is visible for only a third of the time.  Indeed, it is also entirely possible that a visitor to Defendant's site may visit the home page, and navigate to another page on the site

---

[2] This is something Gelb believes depresses confusion.

without ever seeing the screen that advertises the name change. Gelb completely ignores this fact, and creates an unrealistic simulation of Defendant's web page. Using the "Test" image the way Gelb has done only serves to artificially lower confusion, likely by multiples. Yet, even when his method informs respondents of the name change and tells them what the old name was, the results still yield 6% confusion. This is telling.

        b. *Gelb fails to survey the name change as it is routinely used.*

As further evidence of the uselessness of the Gelb Survey, it is easy to see that the way that the Survey was conducted does *nothing* to actually test confusion related to the name "Houston College of Law" in the way Defendant actually uses it, and never tests for confusion of use of the name in any other context other than prominently emphasizing the fact of a recent name change on a screenshot. For example, the Gelb Survey fails to show respondents any of the multiple marketing materials used by the Defendant; such items already pointed out to this Court would include banners, billboards, pens, cups, t-shirts, letterhead, bags, business cards, and other like items. The Gelb methodology fails to test for confusion regarding the name as it might be seen on television, or in print, or even how it may be used in conversation. Instead, the only "test" performed for confusion by Gelb is to tell the respondents that there has been a recent name change, that the former name was "South Texas College of Law, and then ask them if they associate the new name with any other institution. As a matter of mere common sense such a method was designed to get a pre-determined answer, and offers no useful information to this Honorable Court as to confusion of the likelihood thereof.

Because Gelb's Survey only explores the likelihood of confusion *when the name change is heavily advertised on Defendant's website.* This focus on the announcement of the name change prevents the Survey from reliably measuring likelihood of confusion under the

typical future use of the name by the Defendant. As the Court has seen from the evidence presented, Defendant has no plan to always refer to the fact of the name change indefinitely, as it would be uncharacteristic for any entity to do so.[3] After a name change, and the resulting announcement of such, occurs, an entity will typically transition to its new name. Then, the entity will carry on without referring to or calling attention to their old name under normal marketing conditions. Indeed, it is for this reason that Poret, in his survey for the Plaintiffs, showed respondents the Defendant's webpage without the rotating banner.

### c. *Gelb flubbed his so called Control Group.*

There are further problems with the Gelb survey. Indeed, not only is the "Test" flawed, so is the "Control" used by Gelb. For the "Control," the Gelb Survey changed "Houston College of Law" to "South Texas College of Law/Houston" at the top of the site. Gelb also, however, completely removed the announcement of the name change from the Control Group. Exhibit A, pg. 6. It is well-accepted that, for a Control Group, the only change should be to *the mark* at issue, and not other factors. Gelb entirely removes a feature of the site—the advertisement of the name change. Such results in a flawed control group, rendering the entire Survey unreliable.

In short, Gelb shows the webpage in a manner that focused respondents on a prominent advertisement of the name change, which Gelb himself has argued to be a factor that would dispel confusion. Gelb then uses a flawed control that entirely eliminates this element. As the very method by which Gelb conducts his Survey is flawed, the results of the Survey should not be given weight. The Survey is thus wholly unreliable.

---

[3] Defendant is unlikely to continue sending notices of, or marketing, the name change to prospective law students, year in and year out.

## 2. There is no quality control with regard to the Survey Respondents.

The Gelb Survey suffers from a multitude of other problems. On such problem is the Gelb Survey fails to ensure there was a validation procedure in place. In other words, the Survey failed to ensure that the individual who completed the survey was actually the actual LSAT taker invited to participate. Further, and perhaps more damaging, the Survey methodology lacks any quality control procedures to ensure respondents were in fact focused on the Survey, and further lacks quality control procedures that ensure respondents were not looking for outside information online while participating in the Survey. Because the name change recently occurred, there has been a significant amount of news on the name change (and the associated lawsuit) online at present. There is no way to know whether a respondent, during the Survey, decided to conduct internet research prior to finishing the Survey, thereby learning of this lawsuit. Failing to have such controls in place renders the Survey and its results invalid.

Further, and importantly, the Survey fails to identify—and ultimately disqualify—any individual that may have already known about the ongoing litigation before the Court. This failure is critical. It is very likely that several respondents in the Survey already were aware of this lawsuit, because there was significant publicity about the controversy and lawsuit. This knowledge would prevent the Survey from measuring unbiased perceptions. The allegations made in this lawsuit makes clear that the Plaintiff is not, and does not want to be, affiliated with the Defendant. A reading of any headline reporting about this lawsuit would make that clear. If any of the respondents in the Gelb Survey was aware of the lawsuit, this knowledge would again significantly lower the overall confusion rate.

Finally, the Survey fails to even ask if individuals are already enrolled in law school. Specifically, the Survey fails to identify whether its respondents were already enrolled with

either the Plaintiff or Defendant. Clearly, if a respondent is already enrolled at either school, that person would likely be aware of this lawsuit and the respective arguments. This knowledge would again reduce any confusion detected by the Survey. Gelb could have asked the appropriate questions to disqualify those who already knew about the lawsuit, or who were already enrolled in law school at either the Plaintiff or Defendant's law school. He failed in that regard.[4] Gelb could have put mechanisms in place to ensure the respondent completing the survey was actually the individual who took the LSAT, and that such individual conducted no research while being surveyed. He did not. By failing to ensure such quality control procedures were in place in the Survey, any results obtained from it are suspect and unusable; certainly, any such results cannot be relied upon by this Court.

### 3. The Gelb Survey's inclusion of only potential law students is under-inclusive.

Gelb only surveyed LSAT takers. He did not even ask these individuals if they actually had an intention to attend law school. Not every individual who takes the LSAT does so because they intend to go to law school. But, even assuming that LSAT takers are actually prospective law students who would be considered "consumers" in the law school market, as a matter of common sense, it is evident that potential law students are **not** the only category of individuals that are relevant for the purposes of determining a likelihood of confusion. The Gelb Survey's complete failure to include any individuals other than LSAT takers is grossly under-inclusive. This flaw is fatal.

Law school leaves an indelible mark on its graduates. The law schools' respective names are carried with law graduates (as well as with law students, during the time they are enrolled)

---

[4] As is shown later in this Motion, and as will be demonstrated at the Preliminary Injunction hearing, Gelb had a difficult time obtaining respondents to participate in his Survey; and, indeed, had such a small sample that scientifically no valid conclusion can be drawn from his results.

into the marketplace.  When someone indicates that they are a lawyer, inevitably the next question is "where did you attend law school? It cannot be credibly argued that where an individual attends law school is not relevant to employers, judges, other lawyers, and potential clients, among others. Yet, Defendant's survey only surveyed a tiny portion of the consumer marketplace involved in this case. Indeed, as evidence that the marketplace regarding one's law school is broader than simply LSAT takers or even potential law students, Defendant's own survey that it has touted in the press and that was completed in July 2013 prior to changing its name is instructive. This document has been filed under seal, but in it this Honorable Court can examine those surveyed in 2013 as opposed to those that Gelb surveyed after Defendant was sued. Exhibit B, (previously filed under seal)  (excerpts from Defendant's July 2013 survey, bates stamped HCL 577; HCL 580).[5] The only group that Defendant now argues is the relevant market when testing the likelihood of confusion is LSAT takers. Gelb's Survey follows suit, rendering it unhelpful for the Court's purposes.

It goes without saying that an attorney's educational background is a key consideration when being hired for a legal job.  This is true whether it is an employer hiring for a position, or an individual or business in the general public hiring for personal/professional legal services. Any confusion over whether Defendant is affiliated with, or is a part of, the University of Houston or the University of Houston System—a nationally recognized system—impacts that decision.  Dean Guter testified he wanted potential students, employers, members of the legal community and others to know the name "Houston College of Law" and to associate that name with all the intangibles of which the school is known.  Exhibit C (previously filed under seal), at pg. 33-36 (Excerpts from Don Guter deposition). Guter's own testimony identifies the relevant

---

[5] Defendant's Director of Marketing makes clear what groups would make up the relevant market at issue in this case. She testifies that such individuals included potential employers, judges, vendors, the media and others.  Exhibit D (previously filed under seal), at Pg. 10-20 (Excerpts from Diane Summers deposition).

consumer market. Gelb's Survey should have attempted to comprehensively test confusion in that market.

Further, it is important also not to overlook parents of prospective law students. Parents are relevant in the analysis, as parents are often involved in decisions relating to school selection and/or the payment of tuition. As such, parents would qualify as consumers/purchasers or influencers, at the very least. And again, any confusion a parent would have as to whether Defendant is affiliated with, or is a part of, the University of Houston System is relevant to the Court's analysis. Again, this emphasizes the need for a Survey that does not *solely* focus on prospective law students as respondents. Gelb's focus was far too narrow. His Survey failed to test confusion in the relevant marketplace. His results are not reliable.

### 4. The response rate in the Gelb Survey is too low to be representative.

Among its many failures, the Gelb Survey response rate is too low to be representative of the population it attempts to measure. Indeed, out of the 2109 invitations sent to LSAT takers asking them to participate in the Survey, only 118 individuals completed the Survey. Exhibit A. This amounts to a response rate of less than 6%. In fact, the true sample size relied upon by Gelb and the Defendant claiming no confusion was a mere 54 Test Group respondents and 64 Control Group respondents. The strikingly low response rate in the Gelb Survey raises the very real possibility that the minority who responded to an unsolicited email cannot be representative of the overall population. This means that a real possibility exists that had the vast majority that did not respond been included, the result would have been drastically different. Importantly, the low response rate to the Gelb Survey is far below the acceptable standard, demonstrating a severe problem of non-response bias. Exhibit E, pg. 245 (Reference Guide on Survey Research). Yet Gelb still proceeded with the Survey, and the Defendant attempts to rely upon it.

The low response rate creates more problems for Gelb. As set forth by Poret, with a sample size this small, the margin of error for the 18% Test Group result found by the Gelb Survey is roughly 10%. This means that the true rate of confusion in the Test Group could have been as high as 28%, even setting aside the other, multiple flaws in the Survey. Under the same reasoning, the 12% Control Group result found by Gelb could be much lower as well. Thus, although the net confusion rate of the Gelb Survey is reported to be a mere 6%, such confusion even using Gelb's flawed methodology could actually be as high as 15-20%-- if the survey were repeated using a larger sample size.

In stark contrast to Gelb, the Poret Survey consisted of 1,149 respondents and 200 prospective law students. Poret used an online panel survey. Online panel surveys are well-accepted in the industry because they have response rates that experts agree comply with industry standards. The Poret Survey demonstrates that the results hold up not only over 200 prospective law students, but over 1,149 total interviews across various groups.

Finally, it is interesting that Gelb criticized the Poret Survey for covering Texas generally, but not honing in more on the Houston area (and contending that only 25% of the respondents in the Poret Survey were from Houston). Ironically, Gelb's own survey was made up of only 30% of residents in the Houston area. Thus, despite Defendant claiming that 57% of its total student population hail from the Houston area (and Gelb's own criticism of Poret), Gelb did nothing to focus more on the Houston area in his Survey.

In sum, the small sample size of the Gelb Survey combined with the glaring non-response problem results in great uncertainty, making any attempt to rely upon the Gelb Survey questionable. The Gelb Survey.

### 5. The population source of the Survey is suspect

There is one additional reason that merits pointing out that demonstrates the unreliability of the Gelb Survey. As stated, the population source upon which the Survey relies or utilizes is LSAT takers.  This population choice raises several concerns.  First, Gelb admits he went to the Defendant to obtain his list of LSAT takers. As a matter of policy, the Law Student Admissions Council ("LSAC") does not provide a law school with the names and information of *all* LSAT takers.  LSAC supplies a law school with the names and information of test takers who *apply* to that particular school.  However, there is a method on the LSAC website whereby a LSAT taker can opt in to what LSAC calls its "Candidate Referral Service." Exhibit F (Information from LSAC website regarding the Candidate Referral Service). When a law student chooses to opt in, his or her information will be made available to law schools.[6]  Simply put, if a test taker does not opt in, and does not apply to a particular school, that law school cannot get his or her information. When it becomes clear where Gelb obtained list of LSAT takers, and it is understood how the Defendant itself obtained this list, the glaring problem with Gelb's survey population becomes glaringly obvious. *Many of the individuals who took Gelb's survey may have already applied to either Plaintiff or Defendant's school. Some may have even be accepted. Some may have even been enrolled in one of the schools at the time of the Survey.* It goes without saying that if a student were enrolled at either the Plaintiff or Defendant's law school, they will likely be better informed about the controversy before this Court. Compounding the obvious deficiency, it was learned during deposition that, when the name change was announced, Defendant's Director of Marketing sent out an email announcing the name change to "prospective law students." Exhibit D (previously filed under seal). There can be no doubt that

---

[6] Law schools are prohibited from using the names and contact information for any purpose other than to recruit. Obviously, the Defendant in this case failed to abide by that prohibition.

the real possibility exists that some if not all of the Survey respondents had already received an email from the Defendant informing them of the name change, *prior to being asked to complete the Survey*. In Gelb's explanation of his methodology, he completely ignores the real possibility that he may be testing confusion of LSAT takers who are already enrolled at one of the law schools before this Court, or individuals who a mere two weeks before had received an email from the Defendant explaining the name change. This failure, as with many of the others, renders Gelb's Survey utterly useless.

## CONCLUSION

As shown, the Gelb Survey is fatally flawed. Such Survey simply does not meet the requirements of Federal Rule of Evidence 701, or the requirements of *Daubert.* Because of its flaws, Plaintiffs respectfully request that Defendant be prohibited from relying on the Survey results, that Gelb be prohibited from testifying, and that the portions of Defendant's Response where Gelb or his survey is referenced by stricken.

    Respectfully submitted,
    **THE BUZBEE LAW FIRM**
    By: */s/ Anthony G. Buzbee*
    Anthony G. Buzbee
    Attorney - in- Charge
    Texas Bar No. 24001820
    S.D. Tex. No. 22,679
    JP Morgan Chase Tower
    600 Travis, Ste. 7300
    Houston, Texas 77002
    Telephone: (713) 223-5393
    Facsimile: (713) 223-5909
    tbuzbee@txattorneys.com

    **ATTORNEYS FOR PLAINTIFFS**

*Of Counsel:*
**SUITTON MCAUGHAN DEAVER PLLC**
Elizabeth W. King
Texas Bar No. 00788710
SD Tex NO. 433,387
eking@smd-iplaw.com
Robert J. McAughan, Jr.
Texas Bar No. 00786096
S.D. Tex 16,501
bmcaughan@smd-iplaw.com
Albert B. Deaver, Jr.
Texas Bar No. 05703800
S.D. Tex. No. 11, 300
adeaver@smd-iplaw.com
Jeffrey A Andrews
Texas Bar No. 24050227
S.D. Tex. No. 608,251
jandrews@smd-iplaw.com
Three Riverway, Suite 900
Houston, Texas 77056
Telephone: (713) 800-5700
Facsimile: (713) 800-5699

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been duly served on all known counsel of record and pro se parties in accordance with the Texas Rules of Civil Procedure on August 25, 2016, as set forth below:

**Via electronic notification**
David J. Beck
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010

**Via electronic notification**
Eric J.R. Nichols
Karson K. Thompson
Beck Redden LLP
515 Congress Avenue, Suite 1900
Austin, Texas 78701

**Via electronic notification**
Parth S. Gejji
Beck Redden LLP
1221 McKinney, Suite 4500

Houston, Texas 77010-2010
**Via electronic notification**
Lynne Liberato
Kent Rutter
Haynes and Boone LLP
1221 McKinney, Suite 2100
Houston, Texas 77010-2010

**Via electronic notification**
Jeffrey M. Becker
Haynes and Boone LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219

               */s/ Anthony G. Buzbee*
               Anthony G. Buzbee