UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM ON BEHALF OF THE UNIVERSITY OF HOUSTON SYSTEM AND ITS MEMBER INSTITUTIONS; THE UNIVERSITY OF HOUSTON SYSTEM; and THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM, | § § § § § § § | |
| | § | CIVIL ACTION NO. 4:16-CV-01839 |
| Plaintiffs/Counter-Defendants, | § | |
| | § | |
| v. | § | |
| | § | |
| HOUSTON COLLEGE OF LAW, INC., formerly known as SOUTH TEXAS COLLEGE OF LAW, | § § § | |
| | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | |
| | § | |
| | § | JUDGE KEITH ELLISON |

**HOUSTON COLLEGE OF LAW'S SUPPLEMENTAL
BRIEF REGARDING INITIAL INTEREST CONFUSION**

Houston College of Law (the "College") files this Supplemental Brief Regarding Initial

Interest Confusion, as provided by the Court's September 13, 2016 Order for Supplemental

Briefing.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. THE CONTOURS OF THE INITIAL INTEREST CONFUSION DOCTRINE ............... 1

  A. The initial interest confusion doctrine addresses bait and switch tactics that result in a probable sale. ................................................................................................................ 2

  B. *Elvis* does not support the application of the initial interest confusion doctrine to find actual confusion here. .............................................................................................. 4

    1. The Velvet Elvis enticed patrons into the bar and, once there, they stayed. .................... 4

    2. Houston College of Law is not the Velvet Elvis. ............................................................ 5

  C. Other cases applying the initial interest confusion doctrine tend to involve similar facts, which are not present here. ............................................................................................. 9

    1. Courts typically apply the doctrine only where the defendant has bad intent ................. 9

    2. Courts typically apply the doctrine where very strong marks are at issue. ..................... 11

    3. Profiting financially from initial interest confusion is a common, if not key, element of the doctrine. ................................................................................................................ 12

    4. The presence of sophisticated consumers weighs heavily against invoking the doctrine. .......................................................................................................................... 13

  D. District courts in this Circuit have analyzed initial interest confusion to deny an application for a preliminary injunction. ......................................................................... 13

III. RESPONSE TO U OF H'S NEW EVIDENCE AND ARGUMENTS ............................ 15

  A. Neither mischaracterized testimony nor speculation is sufficient to support claims of confusion. .......................................................................................................................... 15

  B. U of H's Supplemental Evidence Is Not Competent Proof of Actual Confusion. ............. 17

    1. Johnson Declaration (Dkt. 64-1). ...................................................................................... 17

    2. Neely Declaration (Dkt. 64-2). ........................................................................................ 17

    3. Pelaez Declaration (Dkt. 64-3). ....................................................................................... 18

  C. Despite continued briefing, the relevant consumer remains potential law students. .......... 18

IV. CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT, LLC v. Capital Connect, Inc.*,
    145 F. Supp. 3d 671 (N.D. Tex. 2015) ..................................................................2

*Amstar Corp. v. Domino's Pizza, Inc.*,
    615 F.2d 252 (5th Cir. 1980) ....................................................................12, 19

*Baker v. DeShong*,
    90 F. Supp. 3d 659 (N.D. Tex. 2014) ...........................................................7, 12

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001)........................................................................13, 20

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ...........................................................................11

*Duluth News-Tribune v. Mesabi Publ'g Co.*,
    84 F.3d 1093 (8th Cir. 1996) .............................................................................20

*Eli Lilly & Co. v. Natural Answers, Inc.*,
    233 F.3d 456 (7th Cir. 2000) .............................................................................16

*Elvis Presley Enters., Inc. v. Capece*,
    141 F.3d 188 (5th Cir. 1998) ..................................................................... *passim*

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
    No. 15-11509, 2016 WL 4010164 (11th Cir. July 26, 2016)........................6, 17, 20

*Exxon Corp. v. Texas Motor Exch., Inc.*,
    628 F.2d 500 (5th Cir. 1980) .............................................................................12

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*,
    730 F.3d 494 (6th Cir. 2013) .....................................................................2, 3, 12

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*,
    523 F.2d 1331 (2d Cir. 1975)........................................................................9, 11

*HRL Assocs., Inc. v. Weiss Assocs., Inc.*,
    1989 WL 274391 (T.T.A.B. July 21, 1989)........................................................13

*John Crane Prod. Solutions, Inc. v. R2R & D, LLC*,
    861 F. Supp. 2d 792 (N.D. Tex. 2012) ....................................................13, 14, 15

*Lamparello v. Falwell*,
420 F.3d 309 (4th Cir. 2005) ...........................................................7, 12

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
818 F.2d 254 (2d Cir. 1987)................................................9, 10, 11, 15

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) .................................................................3

*Promatek Indus., Ltd. v. Equitrac Corp.*,
300 F.3d 808 (7th Cir. 2002) ................................................................10

*Rust Env't & Infrastructure, Inc. v. Teunissen*,
131 F.3d 1210 (7th Cir. 1997) ..............................................................13

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*,
589 F.2d 1225 (3d Cir. 1978)................................................................20

*Select Comfort Corp. v. Baxter*,
156 F. Supp. 3d 971 (D. Minn. 2016) ...................................................13

*Syndicate Sales, Inc. v. Hampshire Paper Corp.*,
192 F.3d 633 (7th Cir. 1999) ..................................................................2

*Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*,
516 F.3d 853 (10th Cir. 2008) ..........................................................2, 16

*Water Pik, Inc. v. Med-Sys., Inc.*,
726 F.3d 1136 (10th Cir. 2013) ............................................................17

*Weiss Assocs., Inc. v. HRL Assocs., Inc.*,
902 F.2d 1546 (Fed. Cir. 1990)............................................................13

## Other Authorities

Stacy L. Dogan, et al., *Trademarks & Consumer Search Costs on the Internet*, 41
HOUS. L. REV. 777, 780-82 (2004) (Ex. 1) ..............................................4

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:6 (4th ed. Sept.
2016) (Ex. 2) ........................................................................................16

## I.    INTRODUCTION

The initial interest confusion doctrine is a scalpel, not a bludgeon.  Thus, courts employ it only in limited circumstances.  The parameters generally drawn around the doctrine are not present here.  First, the College does not seek to trade or profit off of Plaintiffs ("U of H").  It simply uses the geographic term "Houston" to convey its 93-year-old tie to the country's fourth-largest city.  Second, U of H's marks are not strong.  They are merely descriptive, and they reside in a crowded field of similar marks.  Third, relevant consumers—potential law students— are highly unlikely to be deceived such that actionable infringement would ever arise.

Unlike cases in which the doctrine is applied, this case does not involve the decision to enter a bar, talk to an oil trader, or even buy a new piano.  It involves a decision that the purchaser, in advance, knows costs more than $100,000, takes three years, and affects the rest of the purchaser's life.

In its Order, the Court directed the parties to elaborate on this doctrine and its application. In doing so, the College will delineate the contours of the doctrine and respond to U of H's brief on the issue.  Next, the College will address U of H's newly filed Supplemental Evidence (Dkt. 64).  Finally, the College will respond to U of H's new legal discussion and authorities *unrelated* to the initial interest confusion doctrine.

## II.    THE CONTOURS OF THE INITIAL INTEREST CONFUSION DOCTRINE

Initial interest confusion is a court-developed doctrine addressing "bait and switch" tactics that change consumers' buying decisions by allowing infringing competitors to get a foot in the door via consumers' confusion.  Courts correctly apply the doctrine to cases in which a junior user *intentionally* uses a strong mark to lead to a market transaction of low value involving little customer care.  The doctrine is not a proxy for examining the facts of this case, including the traditional likelihood of confusion factors of intent, strength of mark, and consumer

sophistication, as well as whether the junior user profited from the alleged initial interest confusion.

### A. The initial interest confusion doctrine addresses bait and switch tactics that result in a probable sale.

Typically, initial interest confusion is characterized by a "bait and switch" tactic that "permits a competitor to lure consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale." *Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008); *see also Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 638 (7th Cir. 1999); *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 690 (N.D. Tex. 2015).

The typical factual scenario—outside of the context of the Internet[1]—unfolds as follows: A consumer seeking a certain business is deceived into entering a different business. Even though the consumer soon realizes that she is in the wrong business, for whatever reason (often convenience), she makes her purchase from the second business. The Sixth Circuit offered an example of a typical scenario, using the example of a hungry driver who wants a hamburger, as follows:

> Soon you spot a "McDonald's" sign by an exit. You take the exit and follow the signs, looking forward to your favorite McDonald's hamburger. But—behold—it's a Burger King. The signs were misleading. You are not so fond of Burger King but, having already made the detour and loath to waste even more time, you reluctantly buy a Whopper and get on with your trip.

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 518 (6th Cir. 2013) (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999) (describing a similar scenario based on misleading billboards for video rental stores)).

---

[1] As one court in this Circuit has observed, "the initial interest doctrine most often appears in Lanham Act disputes based on Internet browsing, metatags, and how well websites are labeled when a user is moving from one website to another." *ADT, LLC*, 145 F. Supp. 3d at 691.

Thus, the initial interest confusion doctrine protects against this kind of harm to the senior user, where a consumer is lured into a probable purchase as a result of a junior user's bait and switch tactics.

While the doctrine protects against "bait and switch" tactics, it does not trump one of trademark law's main purposes—fostering fair competition. Consequently, it has no application if the use of a mark simply makes the junior user more competitive or makes the junior user more visible to the relevant public. Moreover, to establish initial interest confusion, the senior user "must demonstrate likely confusion, not mere diversion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011). And while a senior user's "desire to be the only game in town is perfectly natural," the courts should not permit trademark law to suppress lawful competition. *Groeneveld*, 730 F.3d at 519.

To assess whether the doctrine properly protects against the harm caused by bait and switch tactics or, instead, improperly suppresses fair competition, one must determine the presence (or absence) of consumer confusion. "Mere diversion" of a consumer from one service or product to another does not implicate the doctrine. As the Sixth Circuit observed in *Groeneveld*, when the senior user's real gripe is initial interest—not initial interest confusion— the doctrine is inapplicable. *Id.*

Accordingly, if the mark "Houston College of Law" assists potential students in identifying the College as being in Houston and, thus, creates interest in applying to the College, the initial interest *confusion* doctrine is not implicated. Instead, such mere diversion—the kind of fair competition trademark law supports—is entirely proper. For courts to hold otherwise would be a disservice to consumers.

Moreover, as U of H appears to agree, the doctrine is not a proxy for examining intent, strength of marks, consumer sophistication, or whether the junior user profited from the alleged initial interest confusion.  (*See* Dkt. 65 at 8, 13.)

**B.      *Elvis* does not support the application of the initial interest confusion doctrine to find actual confusion here.**

The Fifth Circuit has applied the initial interest confusion doctrine to find actual confusion only once—in *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998). *Elvis* involved a fact pattern found in many non-Internet cases—a junior user's intentional use of a strong mark to lead to a market transaction of low value involving little customer care.[2]

**1.      Velvet Elvis enticed patrons into the bar and, once there, they stayed.**

In *Elvis*, the Velvet Elvis nightclub intentionally sought to deceive customers into believing that it was associated with Elvis Presley.  It displayed a velvet painting of Elvis and several other pieces of Elvis-related décor, including magazine photographs, a statuette, and a bust.  *Elvis*, 141 F.3d at 192.  The nightclub's menu also played heavily upon Elvis references, including offerings of a frozen drink entitled "Love Me Blender" and a hot dog named "Your Football Hound Dog."  *Id.*  Velvet Elvis's advertisements included such phrases as "The King Lives," "Hunka-Hunka Happy Hour," and "Elvis has not left the building."  *Id.*

Plaintiff Elvis Presley Enterprises, Inc. sued Velvet Elvis for trademark infringement.  *Id.* Addressing the "actual confusion" digit in its likelihood-of-confusion analysis, the Fifth Circuit pointed to testimony from witnesses who entered the Velvet Elvis initially believing it was associated with Elvis.  All of these witnesses testified that, upon entry, they were certain that the

_____

[2]The initial interest confusion doctrine has also been the subject of much academic commentary and criticism.  Indeed, one article—in U of H's own law review—laments that "[s]ome courts have used the initial interest confusion doctrine to justify claims against virtually any use that temporarily diverts customers . . .., regardless of whether the diversion resulted from confusion or harmed consumer interests in any way" and decries expansion of the doctrine as posing "a grave danger to the law's information-facilitating goals."  Stacy L. Dogan, et al., *Trademarks & Consumer Search Costs on the Internet*, 41 HOUS. L. REV. 777, 780-82 (2004) (Ex. 1).

nightclub was *not* affiliated with Elvis in any way.  *Id.* at 204.  The Fifth Circuit noted that the Velvet Elvis benefitted as follows:

> Despite the confusion being dissipated, this initial-interest confusion is beneficial to the Defendants because it brings patrons in the door; indeed, it brought at least one of [plaintiff's] witnesses into the bar.  Once in the door, the confusion has succeeded because some patrons may stay, despite realizing that the bar has no relationship with [plaintiff].

*Id.*

The court cited two specific examples of benefit to Velvet Elvis that it found concerning—both of which financially benefitted the defendants.  *First*, the court noted that "[o]ne witness who was initially confused stayed and purchased a beer." *Id.* at 204 n.7.  *Second*, the court found especially significant the fact that "the Defendants' bar sometimes charges a cover charge for entry, which allows the Defendants to benefit from initial-interest confusion before it can be dissipated by entry into the bar." *Id.* at 204.  Moreover, the Court's general concern that "some patrons may stay" hinged on the concept that the patrons, once they decided to stay, would buy something from the Velvet Elvis.  On these facts, the Fifth Circuit found actual confusion to exist based on this initial interest confusion.  To the College's knowledge, *Elvis* is the *only case* in which the Fifth Circuit has held that initial interest confusion satisfies the "actual confusion" digit.

### 2.    Houston College of Law is not the Velvet Elvis.

The present case is not *Elvis*—for several reasons.  *First*, the Fifth Circuit found that the defendants' manner of advertising their Velvet Elvis nightclub mark—including by "emphasiz[ing] the 'Elvis' portion of the mark, leaving the 'Velvet' portion almost unnoticeable"—evidenced "an intent to market the bar by relying upon the drawing power of Elvis." *Id.* at 202-03.  Here, there is no evidence, much less a substantial showing, that the College relies on U of H's perceived drawing power to market the College's 93-year-old law

school. Instead, the evidence shows that the College simply identifies its geographic location (Houston) and purpose (legal education)—an entirely reasonable and permissible end with limited potential permutations. (*See* Dkt. 38 at 20-22.)

Nor is there any evidence of the requisite intent on the part of the College. It is undisputed that, in 2013, the College commissioned an extensive market survey regarding the College's former name from an independent agency in Washington, D.C. The market survey examined the problems caused by the name "South Texas College of Law" and identified potential solutions. The survey demonstrated that the College's location was often misperceived as being near the Texas-Mexico border, despite the fact that the College has been located in downtown Houston for the past 93 years. (Dkt. 40, Ex. JJ [7/22/13 Scarborough Survey] at 43-44, 89-90.) The survey also revealed that the most popular option for a new name (favored by 32% of respondents, compared to 9% for the second-place option) was to replace "South Texas" with the word "Houston," thereby changing the name to "Houston College of Law," "Houston School of Law," or "Houston Law School." (*Id.* at 52, 106.) The survey confirms that the action ultimately taken by the College's Board of Trustees had nothing to do with any supposed intention to encroach on U of H's brand. Indeed, the overwhelming evidence establishes that the decision was driven only by a desire to align the College's name with its location—Houston—in the minds of consumers. *See Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, No. 15-11509, 2016 WL 4010164, at *13 (11th Cir. July 26, 2016) (finding lack of intent where "[the defendant] provided a plausible explanation for why it added the word 'University' to its name") (Dkt. 39-2).

*Second*, the Elvis Presley marks were as strong as they come. Indeed, the *Elvis* defendants "conceded that [plaintiff's] marks have 'worldwide fame and almost instantaneous

recognition.'" *Elvis*, 141 F.3d at 201. The Fifth Circuit concluded that plaintiff's marks were "very strong." *Id.* But the Elvis marks are a far cry from U of H's asserted marks, which consist mostly, if not entirely, of descriptive, geographical, or abandoned terms. Nonetheless, U of H argues in its Post Hearing Supplement (without citation) that "the UH brand is commercially strong and well known. This is indisputable." (Dkt. 56 at 3.) To the extent U of H was referring to its asserted marks, this statement is, in fact, both disputable and much disputed. In its response brief alone, the College dedicated several pages to establishing the weakness of the asserted marks and disputing U of H's unsupported assertion of famousness of any of the marks. (Dkt. 38 at 6-16.)

*Finally*, in the statement from *Elvis* that U of H focuses on, the Fifth Circuit describes the general concern of the initial interest confusion doctrine—the "might as well grab a drink or a burger now that I'm here" concern—as follows:

> Initial-interest confusion gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated.

*Id.* at 204. Based on this language, as well as *Elvis*'s reference to the concern that patrons might stay in the bar, other courts have concluded that the Fifth Circuit's decision in *Elvis* hinged on the consumers' purchase of products. *See Baker v. DeShong*, 90 F. Supp. 3d 659, 664-65 (N.D. Tex. 2014) (citing *Elvis* in observing that "offline [non-Internet] uses of marks found to cause actionable initial interest confusion have involved financial gain"); *see also Lamparello v. Falwell*, 420 F.3d 309, 317 & n.5 (4th Cir. 2005) ("Profiting financially from initial interest confusion is thus a key element for imposition of liability under this theory.") (citing cases).

*Elvis*, like every other important initial interest confusion case, is easily distinguished from the present case based on the factual record before the Court on U of H's preliminary-

injunction motion. U of H has not shown that initial interest confusion will "bar [U of H] from consideration" after any alleged confusion is dispelled. The factual record—and common sense—belie U of H's contention that a law school applicant would exclude U of H from consideration for a legal education based on some alleged "bait and switch" scheme. Such a scenario is contrary to the way potential law students investigate, apply to, and select law schools.

U of H has fallen far short of its obligation to produce evidence sufficient to support a claim of confusion in the minds of the relevant consumers. Plainly, U of H has offered no evidence that a potential law student exists who (1) used a search engine to look for "Houston law schools"; (2) clicked on the College's website among the returned search results, initially believing it to be associated with U of H's law school website; (3) had his or her confusion dissipated upon examining the site's content (*including the College's prominent disclaimer*) or even later; and (4) decided to end his or her search for potential law schools and apply only to the College, to the exclusion of U of H. Nor has U of H shown evidence of a scenario in which a law student heard or read of "Houston College of Law" and applied to the College *to the exclusion of U of H*. Finally, U of H has not shown that a law school applicant, having applied to both schools, chose the College over U of H's law school due to some earlier confusion. The reason for the absence of such evidence is easy to understand: potential law students are not equivalent to bar patrons and do not decide to go to a law school after they realize that the school was not the one they were initially investigating.

### C. Other cases applying the initial interest confusion doctrine tend to involve facts not present here.

A review of other cases applying the initial interest confusion doctrine to find actual confusion reveals recurring, shared facts that are either (1) missing from the factual record presented here or (2) weigh against application of the doctrine.

### 1. Courts typically apply the doctrine only where the defendant has bad intent.

Cases finding that initial interest confusion supports actionable likelihood of confusion commonly involve instances where the junior user has *intentionally* adopted its mark to capitalize on that initial interest confusion. This is true of both the landmark cases involving initial interest confusion and the cases U of H relies on in its brief, including *Elvis*, which found "intent to market the bar by relying upon the drawing power of Elvis." *Elvis*, 141 F.3d at 203.

For example, U of H relies heavily on *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975). In *Steinway*, one of the first cases to apply the doctrine, the court found that an "*inference of malice [was] clear*" and cited two examples. *Id.* at 1338 (emphasis added). *First*, the accused infringer, Grotrian-Steinweg, published brochures that prominently referred to its product as "The Instrument of Immortals." The Second Circuit found that "[t]his was nothing less than a blatant copying of Steinway's registered slogan 'Steinway The Instrument of the Immortals.'" *Id*. *Second*, Grotrian-Steinweg testified at trial that the correct pronunciation of "Steinweg" was different from "Steinway." Yet this testimony was contradicted by Grotrian-Steinweg's own brochures, which instructed English-speaking readers to pronounce "Steinweg" in a different way—a way that the court found was "suspiciously close" to "Steinway." *Id.*

U of H also relies on another early initial interest confusion opinion, *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987). There, defendant Pegasus Petroleum

was found to infringe Mobil Oil's "well-known" flying horse symbol. *Id.* at 255. Pegasus Petroleum's owner testified that, in choosing the name "Pegasus Petroleum," he wanted "a name with both mythical connotations and alliterative qualities" and that, despite his knowledge of Mobil Oil's flying horse symbol, he "did not intentionally choose the tradename 'Pegasus' with [Mobil Oil's marks] in mind." *Id.* at 256, 258. The district court rejected this excuse and found that Pegasus Petroleum "did not innocently select its potentially confusing mark." *Id.* at 258. The Second Circuit agreed: "the record clearly substantiates [the district court's] inference of bad faith." *Id.* at 259.

Similarly, in *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002), another case U of H cites, the defendant implanted the word "Copitrack" as a metatag in its website because it serviced plaintiff's trademarked "Copitrak" equipment. *Id.* at 810. And the defendant candidly admitted that it "meant to use the correct spelling of Copitrak in its metatag"—i.e., the plaintiff's exact mark. *Id.* at 812. Thus, the court found that the defendant "used [plaintiff's mark] in a way calculated to deceive consumers into thinking that [defendant] was [plaintiff]." *Id.* at 814. In all of these cases, an element of bad faith was apparent. The infringers chose their marks intending to gain the benefit of another's mark by inviting at least initial interest confusion.

Here, there is no evidence—much less evidence representing a substantial likelihood of success at trial—that the College chose its mark to gain the benefit of U of H's marks (or the marks of any other school containing the words "Houston" or "College"). To the contrary, as described above, all of the record evidence shows that the College did so only to identify itself with its geographic location of the past 93 years.

## 2. Courts typically apply the doctrine where very strong marks are at issue.

For a defendant to succeed in a bait and switch tactic inherent in the initial interest confusion doctrine, the bait must be enticing—or strikingly similar to something that is otherwise unusual or arbitrary. Thus, it is not surprising that the doctrine is typically invoked only where very strong marks are involved:

- *Elvis*: Defendants "conceded that [plaintiff's] marks have 'worldwide fame and almost instantaneous recognition.'" 141 F.3d at 201 (noting also that plaintiff's marks are "very strong");

- *Steinway*: "Whatever reputation [the accused infringer's] products may enjoy outside the United States and whatever may be the competition between the two pianos in other countries, Steinway is the renowned name here." 523 F.2d at 1340, 1342 (noting also that Steinway's mark is "strong and its name famous in the United States");

- *Mobil Oil*: Defendant did "not dispute the district court's conclusion that the strength of Mobil's flying horse mark is 'without question, and perhaps without equal.'" 818 F.2d at 257-58 (noting also that Mobil Oil's mark is of "unparalleled strength"); and

- *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir. 1997):[3] Defendants did "not dispute that the Cat's stove-pipe hat, the words 'Dr. Seuss,' and the title 'The Cat in the Hat' are widely recognized trademarks."

U of H has not shown that its marks are on par with, or even close to, Elvis, Steinway, Mobil Oil's flying horse, or Cat in the Hat. Because they are weak, the asserted marks associated with U of H's law school do not tempt the kind of mischief that the initial interest confusion doctrine seeks to prevent. To the extent that U of H is seeking protection of the word "Houston" as a mark, it—unlike Mobil Oil's Pegasus, Elvis, and Steinway—is used every day by

---

[3]*Dr. Seuss* and *Mobil Oil* were the only two initial interest confusion cases that the *Elvis* court cited in its discussion and application of the doctrine. *Elvis*, 141 F.3d at 204.

thousands of third parties and businesses in the fourth largest city in the nation.[4]  As such, it is a weak, geographically-descriptive term entitled to little, if any, protection.  And "College of Law"—even if it were a mark U of H's law school uses in commerce, which the evidence shows it is not[5]—simply describes what a law school is.

### 3. Profiting financially from initial interest confusion is a common, if not key, element of the doctrine.

Cases finding actionable initial interest confusion tend to involve the junior user profiting financially from the use of the senior mark.  It has been described as a key element of the doctrine.  *Lamparello*, 420 F.3d at 317 & n.5 ("Profiting financially from initial interest confusion is thus a key element for imposition of liability under this theory.") (citing cases).  As the Sixth Circuit has noted: "Simply invoking the term 'initial-interest confusion' does not state a viable claim . . . .  [A]lleging a hypothetical chance that a consumer might think for an instant that two products come from the same source is simply not enough."  *Groeneveld*, 730 F.3d at 519.

Courts in this Circuit have also concluded that a junior user's financial gain is an important element of initial interest confusion.  For example, in *Baker v. DeShong*, the court determined that "offline [non-Internet] uses of marks found to cause actionable initial interest confusion have involved financial gain."  90 F. Supp. 3d at 664-65 (citing *Elvis*, 141 F.3d at 204).  The court's citation to *Elvis* is telling.  *Elvis* did quote McCarthy in noting that "[i]nfringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion."  *Elvis*, 141 F.3d at 204.  But, as

---

[4] "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 504 (5th Cir. 1980); *see also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259-60 (5th Cir. 1980) (evidence of extensive third-party uses of "Domino" mark limited the scope of the protection to be accorded plaintiff's mark).

[5] U of H uses the name "University of Houston Law Center" to market its law school.  (*E.g.*, Dkt. 27-18 ¶ 5; *see also* Dkt. 39-7.)

described above, the *holding* of *Elvis* was predicated on either probable or actual instances of a sale taking place. Here, there is no evidence of the College financially benefitting—via a sale or otherwise—from any kind of confusion.

### 4. The presence of sophisticated consumers weighs heavily against invoking the doctrine.

The initial interest confusion doctrine is less applicable when, as here, the transaction involves careful, sophisticated consumers buying high-cost services. Multiple courts have so held. *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 799-800 (N.D. Tex. 2012) (purchasers' high degree of care and sophistication weighed "heavily" against a finding of initial interest confusion); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 285-86, 298 (3d Cir. 2001) (finding no initial interest confusion, partly because the relevant consumers "place[d] great importance on, and [took] great care in, purchasing these products"); *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997) (sophisticated consumers, small market, and high cost of wastewater projects weighed against a finding of initial interest confusion); *Select Comfort Corp. v. Baxter*, 156 F. Supp. 3d 971, 988 (D. Minn. 2016) (initial interest doctrine inapplicable where specialty mattresses cost between $1,600 and $2,300 and were purchased online, indicating that consumers would exercise a high degree of care).[6]

### D. In a similar situation, a district court in this Circuit analyzed initial interest confusion in denying an application for a preliminary injunction.

A case decided in this Circuit, *John Crane Production Solutions, Inc. v. R2R & D, LLC*, illustrates the appropriate application of the initial interest confusion doctrine in situations where,

---

[6]U of H's citation to *HRL Associates, Inc. v. Weiss Associates, Inc.*, 1989 WL 274391 (T.T.A.B. July 21, 1989), a 1989 Trademark Trial and Appeal Board decision, is neither persuasive nor controlling. Although the Federal Circuit affirmed the Board's decision, it expressly "[did] not reach or embrace [the initial interest] concept in deciding this case." *Weiss Assocs., Inc. v. HRL Assocs., Inc.*, 902 F.2d 1546, 1549 (Fed. Cir. 1990) ("Therefore, we are not following this concept of initial confusion . . . .").

like here, there is a crowded field of similar marks, no evidence that the defendant intended to trade on the senior mark, and sophisticated purchasers.  861 F. Supp. 2d 792 (N.D. Tex. 2012) (Fitzwater, C.J.).

In *John Crane*, the plaintiff and defendants both sold directly competitive fiberglass sucker rods for use in oil wells.  *Id.* at 794.  The plaintiff used the mark FIBEROD, while the defendants used the mark FINALROD.  *Id.*  The plaintiff sought a preliminary injunction enjoining the defendants' use of the FINALROD mark.  *Id.*

The court denied the plaintiff's request for a preliminary injunction, finding that the plaintiff had not "'clearly carried its burden' of showing a likelihood of confusion." *Id.* at 801- 02.  *First*, the court noted that the parties operated in a crowded field consisting of companies using similar marks containing the words "fiber" or "rod," including Flexrod, Fiberflex, Fibertech, Petro Rod, Pro Rod, and others.  *Id.* at 796.  It was unsurprising that "the sellers in the market use names and marks that connote the very product the company sells: fiberglass sucker rods."  *Id.*  Similarly, many other schools in Texas use the words "University," "Houston," or "College."  (Dkt. 38 at 15.)

*Second*, the court found that—as here—the plaintiff "adduced no direct evidence that defendants intended to trade on the reputation and goodwill of [the plaintiff's] mark." *John Crane*, 861 F. Supp. 2d at 797 (rejecting plaintiff's proposed "inferences" of bad faith based upon defendants' knowledge of plaintiff's mark, the similarity of the parties' locations, and the alleged similarity of the marks).  Instead, the court noted that defendants adopted a mark that was "typical of the ones used in the trade." *Id.*  Separately, the court noted that the two marks FIBEROD and FINALROD were not so similar as to cause confusion, in part because they "sound different when spoken and appear different when written." *Id.* at 796.  And this was

despite the two companies both operating in Big Spring, Texas—a tiny community compared to Houston. *Id.* at 797.

*Finally*, the court considered the initial interest confusion doctrine and discussed *Elvis* and *Mobil Oil*. The court rejected the plaintiff's initial interest argument, noting that—like potential law students here—"the purchasers of fiberglass sucker rods exercise a high degree of care and sophistication in making their purchases" and that this "weighs heavily in favor of a finding of no likelihood of confusion." *Id.* at 799-800. Based on its analysis, the court concluded that the plaintiff had not "'clearly carried its burden' of showing a likelihood of confusion" and denied the request for a preliminary injunction. *Id.* at 801-02. Respectfully, this Court should hold similarly.

## III. RESPONSE TO U OF H'S NEW EVIDENCE AND ARGUMENTS

### A. Neither mischaracterized testimony nor speculation is sufficient to support claims of confusion.

As a threshold matter, U of H has proffered no actual evidence of initial interest confusion. Instead, in its Supplemental Brief, U of H mischaracterizes Dean Guter's testimony as an admission of likelihood of confusion and then attempts to rely on mere speculation based on hearsay statements from unidentified persons.

Concerning Dean Guter's testimony, the record shows that Dean Guter made no such admission. In the portion of Dean Guter's deposition transcript cited by U of H,[7] Dean Guter testified that if applicants are "doing their due diligence they know we're not part of [U of H]." (Dkt. 45 Ex. PP at 75:9-15.) Dean Guter also expressed his expectation that with the College's new name, applicants will look at its website, unlike the applicant who did not click on the former "South Texas" link because he or she "didn't want their education to take place in The

---

[7]U of H cites its Exhibit PP at 75:9-77:5 to support its allegations. (Dkt. 65 at 2.)

Valley." (*Id.* at 75:21-23; 36:5-25.) A review of his complete testimony shows that Dean Guter did not, as U of H claims, admit that any confusion resulting from the College's logos "could only be dispelled by the student conducting 'due diligence' through the [College's] website." (Dkt. 65 at 8-9.) Nor did Dean Guter "admit[] that the confusion is not easily dispelled." (*Id.* at 9.)

In response to a question regarding whether someone Googling "Houston law school" would initially be mistaken as to the College's affiliation with U of H, Dean Guter testified that someone "may be mistaken" and that "[a]nything is possible." (Dkt. 45 Ex. PP at 76:18-77:3.) These are speculative answers to speculative questions—not admissions of a likelihood of confusion, as U of H claims. Also purely speculative is U of H's imagined scenario about a potential law student hearing one of the College's professors speak and being "unimpressed or offended" to the point of mistakenly striking U of H from consideration. (Dkt. 65 at 12-13.)

Of course, speculation does not satisfy U of H's heavy burden in seeking preliminary-injunctive relief. The proponent of an initial interest confusion theory must prove it. *Vail Assocs.*, 516 F.3d at 872 ("[A] court cannot simply assume a likelihood of initial interest confusion, even if it suspects it. The proponent of such a theory must prove it."); 4 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:6 (4th ed. Sept. 2016) ("[E]ven if the marks are almost identical, initial interest confusion is not assumed and must be proven by the evidence.") (Ex. 2). Thus, in analyzing initial interest confusion, the focus is on "evidence of *actual* confusion, not a mere risk of confusion." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000) (emphasis in original). U of H offers no competent evidence of actual confusion.

## B. U of H's supplemental evidence is not proof of actual confusion.

Almost a month after oral argument, U of H continues to try to submit what it claims is "evidence" of actual confusion. For the reasons set forth below, the Court should give little or no weight to U of H's latest untimely submissions.

### 1. Johnson Declaration (Dkt. 64-1).

Anna Johnson, a U of H employee (and thus an interested witness), attests that an unknown, unnamed man of unspecified age approached her at a job fair to express confusion between the College and U of H's Law Center. This evidence is not probative for three reasons. *First*, because U of H failed to name the allegedly confused individual, the College (and the Court) has no way to confirm Ms. Johnson's encounter or the reason for the unidentified person's alleged confusion. *Second*, nothing in the Johnson Declaration indicates that the unidentified man was even a relevant consumer—a person likely to attend law school in the near future. *Third,* such an isolated, anecdotal example of actual confusion offers little support to a finding of likelihood of confusion. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1150 (10th Cir. 2013) ("We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis."); *see also Fla. Int'l*, 2016 WL 4010164, at *14 (noting that minor instances of confusion by persons "casually acquainted" with a business are "worthy of little weight"). Finally, to the extent the Johnson Declaration evidences any confusion at all, it is initial interest confusion that should be analyzed in the framework described above and found not to be sufficient to establish likelihood of confusion under the Lanham Act.

### 2. Neely Declaration (Dkt. 64-2).

Nathan Neely, another U of H employee, attests that he had a telephone conversation with another unidentified person seeking an application-fee waiver. Because U of H does not

currently charge an application fee, he concluded that the caller had confused the College and U of H. The Neely Declaration is entitled to little or no weight for the same reasons set forth with respect to the Johnson Declaration.

### 3. Pelaez Declaration (Dkt. 64-3).

Ms. Pelaez, a third-year law student at U of H, attests that she had difficulty registering for the Multistate Professional Responsibility Exam, confusing the College and U of H. Neither the College nor U of H has anything to do with the exam, the National Conference of Bar Examiners, or the Law School Admissions Counsel, which are referenced in the Pelaez Declaration. Plainly, this is not an example of the College using the complained-of mark in commerce, and Ms. Pelaez's "confusion" has little relevance to any likelihood of confusion analysis.

### C. Despite continued briefing, the relevant consumer remains potential law students.

Although the Court directed the parties to file their supplemental briefing on the initial interest confusion doctrine, U of H again exceeded the scope of the Order and has further delved into the topic of relevant consumers. (Dkt. 65 at 14-16.) The College must therefore briefly respond.

The College agrees with U of H that potential law students, especially those likely to attend law school in the near future, are the relevant consumers in this case. (Dkt. 64 at 14.) For this reason, the College's expert—Mr. Gelb—surveyed only persons that had taken the LSAT in the past year. (Dkt. 39-45 [Ex. UU] at 4.) U of H's expert, on the other hand, broadly and unreliably included persons that self-identified (without independent verification) as "considering or will be attending law school" at an unspecified time in the future. (*See* Dkt. 47-3 [Ex. NN] at 4.)

Nevertheless, U of H continues its attempts to impermissibly expand this relevant-consumer group to anyone who may encounter U of H or the College. In fact, U of H's Supplemental Brief includes a brand-new claimed "consumer"—"the public that utilizes the UH Law Center's institutes, centers, and select programs." (Dkt. 65 at 15.) This ill-defined, newly minted group is part of U of H's effort to include almost anyone in the relevant-consumer bucket in order to bolster its expert's flawed surveys. (*See id.* at 14-16.) In doing so, U of H ignores the law in the Fifth Circuit specifying the composition of a survey universe: "[t]he appropriate universe should include a fair sampling of those purchasers most likely to partake of *the alleged infringer's goods or services.*" *Amstar Corp.*, 615 F.2d at 264 (emphasis added). U of H's expert failed to comply with this mandate.

Untimely supplementation of the record, argument, and underlying theories, without leave of Court, conforms to U of H's pattern in this case. U of H did the same thing days after the preliminary-injunction hearing by submitting two irrelevant California state-court unfair-competition cases to support its attempt to make the entire public a relevant consumer. (Dkt. 57 at 7-8 (distinguishing U of H's California authorities).)

Aside from the shifting theories in its briefing, U of H consistently fails to address key points raised by the College. *First*, U of H has yet to distinguish any of the College's authorities establishing that potential students—those persons likely to purchase educational services—are the persons most relevant to evaluating actual confusion in a trademark dispute between educational institutions. (*E.g.*, Dkt. 38 at 19-20.) *Second*, U of H offers no explanation for its reliance on and failure to cite to the decades-old court opinions it only now, well after oral argument, has provided for the Court to review and the College to respond to.

*Third*, U of H fails to address the substantial authorities that provide "even several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098-99 (8th Cir. 1996) (citing *Astra Pharm. Prod. Inc. v. Beckman Instruments Inc.*, 718 F.2d 1201, 1207-08 (1st Cir. 1983) (temporary confusion about association of salesmen from the plaintiff's company with the defendant was insufficient to raise a genuine issue of material fact regarding confusion)); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978) (nineteen misdirected letters in four years were insufficient to establish likelihood of confusion).[8]  Similarly, *de minimis* initial interest confusion can be insufficient to establish actual confusion.  *E.g.*, *Checkpoint Sys., Inc.*, 269 F.3d at 297-98.

*Finally,* the additional new authorities upon which U of H's relies, *Mastercrafters* and *Ferrari*, suffer from the same overriding deficiency: both involved intentional and exact copying of the senior party's product trade dress.  But neither exact, intentional copying of a design nor a product's trade dress are at issue in this case, and U of H has offered no evidence to the contrary.  In *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*, the court determined that the infringer's "intention thus to reap financial benefits from poaching on the reputation of the Atmos clock [by copying its product trade dress] is of major importance." 221 F.2d 464, 466-67 (2d Cir. 1955).  Similarly, in *Ferrari S.P.A. v. Roberts*, the defendant "conceded that his intent in replicating the exterior design of Ferrari's vehicles was to market a product that looked as much as possible like a Ferrari original."  944 F.2d 1235, 1242 (6th Cir. 1991).  As discussed at length above, the College had no intention to associate itself with U of H

---

[8](*See also* Dkt. 38 at 22-23 (citing the *Florida International* court's characterization of minor instances of confusion by persons "casually acquainted" with a business as "worthy of little weight").)

in any way (*supra*, Part II.B.2), and U of H's citations to product trade-dress cases do not support its request for a preliminary injunction.

**IV.      CONCLUSION**

Multiple cases from around the country define the parameters of the initial interest confusion doctrine.  While it is an appropriate doctrine to apply in certain circumstances, it is limited in nature.  Because U of H has not presented the Court with a record making initial interest confusion potentially relevant here, U of H cannot rely on the doctrine to show actionable confusion as part of its burden to obtain a preliminary injunction.

Respectfully submitted,

_____/s/ David J. Beck_____
David J. Beck
State Bar No. 00000070
S.D. Tex. 16605
dbeck@beckredden.com
BECK REDDEN LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

**ATTORNEY-IN-CHARGE FOR
HOUSTON COLLEGE OF LAW**

Eric J.R. Nichols
State Bar No. 14994500
S.D. Tex. 13066
enichols@beckredden.com
Karson K. Thompson
State Bar No. 24083966
S.D. Tex. 2878342
kthompson@beckredden.com
Beck Redden LLP
515 Congress Avenue, Suite 1900
Austin, Texas 78701
Telephone: (512) 708-1000
Facsimile: (512) 708-1002

Parth S. Gejji
State Bar No. 24087575
S.D. Tex. 2917332
pgejji@beckredden.com
Beck Redden LLP
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

**OF COUNSEL:**
Lynne Liberato
State Bar No. 00000075
S.D. Tex. 3072
lynne.liberato@haynesboone.com
HAYNES AND BOONE, LLP
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600

Kenneth G. Parker
California Bar No. 182911
*Admitted pro hac vice*
kenneth.parker @haynesboone.com
HAYNES AND BOONE, LLP
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
Telephone: (949) 202-3000
Facsimile: (949) 202-3114

Jeffrey M. Becker
State Bar No. 02015730
jeff.becker@haynesboone.com
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2016 the foregoing document and exhibits were served via the Court's CM/ECF system on plaintiffs' counsel of record, who have registered as filing users of the CM/ECF system, for this case pursuant to Local Rule 5.1, and that the same was also sent via facsimile or email.

Anthony G. Buzbee
tbuzbee@txattorneys.com
THE BUZBEE LAW FIRM
JP Morgan Chase Tower
600 Travis
Suite 7300
Houston, TX 77002
Telephone: (713) 223-5393
Facsimile: (713) 223-5909

Elizabeth W. King
eking@smd-iplaw.com
Robert J. McAughan, Jr.
bmcaughan@smd-iplaw.com
Albert B. Deaver, Jr.
adeaver@smd-iplaw.com
Jeffrey A. Andrews
jandrews@smd-iplaw.com
SUTTON MCAUGHAN DEAVER PLLC
Three Riverway, Suite 900
Houston, Texas 77056
Telephone: (713) 800-5700
Facsimile: (713) 800-5699

*/s/ Hamilton C. Simpson*
Hamilton C. Simpson