United States District Court
Southern District of Texas
**ENTERED**
October 14, 2016
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **THE BOARD OF REGENTS OF THE UNIVERSITY OF HOUSTON SYSTEM ON BEHALF OF THE UNIVERSITY OF HOUSTON SYSTEM AND ITS MEMBER INSTITUTIONS et al.,**<br><br>**Plaintiffs/Counter-Defendants,**<br><br>**v.**<br><br>**HOUSTON COLLEGE OF LAW, INC., formerly known as SOUTH TEXAS COLLEGE OF LAW,**<br><br>**Defendant/Counter-Plaintiff.** | **CIVIL ACTION NO. 4:16-CV-1839**<br><br>**Honorable Keith P. Ellison** |

### MEMORANDUM OPINION SETTING OUT FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

In this trademark infringement action, Plaintiffs ("UH") move for a preliminary injunction to prevent Defendant Houston College of Law (formerly known as South Texas College of Law, and referred to herein as "Defendant") from using the mark "HOUSTON COLLEGE OF LAW" as a name, mark, or source identifier for its legal education services.[2]

---

[1] Pursuant to Fed. R. Civ. P. 52(a), the Court sets out its findings of fact and conclusions of law in this memorandum opinion. Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

[2] (*See* Pl. Mot. for Prelim. Inj. 1-2, Dkt. 27 ("Mot.").) Also before the Court is Plaintiffs' Motion to Exclude or Strike Defendant's Expert Witness Gabriel Gelb. (*See* Mot. to Exclude, Dkt. 51.) The Court need not reach the issues contained in that motion, which is hereby terminated as moot.

1

Based on the pleadings, the numerous briefs and submissions,[3] the arguments and evidence presented at a hearing on the motion, and the applicable law, the Court enters the findings of fact and conclusions of law set forth below. Based on the findings and conclusions, the Court **GRANTS** UH's motion for a preliminary injunction.

## I.   <u>BACKGROUND</u>

The University of Houston is a public university founded in 1927 that provides undergraduate- and graduate-level courses in a variety of academic disciplines. It is ranked as a Tier 1 research university in the Carnegie Research University Rankings, serves more than 42,000 students annually, and has achieved national recognition for both its football and basketball programs. Its campus is located just outside downtown Houston.

UH's law school was founded in 1947 and was known as the University of Houston College of Law until 1967, when it became the Bates College of Law. This name was relatively short-lived, however, as another name change occurred in 1982 when UH became the University of Houston Law Center ("UHLC"). It has been known and marketed as such ever since. UH is ranked as the 50th best law school in the country in the *U.S. News and World Report* rankings.

Defendant, located in downtown Houston, is a private law school that was founded in 1923 as South Texas College of Law and Commerce. It exists on its own, which is to say that it is not owned by or materially affiliated with a university or other colleges. For most of its

---

[3] The parties have filed eight briefs in an eight week span, and five of those briefs were filed by UH. Two of UH's briefs were not solicited by the Court, though their filing was not entirely outside the bounds of custom. (*See* Pls. Post Hr'g Supp., Dkt. 56, and Pls. Second Post Hr'g Supp., Dkt. 64.) On another occasion, however, the Court requested briefing on the doctrine of initial-interest confusion, and UH took the opportunity to submit briefing regarding other issues—issues that the parties had already briefed repeatedly and addressed at great length at the hearing. (*See* Pls. Supp. Br., Dkt. 65.) This was inappropriate, resulted in Defendant understandably feeling compelled to respond, which led to additional briefing on an already over-briefed issue. The Court did not take UH's briefing of the other issues into consideration.

existence, the law school was known as South Texas College of Law, and more recently as South Texas College of Law/Houston.  It is unranked in the *U.S. News* rankings.

On June 22, 2016, South Texas College of Law announced that it was changing its name to "Houston College of Law."  UH publicly voiced its opposition to the name change almost immediately thereafter, expressing its concern about the potential for "significant confusion" between UH and Defendant's newly-branded law school.  Five days after Defendant announced its name change, UH filed a complaint alleging trademark infringement, among other claims.

## II.   LEGAL STANDARDS

### A.   The Preliminary Injunction Standard

A court may grant an application for a preliminary injunction "only if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."[4]  "Although the grant or denial of a preliminary injunction rests in the discretion of the trial court, '[the Fifth Circuit has] cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.'"[5]

### B.   The Lanham Act Standard

The Lanham Act makes liable "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by

---

[4] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

[5] *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 748 (S.D. Tex. 2009) (quoting *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003)).

another person."[6]  To obtain an injunction for trademark infringement, a party must show that (1) the claimed mark is eligible for protection, (2) the party seeking protection is the mark's senior user, (3) there is a likelihood of confusion between the plaintiff's mark and the defendant's mark, and (4) this likelihood of confusion will cause the plaintiff irreparable injury for which there is no adequate legal remedy.[7]  The parties do not dispute that, to the extent UH's claimed marks are eligible for protection, UH is the senior user.

## III.   LIKELIHOOD OF SUCCESS ON THE MERITS

Analysis for trademark infringement under the Lanham Act proceeds in two steps. "[A] party must first show that it has a protectable right in the mark and, second, show that there is a likelihood of confusion between the marks.[8]

### A.   Protectable Right in the Claimed Marks

UH seeks protection of both federally registered marks and common law marks. The Court will address each type of mark in turn.

### (1)   UH's Registered Trademarks

UH has presented proof that it owns Reg. No. 0,747,078, Reg. No. 3,025,231, and Reg. No. 4,116,569, each of which registers the word mark "UNIVERSITY OF HOUSTON."[9]  "Proof of registration of a service mark or trademark is . . . prima facie evidence of the registrant's exclusive right to use the mark in commerce for the services specified in the registration."[10]

---

[6] 15 U.S.C. § 1125(a)(1)(A); *see also Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008).

[7] *See Paulsson*, 529 F.3d at 309 (quoting *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 844 (5th Cir. 1990)).

[8] *Paulsson*, 529 F.3d at 309.

[9] (*See* Mot. at 5 (citing, *e.g.*, Pl. Exs. C, D and E).)

[10] *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (citing 15 U.S.C. §§ 1057(b) & 1115(a)).

Here, Defendant does not challenge UH's exclusive right to use this mark, but argues that the services specified in the registration are narrower than UH alleges.[11]

The UNIVERSITY OF HOUSTON mark is the subject of numerous federal registrations, and the services specified in each registration vary. Although Defendant correctly notes that Reg. Nos. 0,747,078 and 4,650,772 are not directed at "educational services themselves," Defendant fails to raise a similar objection—or even mention—Reg. No. 4,116,569,[12] which expressly provides for use of the mark in the context of "educational services, namely, providing college and graduate level courses of instruction, continuing education courses, and seminars in the . . . legal . . . field[]."[13] By Defendant's own implicit admission,[14] this is precisely the context in which UH is bringing the instant litigation. The Court therefore holds that UH possesses a protectable right in the "UNIVERSITY OF HOUSTON" mark.

(2)      <strong>UH's Claimed Common Law Trademarks</strong>

UH also alleges that it holds several common law (*i.e.*, federally unregistered) word marks and "color marks" that are eligible for protection, including "UNIVERSITY OF HOUSTON LAW CENTER," "HOUSTON LAW," and the colors red and white.[15]

"To determine whether a word or phrase is protectable, it must first be determined into which category, (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful, the word

---

[11] (*See* Def. Resp. 13-14, Dkt. 38 ("Opp.").)  To the extent that Defendant intends its discussion of third-party usage to rebut the presumption of the mark's validity (rather than as evidence that the mark is weak, albeit protectable), the Court does not find the argument persuasive.  *See* Section III.B.1, *infra*.

[12] (*See* Opp. at 14.)

[13] (Pl. Ex. D.)

[14] (*See* Opp. at 14 (objecting to UH's registered trademark on the grounds that it is not "directed to . . . educational services themselves")).)

[15] (*See* First. Am. Compl. ¶¶ 53, 58, Dkt. 31 ("Compl."); *see also* Mot. at 7 (averring that UH holds common law rights in UNIVERSITY OF HOUSTON LAW CENTER, among other marks).)

or phrase belongs."[16]   Generic marks are never eligible for protection, but here, Defendant concedes that the claimed marks are descriptive.[17]   "Descriptive terms may only be protected after proof that they have acquired secondary meaning."[18]  "Such secondary meaning is achieved when, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself."[19]

UH has provided evidence that the UNIVERSITY OF HOUSTON LAW CENTER mark has acquired secondary meaning,[20] and Defendant seems to concede as much in the briefing.[21] The Court therefore finds that the mark has acquired secondary meaning and concludes that the mark is protectable.  The protectability of UH's other alleged common law marks need not be addressed because, as discussed below, the Court finds that Defendant's mark creates a likelihood of confusion on the basis of the UNIVERSITY OF HOUSTON and UNIVERSITY OF HOUSTON LAW CENTER marks alone.

**(B)   Likelihood of Confusion**

To demonstrate a likelihood of success on the merits of its trademark infringement claim, UH must show that Defendant's new mark, HOUSTON COLLEGE OF LAW, is likely to cause

---

[16] *Union Nat'l Bank*, 909 F.2d at 844.

[17] (Opp. at 7.)

[18] *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 268 (5th Cir. 1999).

[19] *Id.* at 268.

[20] (*See* Pl. Ex. XX and ZZ.)

[21] Defendant does not expressly concede that this is a protectable mark, but such a concession is the only conclusion that the Court can draw from Defendant's opposition briefing.  In both its brief and its Answer, Defendant admits that UHLC is known (and markets itself) as the University of Houston Law Center, and at no point seems to dispute that the mark has acquired secondary meaning.  (*See* Def. First Am. Ans. ¶38, Dkt. 55 ("Ans.") (admitting that UHLC "is known as the "University of Houston Law Center"); Opp. at 10-11 ("In 1982, the law school was renamed once again, and it has been known ever since as the 'University of Houston Law Center.'  That is the name reflected in all of its current marketing materials.") (internal cites omitted).)

confusion with one of UH's protectable marks.[22]  "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion."[23]  A finding of a likelihood of confusion is a finding of fact.[24]  In making this finding, the Court considers a non-exhaustive list of so-called "digits of confusion," including:

(1) the strength of the plaintiff's mark;

(2) the similarity of design between the marks;

(3) the similarity of the services;

(4) the identity of retail outlets and purchasers;

(5) the similarity of advertising media used;

(6) the defendant's intent;

(7) the evidence of actual confusion; and

(8) the degree of care exercised by potential purchasers.[25]

"The digits may weigh differently from case to case, depending on the particular facts and circumstances involved."[26]  "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these digits of confusion."[27] "In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists."[28]

---

[22] *Paulsson*, 529 F.3d at 309.

[23]  *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008).

[24] *Paulsson*, 529 F.3d at 306.

[25] *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

[26] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (internal quotes omitted).

[27] *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998).

[28] *Id*. at 194.

Important to note at the outset is the precise nature of UH's argument.  UH alleges not only that prospective purchasers (*i.e.*, students considering law school) will confuse Defendant with UHLC, they argue more broadly that prospective purchasers are likely to believe that Defendant and the University of Houston are somehow associated.[29]  Likelihood of confusion analysis must be conducted with this broader argument in mind.

### (1) The Strength of UH's Marks

The first digit of confusion raises the question of whether UH's marks are strong or weak.  Strength of a trademark is determined by two factors.[30]  Courts first examine the mark's conceptual strength by evaluating whether the mark should be classified as "generic, descriptive, suggestive, or arbitrary and fanciful."[31]  The strength of a mark—and, by extension, the protection that it is afforded—increases as one moves away from generic and descriptive marks toward arbitrary marks.[32]  The parties seem to agree that the marks at issue here are descriptive,[33] and the Court agrees with their assessment.[34]  The marks are therefore relatively lacking in conceptual strength.

---

[29] *See id*. at 201 (5th Cir. 1998) ("Even if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated.").

[30] *Am. Rice*, 518 F.3d at 330.

[31] *Id*.

[32] *Id*.

[33] (*See* Opp. at 7-8; Mot. at 5-8.)

[34] *See Union Nat'l Bank*, 909 F.2d at 845 (noting that geographic terms are descriptive when describing where certain services are offered).

But "[t]he ultimate strength of the mark, the key inquiry before us, is determined by a number of factors which establish its standing of the mark in the marketplace."[35]   In other words, the second factor that courts consider—and the more important of the two—is a mark's commercial strength.[36]   "Marks may be strengthened in the marketplace by extensive advertising, length of time in business, public recognition, and uniqueness."[37]   UH has introduced evidence indicating that:

- The University spends $5–$6 million on an annual basis to market its academic and athletic programs;[38]

- The law school spends an additional $500,000-$700,000 annually to market its services;[39]

- The University began marketing itself in the field of higher education using the UNIVERSITY OF HOUSTON mark in 1934, and the mark is the subject of numerous federal registrations—several of which are incontestable dating back to 1963;[40]

- The law school has been in the business of providing legal education since 1947, and has been known and marketed as the UNIVERSITY OF HOUSTON LAW CENTER since 1982;[41]

- UHLC has been recognized by *U.S. News and World Report* as the 50th best law school in the nation;[42]

---

[35] *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981).

[36] *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 698 (S.D. Tex. 2009) ("A trademark's strength is determined by the quality of the mark and, *more importantly*, by the degree to which it is recognized in the marketplace.") (emphasis added).

[37] *Homax Prod., Inc. v. Homax, Inc.*, 2009 WL 7808951, at *6 (S.D. Tex. Aug. 5, 2009) ("Other courts in this district have relied on evidence of advertising expenses, promotional activities, and industry reviews to prove strength of the mark.") (citing *Quantum Fitness Corporation v. Quantum Lifestyle Center, LLC*, 83 F. Supp. 2d 810, 820 (S.D. Tex. 1999).

[38] (*See* Pl. Ex. ZZ at ¶ 4.)

[39] (*See* Pl. Ex. XX at ¶¶ 11-13.)

[40] (*See* Pl. Ex. C at ¶ 11 (citing to several federal registrations).)

[41] (*See* Opp. at 10-11 (conceding that "[i]n 1982, the law school was renamed once again, and it has been known ever since as the 'University of Houston Law Center.'  That is the name reflected in all of its current marketing materials.")))

- The University has been the subject of national attention and acclaim for the success of its football program, as evidenced by its quarterback's recent appearance on the cover of Sports Illustrated wearing his red and white Houston Cougars jersey.[43]

This evidence suggests that the commercial strength of UH's marks is relatively strong,[44] and that this is especially true within the legal industry and geographic markets most relevant to this litigation—both UH and Defendant overwhelmingly target prospective students in just two states, Texas and Florida.[45]

The Fifth Circuit has recognized, however, that extensive third-party use of a similar mark can be "impressive evidence that there would be no likelihood of confusion."[46] Moreover, district courts must consider all third-party use of a mark—even if the use occurs outside of the plaintiff's particular industry—in determining whether the plaintiff's mark is strong or weak.[47] "The logic behind this rule is that customers [may] have become so conditioned by a plethora of such similar marks that customers have become educated to distinguish between different marks

---

[42] (Pl. Ex. N.)

[43] (Pl. Ex. XX.)  As of this writing, UH's football team is ranked as the 13th best team in the nation.

[44] See Homax, 2009 WL 7808951, at *7 (holding that evidence indicating advertising spending of several million dollars per year, use of the mark for 27 years, and substantial market share and gross sales establishes "a relatively strong position in the marketplace," and rejecting defendant's argument that direct evidence (e.g., consumer surveys) is required to indicate market strength); Quantum, 83 F. Supp. 2d at 819 (holding that plaintiff had "established a relatively strong mark within the fitness industry" based on $1 million in advertising expenses over a roughly eight year period, distribution of 100,000 promotional brochures, and extensive and favorable reports in industry publications).

[45] (See Pl. Ex. C at ¶19.)  See also Quantum, 83 F. Supp. 2d at 819, 830 (placing an emphasis on the strength of senior user's mark in the relevant market).

[46] Sun Banks, 651 F.2d at 316.

[47] Smack Apparel Co., 550 F.3d at 479 (citing Union Nat'l Bank, 909 F.2d at 848 n. 24).

on the basis of minute distinctions."[48]  Based on this logic, argues Defendant, UH's marks should be deemed relatively weak; more than 25,000 registered businesses use the word "Houston" in their names.[49]

But multiple courts in this district have acknowledged that, although the Fifth Circuit requires a broad examination of all third-party usage, it does not necessarily require fact-finders to assign equal *weight* to all third-party usage.[50]  And common sense dictates that the weight will vary significantly based on the characteristics of the third-party user and the extent of its use.[51]  For example, here, although Defendant identifies a number of Houston-based institutions of higher learning that use either "University" or "Houston" in their name,[52] none has law schools and there is no evidence that any are well known in the marketplace.  To the extent consumers are unaware of third-party use, the logic behind the third-party use rule is inapplicable; the consumers have not been conditioned to distinguish among the marks.  Thus, although Defendant's evidence of third-party use weakens the strength of UH's marks, it is only to a limited degree.

---

[48] *Quantum*, 83 F. Supp. 2d at 820.

[49] (*See* Def. Ex. EE.)

[50] *See, e.g.*, *New Century Fin., Inc. v. New Century Fin. Corp.*, 2005 WL 2453204, at *5-*6 (S.D. Tex. Oct. 4, 2005) (citing numerous cases); *Quantum*, 83 F. Supp. 2d at 820-22 (providing an excellent discussion of relevant precedent).  *See also Smack Apparel Co.*, 550 F.3d at 479 (holding only that all third-party use of a mark "may be *relevant*") (emphasis added).

[51] *See, e.g.*, *New Century*, 2005 WL 2453204, at *5-*6 (listing seven factors to take into account).

[52] Defendant identifies only one institution, Houston Baptist University, that uses both of the referenced terms.  This is a significant departure from the facts of *Florida International*—a case to which Defendant heavily cites—where the court noted that there were a dozen other universities in the state that use both "Florida" and "University," and held that this type of third-party usage weakened FIU's marks.  Moreover, seven of the third-parties' marks followed the template of "Florida _____ University," as did both of the parties' marks.  *Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1247 (11th Cir. 2016).

The Court finds that the UNIVERSITY OF HOUSTON and the UNIVERSITY OF HOUSTON LAW CENTER marks are somewhat strong—particularly in the markets relevant to this litigation—but not overwhelmingly so.  This digit of confusion therefore weighs in favor of finding a likelihood of confusion.

### (2)  The Similarity of the Marks

"The Fifth Circuit uses a 'subjective eyeball test' to determine whether two marks are similar."[53]  In other words, "The similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks."[54]  In making this determination, courts consider "the marks' appearance, sound, and meaning."[55]

The appearance of the UNIVERSITY OF HOUSTON LAW CENTER and HOUSTON COLLEGE OF LAW marks are strikingly similar.  As an initial matter, two of the three words in Defendant's mark appear in UH's mark ("Houston" and "Law"), which is a noteworthy fact in and of itself.[56]  Far more troubling, however, is the way in which Defendant deploys its mark in the marketplace.[57]  Consider Defendant's logo, for example, which is prominently featured in most (if not all) of the promotional material in evidence.  As is true of the UHLC logo,

---

[53] *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 921 (S.D. Tex. 2014) (quoting *Exxon Corp. v. Tex. Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir. 1980)).

[54] *Exxon*, 628 F.2d at 504–05 (citing *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979).

[55] *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998); *see also Blue Bell Creameries, L.P. v. Denali Co., LLC*, 2008 WL 2965655, at *2 (S.D. Tex. July 31, 2008) (citing *Elvis*).

[56] Prepositions are excluded in this word count.

[57] *T-Mobile*, 991 F. Supp. 2d at 921 ("'The use of a mark in advertising[] is highly probative of whether the mark creates a likelihood of confusion in relation to another mark. . . . 'Courts consider marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements.'") (quoting *Elvis*, 141 F.3d at 197).

Defendant's logo uses block letters,[58] emphasizes the word "HOUSTON,"[59] and utilizes a red and white color scheme.[60]   Indeed, these features are ubiquitous throughout Defendant's marketing materials.

Defendant identifies several relatively small differences in the two logos, but none of the distinctions is sufficient to alter the "overall impression" that the logos elicit.  For example, Defendant's logo includes the phrase "EST. 1923" in relatively small font.[61]  Smaller still—and not always present[62]—is the font that states "FORMERLY SOUTH TEXAS COLLEGE OF LAW."[63]  And the generic image of the scales of justice in Defendant's logo does little to dispel confusion between the marks of two law schools,[64] particularly given that the image is displayed in red and white.  Indeed, rare is the case where a defendant has made an *exact* copy of the plaintiff's mark.  As one district court has noted, "the most successful form of copying is to

---

[58] *See Exxon*, 628 F.2d at 505 (noting that marks were similar because each used all block letters).

[59] *See Elvis*, 141 F.3d at 202; *see also* 3 McCarthy on Trademarks and Unfair Competition § 23:44 (noting that it is proper to give greater effect to the dominant feature of a mark in the comparison).

[60] *See Exxon*, 628 F.2d at 505 (noting that marks were similar because each used a red and white color scheme).  Although the parties dispute the shade of red that Defendant has used historically, there is no dispute that Defendant now uses the shade "PMS 200," and that UH uses "PMS 186," which is very similar in color.

[61] *See Elvis*, 141 F.3d at 202 (finding a word presented in relatively small font to be ineffective in dispelling confusion).  Moreover, there is no evidence that potential purchasers sufficiently associate the year 1923 with Defendant to dispel confusion.

[62] (*See e.g.*, Pl. Ex. O (trademark application presenting image of logo that does not show the "formerly known as" language).)

[63] *See Elvis*, 141 F.3d at 202 (finding a word presented in relatively small font to be ineffective in dispelling confusion).

[64] *See Dallas Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc.*, 616 F. Supp. 2d 622, 638 (N.D. Tex. 2009) (existence of stars in defendant's logo was insufficient to offset other similarities)

employ enough points of similarity to confuse the public, with enough points of difference to confuse the courts."[65]

But even if the Court assumed that "prospective purchasers [would] recognize that the two designations are distinct" in their appearance, "confusion may [still] result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users."[66]   And here, the meaning of the parties' marks makes potential purchasers likely to assume such an affiliation between Defendant, on the one hand, and UH and/or UHLC on the other.

The meanings of the marks HOUSTON COLLEGE OF LAW and UNIVERSITY OF HOUSTON LAW CENTER are practically identical, and this alone presents a source of potential confusion.[67]   Compounding this confusion—and making it far more difficult to dispel—are the interrelated meanings of Defendant's mark and UNIVERSITY OF HOUSTON. Universities often serve as umbrella organizations to multiple colleges that are each responsible for educating students within certain academic disciplines.   The University of Houston is no exception.   In addition to housing the Law Center, UH is home to, for example, the University of Houston College of Arts, the University of Houston College of Education, and the University of Houston College of Pharmacy.   "Houston College of Law" fits almost perfectly within this framework, creating a substantial risk that potential purchasers will "think [Defendant's] services

---

[65] *Id*.

[66] *Elvis*, 141 F.3d at 201.

[67] This represents another strong point of distinction from the facts of *Florida International*. There, the court specifically noted that two of the words at issue, "national" and "international," are "near antonym[s]."  *Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 2016 WL 4010164, at *11 (11th Cir. July 26, 2016).  The court placed significant weight on this factor. *See id.* (affirming that it was reasonable for the district court to "attribute[]more weight to the meanings than to the appearance and sound of the marks").

[have] some connection with [UH]."[68]  This is particularly true when the HOUSTON COLLEGE

OF LAW mark is prominently displayed in the red and white colors commonly associated with

UH.

Based on the strong similarities in both appearance and meaning, the Court finds that the

second digit of confusion weighs very heavily in favor of finding a likelihood of confusion.[69]

### (3)  The Similarity of the Products or Services

"The greater the similarity between [the parties'] services, the greater the likelihood of

confusion,"[70] and here, UHLC and Defendant offer practically identical services.[71]  Defendant

attempts to distance itself from the services offered by UH by noting that the University has a

broad array of athletic programs and non-legal educational opportunities while Defendant has

none.  But this distinction is of no moment.  UH alleges trademark infringement based in part on

an affiliation-confusion theory.  In other words, UH is not alleging that consumers will mistake

Defendant *for* the University of Houston, but rather that consumers will mistakenly associate

Defendant *with* the University of Houston (*e.g.*, by assuming that Houston College of Law is one

of the many colleges under UH's umbrella).  The fact that, at a university level, UH participates

---

[68] *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 922 (S.D. Tex. 2014) (internal quotations omitted).  This, too, represents a significant departure from the facts of *Florida International*, which involved marks held by two universities.  Here, the dispute is between a university and a standalone "college," which represents an additional basis for consumer confusion.

[69] UH conducted a consumer confusion survey and, peculiarly, discusses its results in the context of this third digit of confusion.  The court will consider the survey results as evidence of actual confusion, as is consistent with precedent.  *See, e.g.*, *Exxon*, 628 F.2d at 506; *T-Mobile*, 991 F. Supp. 2d at 925; *Dallas Cowboys*, 616 F. Supp. 2d at 641.

[70] *Elvis*, 141 F.3d at 202.

[71] The *Florida Int'l* held similarly despite a substantially weaker set of facts.  *See* 2016 WL 4010164, at *12 (holding that the two institutions offer similar services despite the facts that "almost half of FNU's students were seeking associate's degrees, which FIU does not offer, and another 21% were taking only ESL classes, which FIU generally offers only to prepare students for their full-time enrollment.").

in intercollegiate athletics and offers non-legal educational opportunities does not dispel association-based confusion.  To the contrary, it is perfectly consistent with it.

The Court finds that the third digit of confusion weighs heavily in favor of finding a likelihood of confusion.

### (4)      The Identity of the Retail Outlets and Purchasers

"Differences in the parties' customer bases can lessen the likelihood of confusion."[72] There is no dispute that the parties target the same segments of the market and provide their services in the same geographic area—the campuses are separated by only three miles.[73]  The Court finds that this digit of confusion weighs heavily in favor of finding a likelihood of confusion.

### (5)      The Similarity of the Advertising Media Used

"Courts also consider the similarity between parties' marketing efforts: the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion."[74]  Defendant is forced to concede that it will use channels of advertising similar to those employed by Plaintiffs.[75]  The Court finds that this digit of confusion weighs heavily in favor of finding a likelihood of confusion.

---

[72] *Elvis*, 141 F.3d at 203.

[73] (*See* Opp. 19-20.)

[74] *Quantum*, 83 F. Supp. 2d at 827.

[75] *Id*.  Instead, Defendant argues only that advertising through the same media will, in some instances, actually help students compare and contrast the two schools (*e.g.*, the *U.S. News* rankings).  But this argument would only apply to instances where students see the two marks side-by-side, which would seem to be exceedingly rare.  Indeed, even Defendant's example of the *U.S. News* rankings seems inapplicable—the Law Center is ranked 50th, while Defendant is unranked and referenced on a separate page.  There is no guarantee that the reader will see both marks.  More to the point, although a clever argument, the notion that similar advertising channels cut *against* a finding of confusion is contrary to precedent—Defendant cites none in support of its position.

### (6)   Defendant's Intent

"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion," but "[i]f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion."[76]  "[A] junior user's knowledge or awareness of the senior user's trademark" is insufficient to create an inference of intent.[77] Instead, the proper inquiry "is whether [the junior user] had the intent of deriving benefit from the reputation or goodwill of [the senior user]."[78]  "Direct proof of bad faith is rarely present," so courts must often base their decision on circumstantial evidence.[79]

Defendant contends that the decision to rebrand itself as Houston College of Law was driven by a desire to align its name with its location—Houston—in the minds of consumers.  As evidence, the law school cites to the results of an extensive market survey that it commissioned in 2013 (the "Simpson Report") to explore the market's perception of "the South Texas College of Law name."[80]  In particular, Defendant emphasizes the Simpson Report's finding that many respondents were in favor of a change because the name "South Texas College of Law" can lead people to mistakenly believe that the school is located in the Rio Grande Valley.[81]  When respondents were asked to provide suggestions for a new name, the most frequently mentioned suggestion (32%) was to "include [a] reference to the location in Houston."[82]

---

[76] *Elvis*, 141 F.3d at 203.

[77] *Quantum*, 83 F. Supp. 2d at 828.

[78]  *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir. 1984); *see also Quantum*, 83 F. Supp. 2d at 828 (citing *Sicilia*).

[79] *Quantum*, 83 F. Supp. 2d at 828.

[80] (*See* Def. Ex. JJ ("Simpson Report").)

[81] (*See* Simpson Report at HCL 00000532-33, 548.)

[82] (Simpson Report at HCL 00000496, 550-51.)  The report also noted that, "[f]or respondents who suggested to include reference to the location in Houston, 'Houston College of

UH, on the other hand, contends that the Simpson Report actually cuts against Defendant's position.  While true that some respondents were concerned by the law school's association with the Valley, that concern was far from the most frequently mentioned response in the survey.  Instead, "The most frequently mentioned reason" for changing the law school's name was "that the name South Texas College of Law is often confused with other schools, particularly Texas Southern University."[83]  The Simpson Report further notes that the confusion with Texas Southern "detracts from STCL's prestige and national reputation."[84]  Based on this evidence, UH suggests that Defendant's name change was intended to distance itself from Texas Southern while manufacturing a perceived affiliation with UH—one that would enhance Defendant's prestige rather than detract from it.

To bolster this point, UH presents strong evidence that affiliating with a major university—or generating the mistaken perception of an affiliation—would be beneficial to Defendant.  And again, UH turns to the Simpson Report on which Defendant so heavily relies: "The second most frequently mentioned response in favor of [a] name change [is] if [South Texas] affiliates with a university such as Rice or Texas A&M."[85]  Indeed, Defendant has actually discussed this prospect with several universities throughout the past two decades,[86] and Dean Guter acknowledged at his deposition that "using the University of Houston or Texas

---

Law' (7%) was the top mentioned specific name," along with Houston Law School and Houston School of Law.

[83] (Simpson Report at HCL 00000548; *see also* Simpson Report at HCL 00000447-48, 485, 519, and 546.)

[84] (Simpson Report at HCL 00000519.)

[85] (Simpson Report at HCL 00000548.)

[86] (Pl. Ex. PP ("Guter Dep.") at 135:3-12.)

A&M University or Rice . . . name or affiliating with one of those institutions" could provide benefits such as "broader exposure"[87] and "attracting [more] students."[88]

The benefits of affiliation were thrown into sharp relief for Defendant when the entity formerly known as Texas Wesleyan University Law School leapfrogged South Texas in the *U.S. News* rankings shortly after affiliating with Texas A&M.[89]  In fact, 2016 was the first time in the history of the school that Texas Weslayan had been ranked, and the first time in three years that South Texas had fallen out of the rankings entirely.[90]  Dean Guter testified that he fielded several calls from dissatisfied South Texas board members and alumni following this development.[91] According to UH, it was shortly after this sequence of events—and *three years* after the Simpson Report—that South Texas decided to change its name to Houston College of Law.

If this were the only evidence of intent before the Court, resolution of this issue would be relatively straightforward.  Although it has conceptual merit, UH's theory is rooted in highly circumstantial evidence that would be insufficient to meet the substantial burden imposed at this procedural stage.  But UH presents additional evidence that more directly calls Defendant's intent into question: in connection with the name change, it appears that Defendant adopted a new red and white color scheme that very closely resembles the University of Houston's.

---

[87] (Guter Dep. at 142:4-10.)

[88] (*See* Guter Dep. at 144:6-15; *see also* 143:6-20 ("**Q** And so you will concede if the court reads your deposition or watches your tape that there is benefit for South Texas College of Law or whatever your name becomes or is to affiliate with, for instance, the University of Houston System. True? **A** There could be some benefit. **Q** Yeah. Because the University -- you would agree that the University of Houston that when that -- you hear that name, you were thinking of a certain level of quality, strengths that they have, nationwide recognition, that sort of thing, correct? **A** I think in terms of what -- I do think in terms of what affiliation with any school would bring to us and I assume they think the same thing. I would -- I think that's common sense.")

[89] (*See* Guter Dep. at 279:4-280:10.)

[90] (*See* Guter Dep. at 279:4-280:10.)

[91] (*See* Guter Dep. at 280:11-19.)

Defendant notes that its official school colors are red and gold, and have been since 1973.[92]  The school's use of color in practice, however, tells a different story.  To the extent that Defendant has used red in the past—even its use of red appears somewhat inconsistent throughout the years[93]—the shade has been a dark crimson, and the crimson has typically been accompanied by the color gold in some form or fashion.[94]  Defendant's Houston College of Law logo now consists exclusively of red and white, and its promotional materials similarly feature red and white as the overwhelmingly dominant colors.  According to Defendant, it began employing white (rather than gold) because it provides a better contrast for red lettering.[95]  Regardless, the similarity to UH's color scheme is striking.

Even more troubling is the shade of red that Defendant now employs.  UH has presented numerous images of Defendant's Houston College of Law promotions next to its South Texas College of Law merchandise, and the current shade of red is unmistakably brighter than the classic South Texas crimson.[96]  Instead, it appears more reminiscent of the hue that has long been employed by UH.

At the hearing, Defendant argued that the varied shade of red was the result of using a variety of vendors and inconsistent paper quality.[97]  This argument is not entirely without precedent.  A court in this district recently acknowledged that colors can vary with the material

---

[92] (Hr'g Tr. 105:16-18; Def. Ex. KK at HCL 00000734.)

[93] (*See* Pl. Ex. J.)

[94] (*See, e.g.*, Pl. Ex. CCC; Pl. Ex. K; Pl. Ex. J (showing that the banner on Defendant's website displays a logo of gold lettering on a crimson background from December of 2010 through September of 2015).)

[95] (Hr'g Tr. 105:19-106:24.)

[96] (*See, e.g.* Pl. Ex. CCC; Pl. Ex. R; Pl. Ex. QQ (Summers Dep.) at 58:2-63:12 (representative of Defendant acknowledging that the t-shirts exhibited in Pl. Ex. CCC show different shades of red).)

[97] (Hr'g Tr. 105:19-106:24.)

on which they are printed, but the court's conclusion was expressly based on "credibl[e] testi[mony]" from a witness as well as internal documents corroborating the testimony.  Both are absent here.[98]

Based on the above-referenced evidence, the Court finds that Defendant at least knew of the likelihood that its new mark—particularly dressed in the new red and white color scheme— was likely to cause a mistaken association with UH.  But awareness is not sufficient to establish intent, and, though a close call, the Court cannot find that Defendant acted with the "specific intent" of "deriv[ing] benefit from the reputation or goodwill of plaintiff."[99]  Defendant's rationale for emphasizing "Houston" in its name is entirely plausible, and the Court is wary of relying too heavily on select snapshots of promotions and merchandise produced by various vendors on various types of materials.  The Court therefore finds that this factor does not weigh in favor of either party.[100]

### (7)    The Evidence of Actual Confusion

"Evidence of actual confusion is not necessary to a finding of a likelihood of confusion, but it is nevertheless the best evidence of a likelihood of confusion."[101]  "Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof."[102]

---

[98] *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 910 (S.D. Tex. 2014).

[99] *Quantum*, 83 F. Supp. 2d at 828-829.

[100] *See T-Mobile*, 991 F. Supp. 2d at 921 (absent finding of intent, "this digit of confusion does not weigh in favor of either [party]"); *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 704 (S.D. Tex. 2009) (even if the defendant acted in good faith, "this digit of confusion [is] a non-factor in the likelihood-of-confusion analysis.") (citing *Elvis*, 141 F.3d at 203).

[101] *Elvis*, 141 F.3d at 203 (internal quotes omitted).

[102] *Xtreme Lashes*, 576 F.3d at 229.

In fact, the Fifth Circuit has affirmed a district court's bench-trial finding of actual confusion based on a single known instance.[103]

Although point-of-sale confusion is the "most common and widely recognized type of confusion that creates infringement," it does not "mark the outer boundaries of trademark infringement."[104]  Trademark infringement can also "be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion."[105]  This type of confusion, known as "initial-interest confusion," gives "the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated."[106]

"To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys."[107]  UH relies on both.

### (i)     Consumer Surveys

UH's survey expert, Hal Poret, surveyed two hundred law students using the well-accepted *Eveready* methodology,[108] and found a net confusion rate of 25%.[109]  Defendant takes issue with certain aspects of Mr. Poret's methodology, and instead touts the survey of its own

---

[103] *See Xtreme Lashes*, 576 F.3d at 231 (citing *Louisiana World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)).

[104] 4 McCarthy on Trademarks and Unfair Competition § 23:5 (4th ed.).  Point-of-sale confusion exists when a purchaser is confused as to a product's source at the time he purchases the product.

[105] *Elvis*, 141 F.3d at 204 (internal citations omitted).

[106] *Id.*

[107] *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004).

[108] *See* 6 McCarthy on Trademarks and Unfair Competition § 32:173.50 (4th ed.) ("In cases involving strong marks, the *Eveready* test should be considered the gold standard for fundamental cognitive and marketing reasons."); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:174 (4th ed.) ("An *Ever-Ready* format of survey can easily be combined with additional questions probing whether there is a likelihood of confusion as to sponsorship, affiliation or approval.")

[109] (Pl. Ex. NN (Poret Survey) at 5.)

expert, Gabriel Gelb.  Mr. Gelb found a net confusion rate of only 6%.  Thus, as is so often the case in high-stakes litigation, highly qualified experts have presented dueling reports that reach significantly different results.  The Court must parse the methodology of each to determine which is deserving of greater evidentiary weight.

"In assessing the validity of a survey, courts look to two factors: first, the manner of conducting the survey, including especially the adequacy of the universe; and second, the way in which participants are questioned."[110]   Defendant makes no objection to the universe of respondents in the Poret Survey,[111] but lodges a strong objection to the way in which the survey participants in the "Webpage Test Group" were questioned.  These participants were shown an image that was identical to the Houston College of Law homepage, but with one exception: the image omits two banners that rotate prominently across the webpage ("South Texas College of Law Changes to Houston College of Law" and "Houston College of Law Stands Behind Name Change; Is Prepared to Defend Decision in Court").[112]   Defendant argues Mr. Poret's survey

---

[110] *Scott Fetzer*, 381 F.3d at 487.

[111] Mr. Poret initially surveyed nearly 1,000 other individuals, including college students, parents of college students, and people involved in hiring attorneys.  UH relied on this survey in its initial brief.  In Defendant's opposition briefing, Defendant objected to UH's universe of respondents, arguing that only the confusion of prospective law students is relevant.  Precedent casts doubt on Defendant's objection.  *See New Century Fin., Inc. v. New Century Fin. Corp.*, 2005 WL 2453204, at *7 (S.D. Tex. Oct. 4, 2005) ("evidence of confusion in others permits the inference of confusion in purchasers . . . [though] proof of confusion in consumers is more probative than proof of confusion in others") and *T-Mobile*, 991 F.Supp.2d at 926 ("Aio's suggestion that Dr. Isaacson's survey and the anecdotal evidence from Latin Works should be given no weight as evidence of actual confusion because the respondents were not actual market-place consumers overlooks the case law using surveys and anecdotal evidence for this purpose.").  But the issue is moot either way.  Mr. Poret conducted a supplemental survey of prospective law students, and Defendant seems to have dropped its overinclusion objection as a result.  (*See* Def. Resp. to Pl. Dec. 5-6, Dkt. 57).

[112] (*Compare* Pl. Ex. B at 21-28 *with* Def. Ex. UU at 6.)

should therefore be given no weight because it failed to "test the alleged infringing use as it's actually seen in the real world today."[113]  The Court disagrees.

Defendant's use of the alleged infringing mark "in the real world today" comprises far more than its use of the mark on *one* page of *one* website.  To the contrary, UH has presented evidence that Defendant has already begun aggressively marketing its new name by advertising on large billboards on major Houston highways,[114] sending out mailers to prospective law students and members of the legal community,[115] and selling merchandise bearing its new name and logo.[116]  None of those uses contains the purported disclaimers on which Defendant's argument so heavily relies.  Further, Defendant's argument even overstates the prevalence of the two banners on the Houston College of Law website.  The banners are apparently limited to the website's home page, meaning that anyone who clicks a direct link from Google to the "Admissions" page, for example, would never see them.  And even these two banners are not always displayed on the home page; a third, unrelated banner rotates along with them.[117]

Mr. Gelb's survey fails to take this consideration into account, and the weight of his findings is diminished as a result.  In fact, the only image of the webpage that respondents saw in Mr. Gelb's survey included the prominent "South Texas . . . Changes to Houston College of Law" banner.  His omission of the other two rotating banners is somewhat surprising given his criticism of Mr. Poret's decision to alter the presentation of the same subject matter.[118]

---

[113] (Opp. at 26.)

[114] (*See, e.g.*, Def. Ex. LL at 8 (image of billboard).)

[115] (*See, e.g.*, Pl. Ex. R (containing image of mailer).)

[116] (*See, e.g.*, Pl. Ex. CCC (containing images of Houston College of Law t-shirts).

[117] (*See* Pl. Ex. VV (Gelb Rebuttal) at 13.)

[118] (*See* Def. Ex. UU (Gelb Report) at 10; *see also* Pl. Ex. VV (Poret Rebuttal) (criticizing Gelb for this flaw).)

Moreover, to the extent that the two banners on Defendant's homepage are the only readily available means of dispelling consumers' initial confusion, Defendant's position is all the more troubling.  While those banners are admittedly a prominent feature of the webpage, the *most* prominent feature of its homepage is a series of eight rotating banners that tout Defendant's primary selling points.[119]   In other words, even if a consumer's initial-interest confusion only persists long enough to lead him to the homepage, then Defendant has "br[ought] the patrons in the door.  . . . [T]he confusion has succeeded."[120]   Defendant is able to inform prospective purchasers of its "best value" status, acclaimed advocacy program, and "high bar-passage rate," for example, and is able to do so only because of the brand recognition and goodwill that UH has "expensively and carefully built" over decades.[121]

The Court concludes that, while neither survey is without flaw, Mr. Poret's is substantially stronger.[122]  Further, precedent in this district indicates that Mr. Poret's finding of a 25% net confusion rate among prospective purchasers is significant and provides support for finding that this digit of confusion weighs in UH's favor.[123]

---

[119] (*See* Pl. Ex. B at 32-40.)

[120] *Elvis*, 141 F.3d 188, 204 (5th Cir. 1998); *see also Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), as amended (Oct. 18, 2002) ("Customers believing they are entering the first store rather than the second are still likely to mill around before they leave. The same theory is true for websites. Consumers who are directed to Equitrac's webpage are likely to learn more about Equitrac and its products before beginning a new search for Promatek and Copitrak.")

[121] *See T-Mobile*, 991 F. Supp. 2d at 918.  (*See also* Pl. Ex. B at 21-28 (providing images of each of the eight rotating banners).)

[122] (*See* Def. Ex. UU (Gelb Report) at 10; *see also* Pl. Ex. VV (Poret Rebuttal) (criticizing Gelb for this flaw).)  In addition to the most troubling deficiency discussed above, the Court also notes that Mr. Gelb's findings were based on a survey of only 100 prospective law students (as compared to the 200 surveyed by Mr. Poret).

[123] *See, e.g., T-Mobile*, 991 F. Supp. 2d at 925 (finding 26% confusion significant); *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc.*, 616 F. Supp. 2d 622, 641 (N.D. Tex. 2009) ("These percentages are within the range accepted by courts—generally 15 percent—

### (ii)   Anecdotal Instances of Consumer Confusion

UH has documented numerous instances of actual confusion.  These instances include the following:

1. The United States Postal Service delivered a letter to UH that should have been delivered to Houston College of Law.[124]

2. Someone in the IT department of a law firm mistakenly changed a South Texas College of Law alumnus's profile to indicate that he graduated from UHLC and was on the Houston Law Review, which is the name of UHLC's primary law journal.[125]

3. Defendant sent an email to the members of the Sunbelt Consortium, an organization comprised of seventeen law schools in the region, informing them of the name change and asking that the change be reflected on the organization's website.  The email displayed Defendant's logo (bearing the "formerly South Texas College of Law" language), was sent from an "@stcl" email address, and even included a link to the www.stcl.edu.  Nevertheless, the Sunbelt Consortium thought the email came from UHLC and changed UHLC's name by mistake.[126]

4. The Texas Board of Law Examiners mistakenly sent UHLC an email regarding a student who actually attends Houston College of Law.[127]

5. SMU Law School hosted a workshop and provided a Houston College of Law professor with a seating placard identifying him as a professor at "University of Houston Law Center."[128]

6. A UHLC student mistakenly selected the "Houston College of Law" location rather than the UHLC location when signing up for the Multi-State Professional Responsibility Exam.[129]

---

in assessing likelihood of confusion."); *Tiffany & Broadway, Inc. v. Comm'r of Patents and Trademarks*, 167 F.Supp.2d 949 (S.D.Tex.2001) (finding 15% confusion significant).

If anything, 25% may actually understate the actual confusion rate.  Mr. Poret noted in his report that, "In order to avoid needless debate over whether the answers 'Houston' or 'Houston University' refer to University of Houston, I am only counting as confused those who name 'University of Houston' or 'U of H' in analyzing confusion amongst the prospective law student group."  (Pl. Ex. NN at 4.)

[124] (Mot. at 22 (citing Pl. Ex. GG).)

[125] (Mot. at 22-23 (citing Pl. Ex. HH).)

[126] (Mot. at 21-22 (citing Pl. Ex. FF); Reply at 16, Dkt. 45 (citing Pl. Ex. AAA).)

[127] (*See* Pl. Ex. HHH.)

[128] (*See* Pl. Ex. III.)

[129] (*See* Pl. Ex. MMM.)

7. At the 2016 Graduate and Professional School Fair in Lubbock, Texas, an attendee approached a representative from UH's College of Social Work and mentioned that he had just spoken to a representative from "your law school."  Even after the representative stated that she did not think UHLC was at the event, the attendee reiterated that he had just spoken to them.  In fact, UHLC did not attend the Fair, but Defendant did (and displayed a red and white banner).  UH reasonably assumes that the attendee mistook Houston College of Law as being affiliated with the University of Houston.[130]

8. A prospective law student contacted UHLC's Associate Director of Admissions, Nathan Neely, asking if the Law Center would waive its application fee.  Mr. Neely informed her that UHLC does not have an application fee, but the student reiterated that she was on the Law School Admission Counsel's website and was being charged a $55 application fee.  Mr. Neely asked the prospective student if she intended to contact Houston College of Law or the University of Houston Law Center.  The student stated that she meant to contact Houston College of Law.[131]

Defendant argues that these instances of actual confusion are irrelevant to the extent that they do not involve prospective law students.  But this position is at odds with case law in this district.  While true that "'[t]rademark infringement occurs only when the use . . . is likely to confuse purchasers,'"[132] courts and commentators have also repeatedly recognized that "evidence of confusion in others permits the inference of confusion in purchasers."[133]  In other words, evidence of confusion in non-purchasers is relevant to the extent that it proves actual purchasers would be similarly confused by the junior user's mark.

---

[130] (*See* Pl. Ex. KKK.)

[131] (*See* Pl. Ex. LLL.)

[132] *T-Mobile*, 991 F.Supp.2d at 917 (quoting *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir.1977)).

[133] *See New Century*, 2005 WL 2453204, at *7 ("evidence of confusion in others permits the inference of confusion in purchasers . . . [though] proof of confusion in consumers is more probative than proof of confusion in others"); *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985); *T-Mobile*, 991 F.Supp.2d at 926 ("Aio's suggestion that Dr. Isaacson's survey and the anecdotal evidence from Latin Works should be given no weight as evidence of actual confusion because the respondents were not actual market-place consumers overlooks the case law using surveys and anecdotal evidence for this purpose.").

The first two instances of confusion are deserving of relatively little weight—they involved individuals who are unfamiliar with the legal education industry.[134]  The next four instances are significantly more noteworthy, however, as they evince mistakes made by individuals who are active participants in the field.  Most important, the last two anecdotes are instances of actual confusion by prospective law students, and even suggest that the confusion is not quickly dispelled.  One involved a prospective law student who assumed that Defendant was affiliated with UH even *after* visiting Defendant's booth and speaking with its representative.  Similarly, it seems reasonable to presume that the prospective student in the other anecdote was well into the process of researching law schools—and Defendant in particular—if she was calling about Defendant's $55 application fee.  The fact that confusion could persist at the point of paying to apply for admission is particularly significant in the context of initial-interest confusion.[135]

The Court finds that this digit of confusion weighs heavily in favor of finding a likelihood of confusion.  UH has provided relatively cogent survey evidence as well as strong anecdotal examples of actual confusion.  The quantity of anecdotes is made all the more compelling given the short amount of time since Defendant's name change and the summer lull in the law school application cycle.[136]  This constitutes far more than the "very little proof of

---

[134] *But see* Section III.B.8, *infra*, noting that even prospective law students are unfamiliar with the legal industry at the outset of the research process.

[135] *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998) ("This initial-interest confusion is even more significant because the Defendants' bar sometimes charges a cover charge for entry, which allows the Defendants to benefit from initial-interest confusion before it can be dissipated by entry into the bar.")

[136] *See T-Mobile*, 991 F. Supp. 2d at 923.

actual confusion" that the Fifth Circuit has required to tip this digit of confusion in plaintiffs' favor.[137]

### (8)      Degree of Care Exercised by Potential Purchasers

The eighth digit is the degree of care exercised by purchasers. "Where [services] are relatively inexpensive, a buyer may take less care in selecting [them], thereby increasing the risk of confusion."[138]  But if the items are expensive and the buyers are sophisticated, then confusion is less likely to occur.[139]  Nonetheless, "a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar,"[140] and "even a sophisticated purchaser can be subject to initial interest confusion."[141]

There can be no dispute that the cost of a legal education is tremendous, nor can there be much debate regarding the relative sophistication of prospective law students at the point of sale—but *only* at the point of sale.  Prospective law students are not endowed with an inbuilt knowledge of the legal education industry.  It is only after their interest in legal education is first piqued that they begin the process of *becoming* sophisticated.  In other words, there exists a period of time in every prospective law student's career where, not only is he unsophisticated, he knows practically nothing about the industry and is particularly susceptible to confusion.

---

[137] *Xtreme Lashes*, 576 F.3d at 229 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) and noting that the Fifth Circuit has affirmed a district court's bench-trial finding of actual confusion based on a single known instance of actual confusion).

[138] *Smack Apparel*, 550 F.3d at 483.

[139] *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 798 (N.D. Tex. 2012) (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 174 (5th Cir. 1986).

[140] *Xtreme Lashes*, 576 F.3d at 231 (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 595–96 (5th Cir.1985)).

[141] *John Crane*, 861 F. Supp. 2d at 800 (N.D. Tex. 2012).

The Court finds that this digit of confusion weighs heavily against finding a likelihood of point-of-sale confusion.  At best, however, it weighs only slightly in Defendant's favor as it relates to initial-interest confusion.

### (9)    Weighing the Digits of Confusion

Before weighing the digits of confusion, the Court must calibrate the scale.  In the context of point-of-sale confusion, this inquiry is relatively straightforward: the Court weighs the digits of confusion to determine whether a prospective purchaser will likely be confused as to a product's source at the time he purchases the product.  The concept of initial-interest confusion is more challenging to delineate, and the Court requested supplemental briefing from the parties on this subject.

### (i)    The Initial-Interest Confusion Doctrine

The Fifth Circuit first held that a trademark infringement claim "can be based upon confusion that creates initial consumer interest" in *Elvis Presley Enterprises, Inc. v. Capece*.[142] This holding was particularly noteworthy because, unlike in cases involving point-of-sale confusion, it provided that a claim of infringement can be valid "even though no actual sale is finally completed as a result of the confusion."[143]  Instead, the court expressed concern that "[i]nitial-interest confusion gives the junior user credibility during the early stages of a transaction," which "can possibly bar the senior user from consideration" down the road.[144]

Defendant argues that the Fifth Circuit's holding in *Elvis* was driven by the plaintiff's evidence that consumers were likely to purchase something from the defendant once they entered

---

[142] 141 F.3d 188, 204 (5th Cir. 1998).

[143] *Id*. (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)).

[144] *See id*.

his bar.[145]  But, while this evidence may have been relevant to the court's decision, there is

nothing to suggest that it was a necessary factor—the court mentioned it only in passing,[146] and

did so directly on the heels of holding that no sale need actually occur.  Rather, *Elvis* focused on

the concern that the misappropriated credibility of the senior user would "bring[] patrons in the

door."[147]  "Once in the door, *the confusion has succeeded*."[148]  In other words, *Elvis* suggests that

the initial-interest confusion doctrine is intended to address situations where a junior user trades

on the goodwill of the senior user for its own financial gain.[149]

      This interpretation is supported both by the authority to which *Elvis* cites, as well as by

cases that have cited to it.  *Elvis* cited to the Second Circuit's decision in *Mobil Oil*, for example,

which held that the likelihood of initial interest confusion was based "not in the fact that a third

party would do business with [the junior user], but rather in the likelihood that [the junior user]

---

[145] (Def. Supp. at 5 (citing *Elvis* 141 F.3d at 204).)

[146] *See Elvis,* 141 F.3d at 204 n.7 (referencing (in a footnote) that one witness who was initially confused stayed and bought one beer; noting that initial interest confusion is made "even more significant"—suggesting that other considerations were already significant—because the bar sometimes charges a cover charge).

[147] *Elvis*, 141 F.3d at 204.

[148] *Id.* (emphasis added).

[149] *Elvis*, 141 F.3d at 204.  There appears to be some tension between *Elvis's* recitation of the legal standard and the fact-specific holding of the case.  On the one hand, the Fifth Circuit begins with the proposition that "initial-interest confusion" gives "the junior user credibility during the early stages of a transaction *and* can possibly bar the senior user from consideration by the consumer."  141 F.3d at 204.  This would suggest that the confusion must not only benefit the junior user, but also have some negative effect on the senior user's standing in the marketplace.  On the other hand, the senior user in *Elvis* (the Elvis estate) did not compete in the same market as the junior user (a pub in Houston), so it would have been impossible for the junior user to "bar the senior user from consideration."  Thus, considered in the factual context of the case, *Elvis* suggests that a plaintiff need only show that the junior user achieved some financial benefit as a result of the confusion, regardless of any potential pecuniary effects on the senior user.  The distinction here is irrelevant, however, as either interpretation of *Elvis* would lead to finding a likelihood of initial-interest confusion on the facts of the case at bar.

would gain crucial credibility during the initial phases of a deal."[150]  "[A]n oil trader might listen to a cold phone call from [the junior user] . . . when otherwise he might not, because of the possibility that [the junior user] is related to [the senior user]."[151]  Courts in several other circuits have held similarly.[152]

More recently, a court in this district granted a preliminary injunction based, at least in part, on the potential for initial-interest confusion.  Again, the court's focus was on the fact that the junior user would "benefit from the consumer's belief that [the junior user] is affiliated with the [senior user]," and that the consumer "will impute . . . the goodwill that [the senior user] has expensively and carefully built since 2002."[153]

### (ii)    Weighing the Digits of Confusion

The first factor favors finding a likelihood of confusion, and the second, third, fourth, fifth, and seventh digits of confusion weigh heavily in favor of such a finding.  Only the seventh factor cuts against UH's case, and the sixth factor weighs in no one's favor at all.  This strongly suggests that prospective law students are likely to assume that Houston College of Law is affiliated with the University of Houston.[154]  Although this confusion will likely dissipate by the

---

[150] *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987); *Elvis*, 141 F.3d at 204 (citing *Mobil Oil*).

[151] *Mobil*, 818 F.2d at 259.

[152] *See, e.g.*, *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294–95 (3d Cir. 2001) ("Without initial interest protection, an infringer could use an established mark to create confusion as to a product's source thereby receiving a 'free ride on the goodwill' of the established mark.") (quoting *Mobil*, 818 F.2d at 259); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812–13 (7th Cir. 2002), as amended (Oct. 18, 2002) ("What is important is not the duration of the confusion, it is the misappropriation of  Promatek's goodwill."); *Lamparello v. Falwell*, 420 F.3d 309, 317 (4th Cir. 2005) (noting in dicta that profiting financially is a key element to cases finding initial-interest confusion, and indicating that such financial profit occurs when a junior user free rides on the goodwill of a senior user who operates in the same market).

[153] *T-Mobile*, 991 F. Supp. 2d at 918.

[154] Indeed, UH's consumer survey and anecdotal evidence means that the Court need not resort to mere speculation as to whether the marks' strong similarities result in actual confusion

point of sale, this type of confusion implicates the very concerns that the initial-interest confusion doctrine is intended to address.

Defendant cautions against reading this doctrine too broadly, and their admonition is well taken. As the 6th Circuit noted in *Groeneveld*, "[W]hat appears to concern Groeneveld is not so much initial-interest confusion, but initial interest, period."[155] "Simply invoking the term 'initial-interest confusion' does not state a viable claim."[156] This Court agrees; more is required.

But Defendant fails to acknowledge that, here, more is provided. Prospective students are likely to further investigate Houston College of Law not necessarily because of their initial interest in the law school, as Defendant suggests, but rather because the mark seemingly bears the imprimatur of UH's well-known brand—in other words, because of initial-interest *confusion*.[157] And not only is Defendant benefitting from the goodwill of a stronger brand,[158] the stronger brand is that of a direct competitor.[159] UH and Defendant offer the *same* set of services

---

among consumers. A prospective student who was on the verge of applying for admission mistakenly called UHLC rather than Defendant, and another was still confused about the two schools even after speaking to Defendant's representative at a graduate school fair.

[155] *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 518 (6th Cir. 2013).

[156] *Id.* at 518-19.

[157] In *Groeneveld*, the plaintiff had "presented no proof as to how, in view of the two pumps' starkly different labels and logos, there would be any initial-interest confusion at all." *Id.* at 518-19. Here, the marks indicate an affiliation both due to their similar appearances and interrelated meanings.

[158] *See* Guter Dep. at 142:4-10 (admitting that affiliating with UH could result in some benefit through broader exposure).

[159] Courts have repeatedly found direct competition between the parties to be particularly relevant to claims of initial-interest confusion. *See, e.g.*, *Checkpoint*, 269 F.3d at 296-97 (when an alleged infringer does not compete with the markholder for sales, "some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement. Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis."); *Lamparello v. Falwell*, 420 F.3d 309, 317 (4th Cir. 2005) (holding that the "critical element" is "use of another firm's mark to capture the markholder's customers and profits" and quoting *Checkpoint* with approval); *Elvis*, 141 F.3d at

through the *same* media to the *same* potential purchasers in practically the *same* location.   In other words, not only does the confusion afford Defendant credibility during the early stages of a transaction, it does so at the direct expense of the University of Houston.   Indeed, while Defendant notes that consumers' confusion will dissipate as soon as they visit Defendant's homepage, the most prominent portion of the webpage is essentially a list of the best reasons to choose Defendant's law school over UH's.[160]

Notwithstanding the opposing digits of confusion, Defendant contends prospective law students exercise such a high degree of care that they are highly unlikely to choose a law school while still confused as to the school's identity.   That may be true[161]—purchasing a legal education typically (and hopefully) involves months of thorough research—but this fact alone does not preclude finding a likelihood of confusion prior to the purchase (*i.e.*, initial-interest

---

204 ("Initial-interest confusion gives the junior user credibility during the early stages of a transaction and can possibly bar the senior user from consideration by the consumer once the confusion is dissipated."); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway and Sons*, 365 F.Supp. 707, 717 (S.D.N.Y.1973) ("Misled into an initial interest, a potential Steinway buyer may satisfy himself that the less expensive Grotrian Steinweg is at least as good, if not better, than a Steinway. Deception and confusion thus work to appropriate [Steinway's] good will."), *aff'd*, 523 F.2d 1331 (2d Cir.1975); *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 918 (S.D. Tex. 2014) (granting a preliminary injunction based, at least in part, on similar reasoning).

[160] *Cf. Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), as amended (Oct. 18, 2002) ("Customers believing they are entering the first store rather than the second are still likely to mill around before they leave. The same theory is true for websites. Consumers who are directed to Equitrac's webpage are likely to learn more about Equitrac and its products before beginning a new search for Promatek and Copitrak. Therefore, given the likelihood of initial consumer confusion, the district court was correct in finding Promatek could succeed on the merits."); *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir.2002) (no initial-interest confusion where the junior user "could not financially capitalize" on a consumer who was misdirected to its website because, for example, "the website contained no contact information . . . , it was otherwise unable to interface with users . . . [and there was] no evidence that [the junior user] ever sold any product or service through its website."); *Lamparello*, 420 F.3d at 317 (citing *Interstellar* with approval).

[161] *See Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242 (11th Cir. 2016).

confusion).[162]   If it did, sellers of goods or services that involve extended purchasing processes would be effectively outside the ambit of the Lanham Act's protection, leaving competitors free to appropriate the senior user's goodwill with impunity, and allowing them to gain "credibility during the early stages of a transaction."[163]   And it is in the early stages of the transaction when

[162] *See e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 256 (2d Cir. 1987) (finding a likelihood of initial-interest confusion among highly-sophisticated oil traders); *John Crane*, 861 F. Supp. 2d at 800 ("even a sophisticated purchaser can be subject to initial interest confusion"); *Stilson & Associates, Inc. v. Stilson Consulting Grp., LLC*, 129 F. App'x 993, 998 (6th Cir. 2005) (finding no clear error with the district court's finding that the "consumer sophistication factor . . . could not negate the likelihood of confusion created by the similarity of the marks and the direct nature of the competition between the parties).  *See also T-Mobile*, 991 F. Supp. 2d at 918 (even assuming *ad arguendo* that the purchasers were sophisticated, it does not necessarily rebut plaintiff's "point about the importance of initial brand identification and resulting consumer interest").

Defendant cites four cases for the proposition that the sophistication of purchasers rebuts initial-interest confusion, but the authority is unpersuasive.  As an initial matter, three of the four cases involved commercial purchasers, who are far more likely to be familiar with the relevant market at the outset of their purchasing process, and therefore less susceptible to confusion throughout it.  *See, e.g.*, *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 801 (N.D. Tex. 2012) ("This is especially the case because the sophisticated purchasers [at issue here] must have a close working relationship with the seller so that the fiberglass sucker rod can be specifically tailored to the specifications of the purchaser's well."); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 276 (3d Cir. 2001) ("devices . . . are sold to retailers to prevent merchandise theft"); *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1212 (7th Cir. 1997) ("Rust is an environmental and engineering consulting firm providing services to private companies and governmental entities throughout the country.").

Moreover, although each of the cited cases rejected initial-interest confusion arguments, it was always on the strength of consumers' sophistication *and* several additional digits of confusion, none of which weighs in Defendant's favor here.  It was common for either the marks to be dissimilar or for the parties to operate in different markets.  For example, in *John Crane*, the court held that the "parties' logos [bear] little resemblance," that the trademark names were not similar in meaning, and that these facts would enable sophisticated purchasers to avoid confusion.  *See John Crane*, 861 F. Supp. 2d at 796, 801 (also noting that plaintiff had presented no evidence of actual confusion).  *See also Checkpoint*, 269 F.3d at 298 ("Checkpoint Systems's and Check Point Software's products are unrelated and are sold in different markets to consumers who exercise a heightened degree of care in making purchasing decisions."); *T-Mobile*, 991 F.Supp.2d at 919 (finding a likelihood of confusion and noting that "the degree of customer care in choosing a produdct such as a cell phone or a service plan does not negate the fact that T–Mobile and Aio's consumer bases are so similar.").

[163] *See Elvis*, 141 F.3d at 204.  In fact, it appears that the Fifth Circuit pulled this language from the paragraph of McCarthy on Trademarks and Unfair Competition explaining that "initial

35

prospective law students are the least sophisticated and most susceptible to confusion, especially when such similar marks are involved.

Defendant additionally attempts to counterbalance the opposing digits of confusion by noting that it did not act with intent.  According to Defendant, cases finding a likelihood of initial interest confusion commonly involve instances where the junior user intentionally adopted its mark to capitalize on the confusion.[164]  But, while intent may be a common thread among the cases to which Defendant cites, nothing in those cases indicates that intent is a *necessary* showing in the context of initial-interest confusion cases—especially where, as here, the other digits of confusion are so overwhelmingly one-sided.  If anything, Defendant's Fifth Circuit precedent speaks directly to the contrary: the *Elvis* court expressly held that "[p]roof of an intent to confuse the public is *not* necessary to a finding of a likelihood of confusion."[165]  Moreover, intent is a notoriously challenging element to prove under even the best of circumstances.[166]  The Court would be reluctant to place undue weight on the "intent" digit of confusion, particularly in the context of a preliminary injunction proceeding where, as here, the plaintiff is handcuffed by an expedited timeline and limited discovery.

---

interest confusion analysis may be applied to a purchasing process that is drawn out over a period of time." *Compare Elvis*, 141 F.3d at 204 (citing McCarthy § 23:6) ("Initial-interest confusion gives the junior user credibility during the early stages of a transaction and *can possibly bar the senior user from consideration by the consumer* once the confusion is dissipated.") (emphasis added) *with* McCarthy § 23:6 ("Such a senior user who is the opposer may suffer injury if a potential purchaser is initially confused between the parties' respective marks in that *opposer may be precluded from further consideration by the potential purchaser* in reaching his or her buying decision.") (emphasis added).)

[164] (Def. Supp. at 9 (citing *Elvis*, 141 F.3d at 203; *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987); and *Promatek Indust. Ltd v. Equitrac Corp.*, 300 F.3d 808 (7th Cir. 2002).)

[165] *Elvis*, 141 F.3d at 203 (emphasis added).  *See also T-Mobile*, 991 F. Supp. 2d at 921 (finding initial interest confusion despite the fact that the plaintiff failed to establish intent).

[166] *See Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 828 (S.D. Tex. 1999) ("Direct proof of bad faith is rarely present.")

It also bears repeating that UH's inability to conclusively prevail on this digit of confusion does not mean that it weighs in Defendant's favor. As the Fifth Circuit noted in *Xtreme Lashes*, even "with no evidence of [defendant's] intent, this factor is neutral."[167] And here, UH has presented considerable evidence that Defendant intended to derive a benefit from UH's goodwill.[168] Although the evidence was insufficient for the Court to find intent as a matter of fact, the Court reached this finding by a very narrow margin. In sum, Defendant attempts to counterbalance the six digits of confusion that weigh heavily against them with a digit of confusion that, at best, weighs in no one's favor at all.

The Court finds that the digits of confusion weigh heavily in favor of finding a likelihood of confusion, and that UH has therefore clearly carried its burden of establishing a substantial likelihood of success that it will prevail on the merits of its trademark infringement claim.

## IV.   <u>IRREPARABLE HARM</u>

UH argues that, in the Fifth Circuit, showing a likelihood of confusion presumptively shows a substantial threat of irreparable harm. Defendant disagrees, and, as it has done throughout this litigation, provides several cogent and well-researched arguments to the contrary. But the disagreement need not be addressed here. Irrespective of the presumption, the Court concludes that monetary damages will not adequately compensate UH, and that UH will be irreparably harmed by Defendant's continued use of the "Houston College of Law" mark to identify and market its brand.

---

[167] *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009).

[168] See Section III.B.6, *supra* (discussing intent); *see also Checkpoint, Inc.*, 269 F.3d 270, 298 (3d Cir. 2001) (evidence of temporary initial interest confusion is stronger "where there is *evidence* or *even an inference* that defendant was trying to trade on plaintiff's goodwill") (emphasis added).

A court in this district recently held that a likelihood of initial-interest confusion would cause irreparable injury to the senior user in two ways, both of which apply here.[169]  First, UH's lack of control over the quality of Defendant's conduct—conduct that prospective law students will likely attribute to UH by mistake—constitutes an irreparable injury.[170]   In fact, UH's evidence of actual confusion exemplifies this consideration.  For example, Defendant's law professors may speak to audiences that include prospective law students, and Defendant's recruiting department has in fact attended school fairs at which its representatives directly interacted with prospective law students.   Second, UH's "time, effort, and expense exerted to create and define its brand has been unfairly exploited," which monetary damages cannot compensate.[171]

Finally, the Court cannot help but note the peculiar context of Defendant's contention that no irreparable harm will occur from their infringement.  Defendant insists that the findings of the Simpson Report were the impetus for its recent name change.  The Report found that "the most frequently mentioned reason" that respondents were in favor of a name change was that "'South Texas College of Law' is often **confused with other schools**, particularly Texas Southern University."[172]   It must be with a great sense of irony that Defendant now attempts to

---

[169] *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 927 (S.D. Tex. 2014) ("The record is clear that Aio wanted to capture T–Mobile customers. . . . T–Mobile has presented credible evidence demonstrating . . . initial-interest confusion. The continued use of large blocks of plum is likely to cause irreparable harm to the good will and brand identity that T–Mobile has spent billions of dollars creating since it arrived in the United States.")

[170] *Choice Hotels Int'l, Inc. v. Frontier Hotels, Inc.*, 2016 WL 4367993, at *4 (S.D. Tex. Aug. 15, 2016) (quoting *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999); *see also T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 928 (S.D. Tex. 2014) (citing *Quantum* in the context of facts similar to those at issue here).

[171] *T-Mobile*, 991 F. Supp. 2d at 929.

[172] (Pl. Ex. JJ at HCL 00000485 (emphasis in original), 546, 548.)

downplay the effects of the *same type* of affiliation confusion that prompted Defendant to spend hundreds of thousands of dollars to rebrand itself.

## V.    <u>BALANCE OF HARDSHIPS</u>

The third requirement for obtaining a preliminary injunction requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant.[173]  Defendant argues that it incurred substantial costs in conjunction with its name change, and that it would similarly incur substantial costs if compelled to revert to South Texas College of Law.  Dean Guter was quoted on June 23, 2016, as stating, "I feel safe in saying we haven't spent $35,000 to $40,000 extra over anything we would have spent anyway. And so the biggest cost that we see going forward is changing the external signage."[174]  Those subsequent changes proved costly.  Diane Summers, Defendant's Director of Marketing and Communications, submitted a sworn declaration indicating that UH incurred approximately $458,000 in additional costs to publicize the name change.[175]  Ms. Summers also notes that her staff had spent considerable time preparing for the name change in the months leading up to the rebranding.

But Defendant's costs, while substantial, engender little sympathy when viewed in the broader context of Defendant's conduct.  A party's claim of hardship is given less weight if he chooses "to incur costs in the face of a possible infringement claim,"[176] and here, a law suit was practically inevitable.  Dean Guter essentially admitted that Defendant changed its name

---

[173] *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

[174] (Pl. Ex. KK at 2.  *See also* Pl. Ex. PP (Guter Dep. 8-18-16) at 99:3-5 ("It was about 40K . . . . That's what we had spent up to that point.  And it was an estimate.").)

[175] (*See* Def. Ex. LL at 2-3 (itemized costs incurred as of 8-19-16 equaled $498,000).)

[176] *Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999); *see also ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 700 (N.D. Tex. 2015) (holding that defendant's reputational damage was of its own doing and therefore entitled to less weight).

knowing that UH would sue to stop it.[177]  Indeed, as the Court has already found, Defendant was at least aware that its new mark would likely cause prospective purchasers to mistakenly associate Defendant with UH.  It consequently must have come as no surprise when UH promptly released a statement on June 23rd—one day after Defendant's announcement—expressing its concern about the "significant confusion" between UHLC and Defendant's newly-branded law school.[178]  Defendant soon boldly proclaimed that it "Stands Behind its Name Change" and "Is Prepared to Defend Decision in Court" on the homepage of its website.  Yet it was only *after* news of UH's objection that Defendant evidently incurred the overwhelming majority of these costs, and destroyed "[m]uch of the older stationary and signage bearing the name 'South Texas College of Law.'"[179]  In other words, Defendant opted to double down, yet cites to the high stakes of the game as a reason to call off the bet.

As explained above, UH has much to lose if the injunction is not granted.  Defendant has spent hundreds of thousands of dollars marketing its new name, and its market presence has been (and will continue to be) enhanced on the strength of UH's well-recognized brand.  If an injunction does not issue, this harm will go unaddressed until a trial on the merits, which is unlikely to take place prior to the close of this application cycle.  Moreover, as *T-Mobile* held on a similar set of facts, "The harm to [UH's] brand, which it has spent [millions] of dollars and [many decades] creating, substantially outweighs the . . . harms that [Defendant] will suffer in stopping the use" of the HOUSTON COLLEGE OF LAW mark.[180]  And whatever the harm,

---

[177] (Pl. Ex. PP 56:24-25.)

[178] (Pl. Ex. KK at 2.)

[179] (*See* Def. Ex. LL at 4.)  Although the value of the destroyed stationary and signage is unknown, the new letterhead and signage evidently cost a total of $170,000.   The decision to dump such costly merchandise when it could soon be needed again defies logic.

[180] *T-Mobile*, 991 F. Supp. 2d at 929.

Defendant's own actions suggest that the harm caused by affiliation-confusion is significant enough to scrap a 93-year-old brand to avoid it.

The Court finds that UH's irreparable harm is greater than the hardship that the preliminary injunction would cause Defendant.

## VI.    THE PUBLIC INTEREST

"The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."[181]   The Court finds that protecting UH in this case from an infringing junior competitor does not disserve the public's interest.

## VII.    CONCLUSION

The Court set out its conclusions of law throughout its above discussion of the case, but it repeats them here for the sake of clarity:

- There is a substantial likelihood of success on the merits of UH's trademark infringement claim under the Lanham Act: at least two of UH's marks, "UNIVERSITY OF HOUSTON" and "UNIVERSITY OF HOUSTON LAW CENTER," are eligible for protection; UH is the senior user of these marks; and there is a likelihood of confusion between UH's marks (both individually and collectively) and Defendant's use of "HOUSTON COLLEGE OF LAW."

- There is a substantial threat of irreparable injury to UH without adequate legal remedy if the injunction does not issue.

- UH's threatened injury if the court were to deny the injunction outweighs the harm to Defendant should the injunction issue.

- The injunction will not disserve the public interest.

The Court therefore **GRANTS** UH's Motion for Preliminary Injunction.   A   hearing   is set for Wednesday, October 19, 2016 at which time the parties may present argument as to: (A) a

---

[181] *Quantum Fitness Corp.*, 83 F.Supp.2d at 832 (citing cases); *see also American Rice*, 532 F.Supp. at 1389–90.

feasible timeline for Defendant to comply with the injunction and (B) whether a bond is necessary and, if so, the proper amount.  The injunction will issue under separate order consistent with this opinion following the hearing.

Signed this 14th day of October 2016.

_____
Hon. Keith P. Ellison
United States District Judge